ACCEPTED
03-14-00774-CV
6707027
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/28/2015 3:45:25 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00774-CV

IN THE COURT OF APPEALS FOR THE THIRD DISTRICT
OF TEXAS AT AUSTIN

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/28/2015 3:45:25 PM
JEFFREY D. KYLE
Clerk

ELLEN JEFFERSON, D.V.M.
Appellant,

vs.

TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS
AND NICOLE ORIA, IN HER OFFICIAL CAPACITY AS EXECUTIVE
DIRECTOR,
Appellees.

On Appeal from the 250 Judicial District Court
Of Travis County, Texas

## AMICUS CURIAE BRIEF ON BEHALF OF
## BEST FRIENDS ANIMAL SOCIETY

MARTHA DICKIE
State Bar No. 00000081
mdickie@abdlawfirm.com
JACOB SCHEICK
State Bar No. 24060563
jscheick@abdlawfirm.com
Almanza, Blackburn & Dickie, LLP
2301 S. Capital of Texas Hwy., Bldg. H
Austin, Texas 78746
(512) 474-9486
(512) 478-7151 – Fax

**COUNSEL FOR AMICUS CURIAE
BEST FRIENDS ANIMAL SOCIETY**

# TABLE OF CONTENTS

Page

INDEX OF AUTHORITIES ............................................................................... iii

INTEREST OF AMICUS CURAIE

    A. Amicus Curiae Interest ....................................................................... 1

    B. Statement of Funding of Brief ............................................................ 1

STATEMENT OF THE CASE ............................................................................ 3

STATEMENT OF ISSUES ................................................................................. 3

STATEMENT OF FACTS ................................................................................... 3

SUMMARY OF THE ARGUMENT .................................................................... 4

ARGUMENT ...................................................................................................... 5

I.     Veterinary Licensing Act Does Not Govern Owners ................................. 5

    A.  The Veterinary Licensing Act Intent to Safeguard Property Right ......... 5

    B.  The Board's Rules Do Not Permit Regulation of Owners- Even
        Veterinarian Owners ...................................................................... 8

    C.  Protection of Animals Themselves is Vested in the Texas Board of
        Health .......................................................................................... 11

II.    If unchecked, the Board's Actions Will Result in More Euthanized
       Animals ....................................................................................... 13

CONCLUSION AND PRAYER .......................................................................... 14

CERTIFICATE OF SERVICE ............................................................................ 16

CERTIFICATE OF COMPLIANCE ................................................................... 17

APPENDIX ........................................................................................................ 18

# INDEX OF AUTHORITIES

## Cases

*Hoog v. State*, 87 S.W.3d 740, 744 (Tex. App.—San Antonio 2002, pet. denied) 12

*Pistole v. State*, 68 Tex. Crim. 127, 130, 150 S.W. 618, 620 ................................... 6

*Strickland v. Medlen*, 397 S.W.3d 184, 192 (Tex. 2013) ..................................... 6,11

*Texas Bd. of Chiropractic Examiners v. Texas Med. Ass'n*, 375 S.W.3d 464, 474

(Tex. App.—Austin 2012, pet. filed) ................................................................. 8,10

*Texas Board of Veterinary Medical Examiners, Petitioner v. Melanie Mercer,*

*D.V.M.* 2013 WL 1785492 ............................................................................... 10

## Statutes

2013 WL 1785492 .......................................................................................... 10

22 Tex. Admin. Code § 571.61 ....................................................................... 11

22 Tex. Admin. Code § 573.6 ........................................................................... 9

22 Tex. Admin. Code § 573.7 ........................................................................... 9

Tex. Health & Safety Code Ann. § 826.016 (Vernon) ..................................... 12

Tex. Occ. Code Ann. § 801.001 (Vernon) ...................................................... 6,7

**Rules**

Texas Rule of Appellate Procedure 11(c) ................................................................. 1

Veterinary Board Rule 571.61 ........................................................................ 10, 11

Veterinary Board Rule 573.72 ......................................................................... 9, 10

# INTEREST OF *AMICUS CURIAE*

### A.    Amicus Curiae Interest

Pursuant to Texas Rule of Appellate Procedure 11(b), this is an Amicus Curiae Brief on behalf of Best Friends Animal Society ("Best Friends"), a national nonprofit animal welfare organization and leader in the no-kill movement whose focus is ending the killing of dogs and cats in America's shelters.

Best Friends offers this brief in opposition to the Texas Board of Veterinary Medical Examiners' (the "Board") illegal *ultra vires* enforcement actions against Ellen Jefferson, D.V.M., as an employee/volunteer of San Antonio Pets Alive!, a non-profit corporation ("SAPA!"), that threatens to upset the regulatory structure established by the Texas Legislature. Though the Board is attempting to expand its authority to governing animal welfare, the Board's actions will have the real world consequences of debilitating no-kill shelters, resulting in an exponential increase in the euthanasia of dogs and cats in Texas. Best Friends has an interest in ensuring Texas no-kill shelters continue and in preserving the welfare of animals who would be unnecessarily killed as a result of the Board's actions.

### B.    Statement of Funding of Brief

Pursuant to Texas Rule of Appellate Procedure 11(c), the undersigned counsel hereby represent the following:

1

(1)   None of the counsel for the parties in this case authored this brief in whole or in part;

(2)   Neither any party nor any party's counsel contributed money to fund the preparation or submittal of this brief; and

(3)   No other person contributed money that was intended to fund the preparation or submittal of this brief.

## STATEMENT OF THE CASE

Best Friends adopts the Statement of the Case as set forth by Ellen Jefferson, D.V.M., in her Brief of Appellant and incorporates it by reference as if set forth fully herein.

## ISSUES PRESENTED

I.     The Board seeks to extend its jurisdiction beyond the statutory confines created by the Texas Legislature and seeks to usurp the animal welfare responsibilities that the Legislature delegated to the Texas Board of Health and that, in turn, were ceded to elected officials in Texas cities.

II.     Shelters across Texas, including no-kill shelters, have relied upon and evolved under the regulatory scheme created by the Texas Legislature. The Board's *ultra vires* action has the real world consequences of debilitating no-kill shelters, resulting in an exponential increase in the euthanasia of dogs and cats in Texas.

## STATEMENT OF FACTS

Best Friends adopts the Statement of Facts as set forth by Ellen Jefferson, D.V.M., in her Brief of Appellant and incorporates it by reference as if set forth fully herein.

## SUMMARY OF THE ARGUMENT

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

This is an Amicus Curiae Brief on behalf of Best Friends Animal Society ("Best Friends"), a national nonprofit animal welfare organization and leader in the no-kill movement whose focus is ending the killing of dogs and cats in America's shelters.

Best Friends offers this brief in opposition to the Texas Board of Veterinary Medical Examiners' (the "Board") illegal *ultra vires* enforcement actions against Ellen Jefferson, D.V.M., as an employee/volunteer of San Antonio Pets Alive!, a non-profit corporation ("SAPA!"), that threatens to upset the regulatory structure established by the Texas Legislature. Shelters across Texas, including no-kill shelters, have relied upon and evolved under the regulatory scheme created by the Texas Legislature. The Board seeks to extend its jurisdiction beyond the statutory confines created by the Texas Legislature and seeks to usurp the animal welfare responsibilities that the Legislature delegated to the Texas Board of Health and that, in turn, were ceded to elected officials in Texas cities. Moreover, the Board's actions not only violate the unambiguous statutory language, but also the rules promulgated by the Board itself. The Board's overreach unlawfully attempts to expand its express purpose to license veterinarians to the regulation of animal

welfare, which duty the Legislature specifically reserved first to the discretion of animal owners and second to the Texas Board of Health and municipalities.

Ironically, though the Board is attempting to expand its authority to governing animal welfare, the Board's actions will have the real world consequences of debilitating no-kill shelters, resulting in an exponential increase in the euthanasia of dogs and cats in Texas.

## ARGUMENT

### I. Veterinary Licensing Act Does Not Govern Owners

Through its unfettered prosecution of Dr. Jefferson, the Board extends its authority well beyond governing veterinarians to intruding on how an owner may choose to care for its property. Not only do these actions run against the express legislative purpose of the Veterinary Licensing Act that created the Board, the Board's actions run against the very intent of the rules promulgated by the Board itself.

### A. The Veterinary Licensing Act Intent to Safeguard Property Rights

The Veterinary Licensing Act:

"was enacted by the Thirty–Second Legislature in 1911, and approved on March 16, 1911 (pages 132 to 136). The object and purpose of the act is clearly manifest on its face, wherein in section 17 it is said: "The fact that there is no law governing veterinaries within this state, and unskilled persons are engaged in that business to the injury and detriment of the interests and material welfare of the people, create an emergency and an imperative public necessity requiring that the

5

constitutional rule requiring bills to be read on three several days be suspended, and the same is hereby suspended, and this act shall take effect and be in force from and after its passage; be it so enacted."

*Pistole v. State*, 68 Tex. Crim. 127, 130, 150 S.W. 618, 620 (Tex. Crim. App. 1912). The purpose of the Veterinary Licensing Act was to regulate "veterinaries within this state, and unskilled persons . . . engaged in that business to the injury and detriment of the interests and material welfare of the people . . . ." In this context, "the interests and *material* welfare of the people" is the people's material property, their animals. The concept of dogs as property is well settled in Texas. Indeed, the Texas Supreme Court recently re-emphasized this point of law, while acknowledging the uniqueness of this personal property:

> We do not dispute that dogs are a special form of personal property. That is precisely why Texas law forbids animal cruelty generally (both civilly and criminally), and bans dog fighting and unlawful restraints of dogs specifically—because animals, though property, are unique.

*Strickland v. Medlen*, 397 S.W.3d 184, 192 (Tex. 2013).

In light of the express purpose of the Veterinary Licensing Act to protect the property—"the material interests"—of the people, the Board's attempt to side step the Veterinary Licensing Act's expressly limited authority over owner's rights to their property is particularly egregious. Section 801.001 of the Texas Occupation Code indicates that "This chapter may be cited as the Veterinary Licensing Act."

Tex. Occ. Code Ann. § 801.001 (Vernon). Section 801.004(1) of the Veterinary Licensing Act, entitled "Application of Chapter," provides:

This chapter does not apply to:

> (1) the treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal, unless the ownership, employment, or designation is established with the intent to violate this chapter . . . .

*Id.* In the context of this legislative intent to protect the people's property interests, the purpose and reasoning behind Section 801.004(1) becomes absolutely evident. Since the purpose of the Veterinary Licensing Act is to protect people's property interests, the Veterinary Licensing Act reserves to the people, not the Board, the right to choose the *manner* that the *owner* desires to *treat or care* for its animal property. Contrary to the legislative intent to protect property interests, the Board's persecution attempts to divest SAPA! and other animal owners across Texas of their right to treat or care for their animal property in the way they see fit. The Board's actions seek to prohibit owners like SAPA! from choosing progressive lifesaving options for the animals they own and from choosing cost-effective ways to care for large populations of shelter and foster animals *that SAPA! owns*. Despite the express limitations in the Section 801.004(1) of the Veterinary Licensing Act, the Board is trying to commandeer owners' rights in their property.

## B. The Board's Rules Do Not Permit Regulation of Owners— Even Veterinarian Owners

An administrative body can only promulgate rules within the limits of the powers expressly granted to it by the Legislature. *See Texas Bd. of Chiropractic Examiners v. Texas Med. Ass'n*, 375 S.W.3d 464, 474 (Tex. App.—Austin 2012, pet. filed) (providing rubric for examining whether administrative rules are within statutory authority). Importantly, no deference is given to an agency's interpretation of its own statutory authority when the statute in question is unambiguous. *Texas Bd. of Chiropractic Examiners*, 375 S.W.3d at 475. Accordingly, the Board has clearly overstepped its statutory authority in its attempt to regulate Dr. Jefferson in her capacity as an employee/volunteer of an owner, SAPA!, despite the statutory restrictions enacted by the Legislature in Section 801.004(1) of the Veterinary Licensing Act. Nevertheless, *assuming arguendo* that the Board had authority to regulate SAPA!, the Veterinary Board's own rules do not permit regulation of Dr. Jefferson as an employee /volunteer of SAPA! because (i) the express intent of the Board's rules and (ii) the legal construction of the Board's rules as a whole undeniably indicate that a veterinarian-owner and/or a veterinarian employee/volunteer of an owner treating the owner's property is outside the jurisdiction of the Board.

Contrary to Section 801.004(1) of the Veterinary Licensing Act, the Board contends that pursuant to a rule it promulgated that it can prosecute Dr. Jefferson

8

no matter if she is an employee of the animal's owner. Rule 573.72 of the Veterinary Board, entitled "Employment by Nonprofit or Municipal Corporations" provides:

> (a) A nonprofit or municipal corporation may employ or contract with a veterinarian to provide veterinary services in connection with sheltering, sterilization, vaccination, or other medical care and treatment of animals.

> (b) Employment by or contractual service to a nonprofit or municipal corporation does not exempt the veterinarian from any of the provisions of the Veterinary Licensing Act or the Board's rules.

> (c) Veterinarians employed by, or contracted to, nonprofit or municipal corporations shall be liable for any violations of the Act or rules occurring as a result of the practice of veterinary medicine or any veterinary services provided by the nonprofit or municipal corporation, including those occurring due to the acts or omissions of non-licensed employees of, or volunteers for, the nonprofit or municipal corporation.

22 Tex. Admin. Code § 573.72. However, this Rule must be read in conjunction with the prohibition of veterinarians, like lawyers, from creating a business partnership with non-veterinarians. *See* 22 Tex. Admin. Code § 573.6 (entitled "Restriction of Partnerships to Members of Veterinary Profession"). In this context, the intent expressed in the Board's adoption of § 573.72 becomes clear: "The Board adopts new §573.72, regarding Employment by Nonprofit or Municipal Corporations, which allows veterinarians to work for non-profits even when the non-profit is not owned by a licensed veterinarian." 2012 TX REG TEXT 282800 (NS), 2012 TX REG TEXT 282800 (NS). Rule 573.72 was not

9

adopted as an *ultra vires* expansion of the Board's authority, as the Board now contends. Instead, the provision was adopted to clarify that a veterinarian could work for a non-profit that offers low-cost treatment for *other peoples'* animals, even if that non-profit was not solely owned by veterinarians. *See e.g., Texas Board of Veterinary Medical Examiners, Petitioner v. Melanie Mercer, D.V.M., Respondent*, 2013 WL 1785492, *13 (TX. St. Off. Admin. Hrgs.) (applying Rule 573.72 in the context of a veterinarian employed by a non-profit animal clinic that provided veterinary services to the general public, not to animals owned by the non-profit). Contrary to the Board's contention, Rule 573.72 was not intended to and does not expand the Board's power to regulate the treatment of an animal by an animal's owner.

The rules of statutory construction, which also apply to interpretation of administrative rules, also demonstrate that Rule 573.72 cannot be constructed to expand the Veterinary Board's powers beyond the scope of Section 801.004 of the Occupations Code/Veterinary Licensing Act. *Texas Bd. of Chiropractic Examiners*, 375 S.W.3d at 475 ("We construe administrative rules in the same manner as statutes . . . .") Veterinary Board Rule 571.61, governing "Inactive Veterinary License Status," provides:

> (b) Restrictions. The following restrictions shall apply to veterinary licensees whose licenses are on inactive status:

10

(1) Except as provided in § 801.004, Texas Occupations Code, the licensee may not engage in the practice of veterinary medicine or otherwise provide treatment to any animal in the State of Texas.

22 Tex. Admin. Code § 571.61. In accordance to Veterinary Board Rule 571.61(b)(1), an inactive veterinarian can "engage in the practice of veterinary medicine or otherwise provide treatment to any animal in the State of Texas" provided such practice/treatment is within the owner exceptions in Section 801.004 of the Veterinary Licensing Act. It strains credulity to argue, as the Board does, that an active veterinarian, such as Dr. Jefferson, cannot offer treatment within the same owner-exceptions to the Veterinary Licensing Act that permits an inactive veterinarian to treat animals.

### C. Protection of Animals Themselves is Vested in the Texas Board of Health

Of course, the Legislature did not leave the welfare of the animals unregulated. Instead, "as a special kind of property" animals are protected from the mistreatment of their owners under the Texas Health and Safety Code, which delegates rule making authority to the Texas Board of Health and the Texas Department of Health, not the Veterinary Board. *Strickland* , 397 S.W.3d at 198 (Tex. 2013); Tex. Health & Safety Code §§ 821.021–.026. The interrelationship of the Veterinary Licensing Act, particularly Section 801.004(1), and the provisions of the Texas Health and Safety Code governing animal welfare requires that an owner can choose to treat its animal in the manner the owner deems appropriate,

11

with limited restrictions regulated in accordance with the Texas Health and Safety Code to protect the animal's welfare. As "unique property" an owner may not do anything it pleases with an animal pursuant to animal welfare restrictions, but neither a veterinarian nor the Board can force an owner to care for its property in a specified manner.

Moreover, this division of power is required under the concepts of statutory construction: "The goal of statutory construction is to give effect to legislative intent. Unless a statute is ambiguous, we discern that intent from the language of the statute itself. Further, we consider a statute as a whole, not its provisions in isolation." *Hoog v. State*, 87 S.W.3d 740, 744 (Tex. App.—San Antonio 2002, pet. denied).

When read in conjunction, as required by the rules of statutory construction, the boundaries of the Veterinary Licensing Act and the Health and Safety Code's animal welfare provisions becomes clear: the Veterinary Licensing Act does not regulate an owner's treatment of his/her animal property and the Health and Safety Code does. Accordingly, the Health and Safety Code permits cities, such as San Antonio, "to enter into contracts or agreements with public or private entities" to carry out the animal welfare provisions of the Code. Tex. Health & Safety Code Ann. § 826.016 (Vernon). Moreover, any appeals regarding cruelty to animals are expressly governed by the Health and Safety Code: "In the event of a conflict

12

between this subchapter and another provision of any other law relating to an appeal of a disposition regarding a cruelly treated animal, including the bond required for that appeal, this subchapter controls." Tex. Health & Safety Code Ann. § 821.026 (Vernon).

## II. If Unchecked, the Board's Actions Will Result in More Euthanized Animals

As set forth in more detail in the amicus brief of Alley Cat Allies filed in the district court and incorporated herein by reference, care of animals in the no-kill model differs substantially from care of animals in the traditional capture and euthanize model. Unlike traditional shelters, which hold animals for the minimum required "stray hold" period before euthanizing them, no kill shelters have to invest in the long term health of the animals. Accordingly, no kill shelters have to care for animals for longer periods, which leads to caring for more animals at any one time than the traditional capture and euthanize model. Therefore, shelter space is one of the primary challenges to no kill shelters, and as a result, no kill organizations often house animals in foster homes until the animals are adopted by new owners. Because of the sheer number of animals and the far flung distance between foster homes, no-kill shelter-owners cannot provide one-on-one veterinary care to all their animals—not that traditional capture and euthanize shelters ever did or even had any incentive to do so. However, under the Legislature's mandate, animal owners do not have to provide veterinary care to their animals, as long as

13

owners treat their animals humanely. Without the owner exception, no-kill shelters who employ a veterinarian[1] would have to provide one-on-one veterinary care to each animal that they own, even though no other owners of animals are required *under the Veterinary Licensing Act* to even seek the aid of a veterinarian. Such change in the policy would debilitate no-kill shelters. Again, this does not mean that no kill shelters can be inhumane to the animals they own—all animal owners are required to treat their animal humanely pursuant to the Health and Safety Code.

## CONCLUSION AND PRAYER

Best Friends supports animal owners like SAPA! that, as owners, choose to value the life of each of their animals by tirelessly working to reduce animal shelter euthanasia. As part of its ownership rights, SAPA! responsibly cares for its animals through a network of foster homes and shelter facilities. Pursuant to the legislative intent of the Veterinary Licensing Act and the Health and Safety Code, absent a finding by municipalities with actual authority to regulate animal welfare pursuant to the Health and Safety Code , SAPA!'s judgment regarding the care of its animal property is within SAPA!'s sole discretion.

---

[1] The Board fails to recognize the legal distinction between SAPA! as a legal entity and owner of animal property and Dr. Jefferson, who is an employee, volunteer, and agent of the entity—who also happens to be a veterinarian.

14

Respectfully submitted,

Martha Dickie
State Bar No. 00000081
mdickie@abdlawfirm.com
Jacob Scheick
State Bar No. 24060563
jscheick@abdlawfirm.com
Almanza, Blackburn & Dickie, LLP
2301 S. Capital of Texas Hwy., Bldg. H
Austin, Texas 78746
(512) 474-9486
(512) 478-7151 – Fax


**COUNSEL FOR AMICUS CURIAE
BEST FRIENDS ANIMAL SOCIETY**

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2015, a true and correct copy of the foregoing was served via email in accordance with the Texas Rules of Civil Procedure, upon the following:

Ryan Clinton
State Bar No. 24027934
rdclinton@dgclaw.com
DAVIS, GERALD & CREMER, P.C.
111 Congress Ave., Suite 1660
Austin, Texas 78701
Ph: (512) 537-9938
Fax: (432) 687-1735

David F. Brown
State Bar No. 03108700
dbrown@ebblaw.com
David P. Blanke
State Bar No. 02453600
dblanke@ebblaw.com
Ewell, Brown & Blanke, LLP
111 Congress Ave., 28th Floor
Austin, Texas 78701
(512) 457-0233

Andrew Lutostanski
andrew.lutostanski@texasattorneygeneral.gov
Ted A. Ross
ted.ross@texasattorneygeneral.gov
Andrew Lutostanski
andrew.lutostanski@texasattorneygeneral.gov
Office of the Attorney General of Texas,
Administrative Law Division
P. O. Box 12548
Austin, TX 78711
(512) 475-4200

Martha Dickie

16

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 3,007 words (excluding the caption, table of contents, table of authorities, signature, proof of service, and certificate of compliance). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes, which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

Martha Dickie

# APPENDIX

1. *Hoog v. State*, 87 S.W.3d 740, 744 (Tex. App.—San Antonio 2002, pet. denied)

2. *Pistole v. State*, 68 Tex. Crim. 127, 130, 150 S.W. 618, 620

3. *Strickland v. Medlen*, 397 S.W.3d 184, 192 (Tex. 2013)

4. *Texas Bd. of Chiropractic Examiners v. Texas Med. Ass'n*, 375 S.W.3d 464, 474 (Tex. App.—Austin 2012, pet. filed)

5. *Texas Board of Veterinary Medical Examiners, Petitioner v. Melanie Mercer, D.V.M.* 2013 WL 1785492

6. 2013 WL 1785492

7. 22 Tex. Admin. Code § 571.61

8. 22 Tex. Admin. Code § 573.6

9. 22 Tex. Admin. Code § 573.7

10. Tex. Health & Safety Code Ann. § 826.016

11. Tex. Occ. Code Ann. § 801.001

12. Texas Rule of Appellate Procedure 11(c)

13. Veterinary Board Rule 571.61

14. Veterinary Board Rule 573.72

APPENDIX 1

87 S.W.3d 740
Court of Appeals of Texas,
San Antonio.

Charles T. HOOG, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–01–00239–CV.　|　Aug. 28, 2002.

Under warrant, the state seized cattle on allegation that they were being cruelly treated. The Justice Court, Frio County, ordered sale. Caretaker of cattle appealed. The County Court, Frio County, David Peeples, J. (Assigned), affirmed, and caretaker appealed. The Court of Appeals, Angelini, J., held that: (1) county court could order sale during pendency of appeal, and (2) forfeiture was invalid, as caretaker was not owner.

Vacated and dismissed.

West Headnotes (8)

**[1]** **Forfeitures** 🔑 Substitute assets

**Forfeitures** 🔑 Jurisdiction and authority

Court of Appeals had jurisdiction over appeal of cattle forfeiture case, although cattle had been sold; proceeds of the sale were a substitute res that gave the Court jurisdiction.

Cases that cite this headnote

**[2]** **Forfeitures** 🔑 Proceedings and review

Trial court could order sale of forfeited cattle during pendency of caretaker's appeal to the Court of Appeals; statute barring sale applied only to appeals from justice court to county court. V.T.C.A., Health & Safety Code § 821.025(b).

Cases that cite this headnote

**[3]** **Statutes** 🔑 Intent

The goal of statutory construction is to give effect to legislative intent.

Cases that cite this headnote

**[4]** **Statutes** 🔑 Language and intent, will, purpose, or policy

**Statutes** 🔑 In general; factors considered

Unless a statute is ambiguous, a court discerns the intent of the legislature from the language of the statute itself.

Cases that cite this headnote

**[5]** **Statutes** 🔑 Statute as a Whole; Relation of Parts to Whole and to One Another

A court considers a statute as a whole, not its provisions in isolation.

Cases that cite this headnote

**[6]** **Forfeitures**  Preservation of error; plain error

Caretaker of cattle waived for appeal his claim of lack of notice of forfeiture hearing, where he failed to timely object to lack of notice, failed to move for continuance, and fully participated in hearing. V.T.C.A., Health & Safety Code § 821.023.

2 Cases that cite this headnote

**[7]** **Animals**  Searches, seizures, inspections and forfeitures

**Forfeitures**  Particular cases

Evidence did not support seizure and sale of cattle from caretaker, on the basis of cruelty; evidence showed that caretaker was not owner. V.T.C.A., Health & Safety Code §§ 821.021, 821.023.

Cases that cite this headnote

**[8]** **Robbery**  Property subject of robbery and ownership and possession thereof

In criminal law, a "special owner" is an individual, such as an employee, who is in care, custody, or control of the property belonging to another person or a corporation; this legal fiction is created so that a store employee has sufficient interest in property taken during the course of a robbery to qualify as an owner of the property under the robbery statute.

Cases that cite this headnote

**\*741** From the County Court, Frio County, Texas, Trial Court No. 2421; David Peeples, Judge Presiding. [1]

**Attorneys and Law Firms**

Roberto Maldonado, Law Office of Roberto Maldonado, San Antonio, for appellant.

Grady L. Roberts, Jr., Law Office of Grady L. Roberts, Jr., Hector M. Lozano, County Attorney, Pearsall, for appellee.

Sitting: ALMA L. LÓPEZ, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

**Opinion**

Opinion by KAREN ANGELINI, Justice.

The State of Texas seized seventy-three head of cattle under chapter 821 of the Texas Health and Safety Code, alleging that Charles T. Hoog had cruelly treated the cattle. The county court found that Hoog had cruelly treated the cattle and ordered their sale at auction. Hoog appeals. We vacate the judgment of the trial court and dismiss the cause.

## BACKGROUND

The State seized seventy-three head of cattle, alleging in the warrant that Charles Hoog, their owner, had cruelly treated the animals. The cattle were placed in a feedlot. Castroville State Bank filed an answer, alleging that the cattle were owned by Thomas Hoog, Charles's father, and that the bank possessed the first lien on the cattle. On June 9, 2000, a justice of the peace held a hearing at which Charles Hoog appeared pro se. The court found that both Charles and Thomas Hoog had cruelly treated farm livestock under section 821.021 and 821.023 of Texas Health and Safety Code. The justice court ordered both Charles and Thomas Hoog to be divested of ownership and ordered a public **\*742** sale of the cattle. [2] Charles Hoog appealed the justice court's decision to the county court.

In the county court, Frio County [3] filed an application to sell the cattle at public auction. On December 28, 2000 and January 2, 2001, the county court held a hearing at which Charles Hoog, again, appeared pro se. On January 2nd, the county court approved the stipulation between "*parties, Frio County and Charles T. Hoog,*" and "*non-parties, Castroville State Bank and Thomas V. Hoog* " that Thomas Hoog had legal title to the cattle. The county court then found that Charles Hoog had cruelly treated the cattle and ordered the cattle to be sold at public auction on January 10, 2001. On January 10th, Hoog filed an application for temporary restraining order, temporary injunction, and permanent injunction. The county court denied his application, and the cattle were sold at auction for a total of $67,900.22. On February 28, 2001, the county court entered a final judgment. The judgment ordered expenses from the sale and from the feeding and maintaining of the cattle be deducted from the sale's proceeds. After expenses, the county court ordered $15,820.82 to be paid to Thomas V. Hoog and Castroville State Bank.

## MOTION TO DISMISS

[1] Frio County argues that we do not have jurisdiction over this appeal pursuant to *Costello v. State,* 774 S.W.2d 722 (Tex.App.-Corpus Christi 1989, writ denied). In *Costello,* the court of appeals decided whether it had jurisdiction after the *res* in dispute had been sold, retitled, or was no longer within the appellate court's control. *Id.* at 723. The court noted that "there are several federal decisions dealing with an appellate court's jurisdiction in an *in rem* proceeding after the *res* has been sold or dispersed" and that those cases required the claimant to "obtain a stay of execution of the trial court's judgment to prevent removal of the *res* from the control of the court and to preserve jurisdiction for appeal." *Id.* at 723–24. "Otherwise, the release or removal of the *res* from the control of the court will terminate jurisdiction, unless the *res* is released accidently, fraudulently, or improperly." *Id.* at 724 (citing *United States v. $79, 000,* 801 F.2d 738, 739 (5th Cir.1986)).

Since *Costello,* however, the Supreme Court has held that an appellate court may still have jurisdiction despite the *res* having been sold, retitled, or no longer being within the appellate court's control. In *Republic National Bank v. United States,* 506 U.S. 80, 82, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992) (Blackmun, J.), [4] the government seized a house that had been purchased with the proceeds of narcotics trafficking. After a trial on the merits, the district court ordered the proceeds of the sale of the house forfeited to the government, which deposited the funds in the U.S. Treasury. *Id.* at 83, 113 S.Ct. 554. Republic National Bank claimed a lien on the funds and appealed. *Id.* The appellate court dismissed the appeal for lack of jurisdiction, noting that the transfer of the res destroyed jurisdiction. *Id.*

**\*743** The Supreme Court reversed, holding that "in an in rem forfeiture action, the Court of Appeals is not divested of jurisdiction by the prevailing party's transfer of the res from the district." *Id.* at 88–89, 113 S.Ct. 554. The Court rejected the government's argument that the transfer of the sale proceeds from the district court to the U.S. Treasury destroyed jurisdiction, because the appellate court no longer had control over the *res:*

> The rule invoked by the Government thus does not exist, and we see no reason why it should. The fictions of *in rem* forfeiture were developed primarily to expand the reach of the courts and to furnish remedies for aggrieved parties, not to provide a prevailing party with a means of defeating its adversary's claim for redress. Of course, if a "defendant ship stealthily absconds from port and leaves the plaintiff with no *res* from which to collect," a court might determine that a judgment would be "useless." So, too, if a plaintiff abandons a seizure, a court will not proceed to adjudicate the case. These exceptions, however,

are closely related to the traditional, theoretical concerns of jurisdiction: enforceability of judgments and fairness of notice to parties. Neither interest depends absolutely upon the continuous presence of the res in the district.

*Id.* at 87, 113 S.Ct. 554 (citations omitted). The useless judgment exception did not apply in *Republic National,* because "the government had possession of the specific 'substitute res'—the sale proceeds—and an appropriations statute 'authoriz[ed] the payment of funds in the event petitioner were to prevail in the underlying forfeiture action.' " *Newpark Shipbuilding & Repair, Inc. v. M/V Trinton Brute,* 2 F.3d 572, 573 (5th Cir.1993) (quoting *Republic National,* 506 U.S. at 96, 113 S.Ct. 554 (Rehnquist, C.J.)). [5]

Since *Republic National,* the Fifth Circuit decided a similar issue in *Newpark Shipbuilding & Repair, Inc. v. M/V Trinton Brute,* 2 F.3d 572, 573 (5th Cir.1993). Newpark brought an in rem action against a vessel owned by McKinney, seeking to recover for past-due repairs it had performed on the vessel. The district court entered judgment in favor of Newpark and ordered the vessel sold at a marshal's sale. *Id.* Newpark was the successful bidder at the sale and substituted its judgment in lieu of payment for the vessel. *Id.* McKinney appealed. *Id.* Newpark moved to dismiss the appeal for lack of jurisdiction. The Fifth Circuit distinguished *Newpark* from *Republic National* and dismissed the appeal, noting that the appeal fell within the "useless" judgment exception:

> In this case, by contrast, there never was a substitute res. Newpark used its judgment to purchase the [vessel]; no money changed hands as a result of the marshal's sale. Moreover, the vessel is no longer the res; a marshal's sale discharges all liens against the ship and grants the purchaser title free and clear of liens. Unlike the situation in *Republic,* we cannot trace the res or its proceeds to a particular fund in Newpark's possession.

*Id.* at 573 (citations omitted).

Here, however, we do have a "substitute res," the proceeds of the auction. Therefore, under *Republic's* analysis, we have jurisdiction over this appeal despite the sale of the cattle. We deny Frio County's motion to dismiss.

### *744  SALE OF CATTLE

 **[2]**    In his first issue, Hoog argues that section 821.025(b) of the Texas Health and Safety Code prohibited the trial court from ordering the sale of the cattle during his appeal to this court. Section 821.025(b) provides that "[w]hile an appeal under this section is pending, the animal may not be sold, destroyed, or given away as provided by Sections 821.022–821.024." TEX. HEALTH & SAFETY CODE ANN. § 821.025 (Vernon 1992). In its conclusions of law, the county court held that

> section 821.025 of the Texas Health and Safety Code prohibits the sale of the cattle during the time this case is on appeal from the Justice Court to the County Court but does not prevent the sale if the case is appealed from the County Court to the Court of Appeals or the Supreme Court of Texas.

We agree.

 **[3]    [4]    [5]**    The goal of statutory construction is to give effect to legislative intent. *Continental Cas. Co. v. Downs,* 81 S.W.3d 803, 805 (Tex.2002); *Kroger Co. v. Keng,* 23 S.W.3d 347, 349 (Tex.2000). Unless a statute is ambiguous, we discern that intent from the language of the statute itself. *Downs,* 81 S.W.3d at 805. Further, we consider a statute as a whole, not its provisions in isolation. *Id.; Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001). Section 821.022 allows an officer who has reason to believe that an animal has been or is being cruelly treated to apply to a justice court in the county or to a municipal court in the municipality in which the animal is located for a warrant to seize the animal. TEX. HEALTH & SAFETY CODE ANN. § 821.022(a) (Vernon 1992). On a showing of probable cause to believe that the animal has been or is being cruelly treated, the justice or municipal court shall issue the warrant and set a time within ten days from the date of issuance for a hearing in

the court to determine whether the animal has been cruelly treated. *Id.* § 821.022(b). Section 821.023 describes what actions the court may take after this hearing:

> (e) If the court finds that the animal's owner has cruelly treated the animal and that the animal is farm livestock, the owner shall be divested of ownership and the court shall order a public sale of the animal by auction, order the animal given to a nonprofit animal shelter, pound, or society for the protection of animals, or order the animal humanely destroyed if the court decides that the best interests of the animal or that the public health and safety would be served by doing so. In this subsection, "farm livestock" means cattle, hogs, sheep, goats, mules, horses, jacks, jennets, or poultry raised or used on a farm or ranch for food or for the production of legal income....

> (g) The court shall order the animal returned to the owner if the court does not find that the animal's owner has cruelly treated the animal.

*Id.* § 821.023(e), (g) (Vernon Supp.2002). Section 821.025 allows an "owner of an animal ordered sold at public auction as provided in this subchapter" to appeal the order. *Id.* § 821.025 (Vernon 1992). The revisor's note to section 821.025 recognizes that section 821.025 applies to an appeal from the justice court to the county court:

> The source law provides *procedures for appealing a justice court's order* to sell an animal that has been cruelly treated. The revised law omits the provision that requires the appellant to give notice of appeal within 10 days *because procedures for appeal from a justice court* are provided by Rules 571–574, Texas Rules of Civil Procedure. The rules also provide procedures for adjudging court costs, and therefore the revised law **\*745** omits the provision in the source law authorizing the court to assess costs of the hearing. (See Rules 139 and 141, Texas Rules of Civil Procedure.) The revised law also omits a provision in the source law providing for appeals in county court because section 26.042(e), Government Code, *provides that the county court has appellate jurisdiction from the justice court* in cases in which the judgment appealed from or the amount in controversy exceeds $20, exclusive of costs.

*Id.* § 821.025 revisor's note (Vernon 1992) (emphasis added). The revisor's note makes clear that section 821.025 applies to an appeal from the justice court to the county court. We, therefore, overrule Hoog's first issue.

## NOTICE

 **[6]**    Hoog complains that he was given insufficient notice that the hearing on January 2, 2001 was a full evidentiary hearing under section 821.023 of the Texas Health and Safety Code. Hoog, however, has waived this issue on appeal by failing to timely object to lack of notice, by failing to move for a continuance, and by fully participating in the January 2nd hearing. *See Custom–Crete, Inc. v. K–Bar Services, Inc.,* 82 S.W.3d 655, 658–59 (Tex.App.-San Antonio 2002, no pet. h.) (noting that three day notice requirement of setting of hearing under Texas Rule of Civil Procedure 21 may be waived by failure to object to lack of notice); *Prade v. Helm,* 725 S.W.2d 525, 526 (Tex.App.-Dallas 1987, no writ) (to preserve complaint of untimely notice under Rule 21, party must (1) object on specific grounds, or (2) move for continuance, and (3) obtain ruling; *see also Padilla v. Comm'n for Lawyer Discipline,* 87 S.W.3d 624, 626 (Tex.App.-San Antonio 2002, no pet. h.) (emphasizing that error resulting from trial court's failure to provide parties proper notice under Rule 245 is waived if party proceeds to trial and fails to object to lack of notice); *In re J.(B.B.)M.,* 955 S.W.2d 405, 408 (Tex.App.-San Antonio 1997, no pet.) (same). On January 2nd, Hoog asked the trial court whether the hearing was for the purpose of determining whether the cattle should be sold as perishable property under rule 600 of the Texas Rules of Civil Procedure or whether it was a hearing under chapter 821 of the Health and Safety Code. The trial court replied that the hearing was a proceeding under chapter 821. Hoog did not object or move for a continuance. Instead, he fully participated in the hearing by cross-examining a witness and by calling his own witness. We, therefore, overrule this issue.

## LEGAL SUFFICIENCY

 **[7]** Hoog argues that the evidence is legally insufficient, because there was no evidence that he was the owner of the cattle. In fact, the evidence conclusively shows that Hoog is not the owner. The trial court approved a stipulation between the parties that Thomas V. Hoog, not Charles Hoog, was the owner of the cattle:

> It was stipulated by the parties, Frio County and Charles T. Hoog, together with non-parties, Castroville State Bank and Thomas V. Hoog [that] ... 6. The cattle (152) head that are the subject of this lawsuit and upon which a ruling will be made by this Court form a part of cattle that *are cattle owned by Thomas V. Hoog who has legal title to them,* and form a part of the cattle that are subject to the lien of Castroville State Bank, and upon which Castroville State Bank has a lien and is the lien holder for its indebtedness owned by Thomas V. Hoog as reflected in the above named documents.

(emphasis added). Section 821.023 gives the trial court the authority to order the **\*746** sale of the cattle if it "finds that the *animal's owner has cruelly treated the animal.*" *See* TEX. HEALTH & SAFETY CODE ANN. § 821.023(e) (Vernon Supp.2002) (emphasis added). Here, the trial court found that *Charles* Hoog cruelly treated the cattle while at the same time, approving the stipulation that *Thomas* Hoog was the owner of the cattle. There is, therefore, no finding by the trial court that the owner, Thomas Hoog, cruelly treated the cattle. Moreover, Thomas Hoog is a non-party, having never been joined as a defendant even after the State knew that he was the legal owner of the cattle.

 **[8]** The State responds by arguing that Charles Hoog was the "special owner" of the cattle. In criminal law, a "special owner" is an individual, such as an employee, who is in care, custody, or control of the property belonging to another person or a corporation. *Harrell v. State,* 852 S.W.2d 521, 523 (Tex.Crim.App.1993); *Liggens v. State,* 50 S.W.3d 657, 660 (Tex.App.-Fort Worth 2001, pet. ref'd). This legal fiction is created so that a store employee has sufficient interest in property taken during the course of a robbery to qualify as an owner of the property under the robbery statute. *See Liggens,* 50 S.W.3d at 660. The State requests that we expand this concept under criminal law to forfeiture cases in civil law. We decline to do so. Under the State's interpretation of a "special owner," the State could name an owner's employee in a warrant for seizure of an animal, and then a trial court could order the sale of that animal at auction upon a finding that the owner's employee had cruelly treated the animal, all without the animal's actual owner being named as a party to the forfeiture proceeding. The legislature could not have intended such a result. We, thus, hold that the evidence was legally insufficient and sustain this issue. [6]

## CONCLUSION

Normally, upon a finding that the evidence was legally insufficient, we would reverse the judgment of the trial court and render judgment accordingly. This appeal, however, presents an unusual situation, because the stipulated owner of the cattle is a non-party. Therefore, because Charles Hoog is not the owner of the cattle, a forfeiture proceeding never should have been initiated against him. We vacate the judgment of the trial court and dismiss the trial court cause against Charles Hoog.

**All Citations**

87 S.W.3d 740

Footnotes

1    Assigned to this case by the Chief Justice of the Supreme Court of Texas.
2    The justice court divested Thomas Hoog of ownership despite the warrant of seizure naming only Charles Hoog as the owner of the cattle.

3        Prosecuting the forfeiture action on behalf of the State of Texas.

4        Justice Blackmun was joined by a majority of the Court with respect to Parts I, II, and IV of his opinion.

5        Chief Justice Rehnquist's concurred and dissented with Justice Blackmun's opinion, noting that he disagreed with Justice Blackmun's Appropriations Clause analysis. Chief Justice Rehnquist's analysis was joined by Justices White, Scalia, Kennedy, Souter, and Thomas. His Appropriations Clause analysis, thus, represents the majority of the Court.

6        By holding that the evidence was legally insufficient, we need not reach Hoog's argument that the evidence was also legally insufficient because the trial court did not make a finding that the cattle were perishable property under Texas Rule of Civil Procedure 600. Similarly, we need not address Hoog's argument that the trial court should have returned the cattle to their owner, Thomas Hoog.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 2

68 Tex.Crim. 127
Court of Criminal Appeals of Texas.

PISTOLE

v.

STATE.

June 19, 1912. | Rehearing Denied Nov. 6, 1912.

Appeal from Dallas County Court at Law; W. F. Whitehurst, Judge.

Henry Pistole was convicted of unlawfully practicing veterinary medicine, surgery, and dentistry, and he appeals. Affirmed.

West Headnotes (12)

**[1]** **Constitutional Law** Inquiry Into Legislative Judgment

The questions of the widsom, justice, policy, or expediency of a statute are for the Legislature alone.

1 Cases that cite this headnote

**[2]** **Constitutional Law** Licenses in general

**Health** Validity

Act March 16, 1911, Acts 32d Leg. c. 76, §§ 1-5, requiring licensing of veterinary surgeons, is not violative of Const. art. 1, §§ 3, 17, 19, declaring men equal, and none entitled to separate privileges.

Cases that cite this headnote

**[3]** **Constitutional Law** Trade, business, profession, or occupation, regulation of

**Health** Validity

Act March 16, 1911, Acts 32d Leg. c. 76, regulating the practice of veterinary medicine, surgery, and dentistry, is not violative of Const.U.S. art. 4, § 2, regarding privileges and immunities of the citizens of the several states.

Cases that cite this headnote

**[4]** **Constitutional Law** Veterinarians

Act approved March 16, 1911, Acts 32d Leg. c. 76 §§ 1-5, relating to the licensing of persons to practice veterinary surgery, is not violative of Const. art. 1, § 19, nor of the fourteenth amendment of the federal Constitution, relating to due process of law.

Cases that cite this headnote

**[5]** **Eminent Domain** Labor and employment in general

Act March 16, 1911, Acts 32d Leg. c. 76, §§ 1-5, requiring licensing of veterinary surgeons, is not violative of Const. art. 1, § 17, forbidding taking or damaging of property without compensation.

Cases that cite this headnote

**[6]** **Licenses** Constitutionality and Validity of Acts and Ordinances

Statute relating to licensing of persons to practice veterinary surgery was not unconstitutional.

Cases that cite this headnote

**[7]** **Licenses** Equality and uniformity in general

The act approved March 16, 1911, Acts 32d Leg. c. 76, requiring persons to procure a license before they are permitted to practice as veterinarians, is not violative of Vernon's Ann.St. Const. art. 8, §§ 1, 2, requiring taxation to be equal and uniform.

Cases that cite this headnote

**[8]** **Health** Power to regulate professionals in general

The regulation of the practice of veterinary medicine, surgery, and dentistry is within the police power of the state.

Cases that cite this headnote

**[9]** **Health** Validity

Statute requiring licensing of veterinary surgeons was not unconstitutional.

Cases that cite this headnote

**[10]** **Health** Validity

Statute regulating practice of veterinary medicine, surgery and dentistry was not unconstitutional.

Cases that cite this headnote

**[11]** **Health** Veterinarians

In the trial of one for violating Acts 32d Leg. c. 76, regulating the practice of veterinary medicine, surgery, and dentistry by practicing without a license, it was no defense that the board of examiners consisted of only five members, though seven are required by law, and three of the five were graduates of the same school.

Cases that cite this headnote

**[12]** **Statutes** Environment and health

The title of the act approved March 16, 1911, Acts 32d Leg. c. 76, regulating the practice of veterinary medicine, surgery, and dentistry, held to sufficiently embrace the provisions of the act.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*128** **\*\*619** Walker & Williams, H. C. Jarrel, and C. F. Greenwood, all of Dallas, for appellant.

C. E. Lane, Asst. Atty. Gen., for the State.

**Opinion**

PRENDERGAST, J.

On August 2, 1911, a complaint and information was filed against appellant charging that on August 1, 1911, in Dallas county, Tex., appellant, "who was then and there a resident of said county of Dallas and state of Texas, did then and there unlawfully practice and attempt to practice veterinary medicine, surgery, and dentistry by then and there treating, operating on, and prescribing and attempting to treat, operate on, and prescribe for a physical ailment and physical injury to and deformity of a domestic animal, to wit, a horse, for a money compensation, which he did then and there receive, and the said Henry Pistole did then and there profess publicly to be a veterinary surgeon and dentist within the aforesaid **\*129** county of Dallas and state of Texas; without the said Henry Pistole first having registered in the district clerk's office of Dallas county, Texas, his authority and certificate of license from the state board of veterinary medical examiners of the state of Texas for so practicing and without the said Henry Pistole first having applied for and taken out a license from the aforesaid board to practice veterinary surgery in said state and county, and without the said Henry Pistole having first made an affidavit before the district clerk of Dallas county, that he had practiced veterinary surgery for five years before the date last above."

The appellant waived a jury and submitted the case to the court on an agreed statement of facts, which is as follows: "That the defendant resides at Garland, in Dallas county, Tex., and has resided in Dallas county, Tex., for about 12 years, and is 40 years of age, and that he has been practicing veterinary medicine and veterinary surgery and veterinary dentistry for a part of 12 years in Dallas county, Tex., and for a number of years in Rockwall and Collin counties, Tex., and that he charges fees and money for the services so rendered, and that he did perform the act alleged in the complaint and information in Dallas county, Tex., about the time, charged and collected a fee for the same. The defendant has for 10 years been engaged in the active practice of veterinary medicine, surgery, and dentistry as his sole calling, occupation, and profession, and that his said practice has covered the counties mentioned above. That he is well versed and schooled in said profession of veterinary medicine, surgery, and dentistry, and has shown himself thoroughly qualified to practice said science in all its branches in a skillful and successful manner. That he could successfully pass an examination before the board created for the examination of applicants to practice veterinary medicine, surgery, and dentistry under the Acts of the Thirty–Second Legislature, pp. 132, 133, 134, 135, 136. That he has not submitted to an examination before the state board of veterinary examiners under said law, nor under any section of said law, and that he has not passed any examination before said board since the passage of said law, and that he had not done so at the time he performed the act alleged in the complaint and information, and has not done so since then, and has no certificate of license or license of any character from said board. That the defendant herein did not prior to the day and date alleged in the affidavit and information in this cause make an affidavit before the district clerk of Dallas county, Tex. (county of his residence), that he had practiced veterinary surgery for a period of five (5) years. That the defendant herein has no diploma or certificate or license from any regularly organized and recognized veterinary college or school of any sort or kind anywhere. **\*130** That the defendant has practiced his profession of veterinary medicine, surgery, and dentistry in the counties of Rockwall and Collin, in the state of Texas, both before and after the filing of the complaint and information in this cause, and that he **\*\*620** has in each instance, when he has so practiced his profession in said counties, fixed and collected fees for his work. That the defendant has actively practiced his said profession in Dallas county for more than five years preceding the passage of said law. That the state board of veterinary medical examiners, as it now (November 20, 1911) stands under the act of the Thirty–Second Legislature, is composed of five (5) members only, and that three of said five members on said board are graduates from the same veterinary college; that is, from the Kansas City Veterinary College and institute. That the defendant in this case is a man of good moral character."

The court adjudged the appellant guilty, and fixed his penalty at a fine of $25–the lowest under the law.

It was doubtless the intention of the parties to make this a test case; for, if the act under which appellant was prosecuted and convicted is valid, the record shows he defied the law, and it is clear that it was his purpose to in no way comply, or attempt to comply, therewith. The act under which this prosecution was had was enacted by the Thirty–Second Legislature in 1911, and approved on March 16, 1911 (pages 132 to 136). The object and purpose of the act is clearly manifest on its face, wherein in section 17 it is said: "The fact that there is no law governing veterinaries within this state, and unskilled persons are engaged in that business to the injury and detriment of the interests and material welfare of the people, create an emergency and an imperative public necessity requiring that the constitutional rule requiring bills to be read on three several days be suspended, and the same is hereby suspended, and this act shall take effect and be in force from and after its passage; be it so enacted." This act, like many others when the subject is first legislated upon, may be crude in some of its provisions. It is evident that in some sections of the act some word or words are omitted, but, if so, the act is thereby in no way made invalid. In some instances, to take the whole context, such word or words are so apparent that they should be supplied. But whether this is done or not, as said above, such omissions in no way materially affect the validity of the act.

[1] It is perfectly manifest from the whole of the act that the Legislature intended to regulate the practice of veterinary medicine, surgery, and dentistry, which was clearly within the proper police powers of the state. It is so universally laid down by all textbook writers and the opinions of the courts of the various states and the United States that such legislation is within the police power of the state that it is unnecessary to cite any authority on this point.

The validity of the act is attacked by appellant's able attorneys on **\*131** many grounds. It is so late in the term, and other matters of importance are so pressing, that we deem it unnecessary to cite the numerous authorities and argue the questions sustaining the validity of this act. But after a careful study of the act and the attacks thereon by appellant we have reached the conclusion that the act is a most reasonable and proper exercise of the police power of this state, and that none of the contentions of appellant as to its invalidity are correct. It is our opinion that the act is clearly constitutional. We shall not undertake to take up in the order presented by appellant the points on which he contests the validity of the act, but will call attention to the principal ones thereof, and merely decide the point and perhaps cite some of the authorities on the question.

[2] One contention by appellant is that the title to the act is too general, and does not embrace or authorize the various provisions thereof. The title is as follows: "An act to regulate the practice of veterinary medicine, surgery and dentistry; creating a board for the examination of applicants for the practice of veterinary medicine, surgery and dentistry; prescribing their powers, duties and qualifications; said board to be known as the 'State Board of Veterinary Medical Examiners,' prescribing penalties for a violation of the provisions of this Act, and declaring an emergency." In our opinion the title is in every way sufficient under the Constitution and many decisions of this court. Watts v. State, 61 Tex. Cr. R. 364, 135 S. W. 585, and authorities therein cited.

[3] Another contention by appellant is that it violates sections 1 and 2, art. 8, of our Constitution, which require that taxation shall be equal and uniform, and that all occupation taxes shall be equal and uniform, etc. These provisions of our Constitution are wholly inapplicable to this act. This is not a tax measure but a police regulation requiring persons to procure a license before they are permitted to practice as veterinarians. Ex parte Cramer, 62 Tex. Cr. R. 11, 136 S. W. 61, 36 L. R. A. (N. S.) 78, and cases therein cited.

[4] Again, appellant contends that it violates these sections of our Constitution: Section 3, art. 1, to the effect that all free men have equal rights, and no man or set of men are entitled to exclusive, separate public emoluments or privileges, etc., and section 17, art. 1, which provides that no person's property shall be taken, damaged, or destroyed, or applied to public use without adequate compensation being made, and section 19, art. 1, which provides that no citizen of this state shall be deprived of property, privileges, or immunities, etc., except by due course of the law of the land. In our opinion none of this provisions are violated by this act, and none of these provisions are applicable. The act in our opinion **\*\*621** is a most reasonable regulation in all of its provisions of the subject legislated upon, and, while it makes some classifications of those who have heretofore practiced or who may hereafter desire to practice, they are very reasonable, and, unless they were in the act, a much more plausible claim **\*132** could be made that its provisions were unreasonable, than with the provisions as they exist in the act. By every provision of it, where classes are made, it is necessary to do so, and each within that class have equal rights with the others, and no exclusive rights or privileges are improperly attempted to be given to one over another. No one's property thereby

is taken, damaged, or destroyed, but merely a reasonable and proper police regulation is made of the business legislated upon. Neither is any one thereby deprived of his life, liberty, property, privileges, or immunities, but the act reasonably, and only reasonably, for the benefit of the whole people, undertakes and does properly regulate the license and practice of a veterinarian.

We will state briefly the substance only of the act as we deem that amply sufficient. The first section prohibits any person from practicing veterinary surgery, unless and until such person complies with the act.

Section 2 provides for the appointment by the Governor of a board of seven medical examiners, and prescribes whom the Governor may appoint and whom he shall not appoint.

Section 3 provides for the meeting of this board and the organization thereof, and the election of the several officers, and that four members shall constitute a quorum.

Section 4 prescribes when they shall meet, and that notice shall be given of such meeting, and what examinations are authorized, and some of the qualifications of the applicants.

Section 5 prescribes the various subjects upon which applicants shall be examined. This section has a most reasonable provision to the effect that any one who has been practicing as a veterinarian in Texas as his principal occupation for at least one year prior to the time the act goes into effect shall be entitled to a temporary certificate or license which shall be good for one year authorizing him to practice, and without at that time undergoing an examination by the board. It also provides that where any person who has practiced for five years prior to the enactment may practice in their county or residence only without license by making an affidavit before the district clerk of his county that he has so practiced for five years, but, if such person shall remove from the county of his residence, he shall comply with all the requirements of said act before he shall be allowed to practice in the county to which he removes. This is a general provision applicable alike to all under the same conditions; is not an arbitrary discrimination permitting some and forbidding others to carry on their business or profession. But, as stated, is general and applicable to all alike under the same circumstances. In our opinion it does show such material difference in the situation of the parties as would not only authorize but would require such difference to be made. In fact, it occurs to us that, if such distinction were not made as to the classes of persons under the different situations, that the provisions of the act would then be unequal, and perhaps raise some question of its validity.

[5] This court cannot pass upon a question of policy by the Legislature. In some instances this court might materially differ with the Legislature  *133  about the policy of certain legislation, but, whenever the Legislature has the right itself to pass upon the question of policy, this court cannot substitute its judgment for that of the Legislature. The Legislature, and not this court, knows, or is, so far as this court is concerned, conclusively presumed to know, the differences, if any, of the various persons who have heretofore practiced or who may hereafter seek to practice veterinary medicine or surgery, and would better know than this court the situation of such persons so as to make the proper distinction between them as classes, not as individuals, in authorizing or prohibiting them from practicing such profession.

[6] Again, appellant contends that said act violates section 2 of article 4 of the United States Constitution, wherein it is provided that citizens of each state shall be entitled to all the privileges and immunities of citizens of the several states. And of the fourteenth amendment to the Constitution of the United States, wherein it requires that no state shall make or enforce any law which may abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the law. In our opinion neither of these constitutional provisions are in any way violated by this act. In this connection we state further of the specific enactments of this law.

Section 6 provides that the board shall keep books, and what they shall show and that they shall be open to inspection.

Section 7, in effect, requires that all persons who make an original application, and who must stand an examination by the board on the various subjects prescribed by section 5 of the act, shall pay a fee of $5 which is intended as some compensation to the

board for its work in making this examination, but it expressly provides that the payment of such fee shall not be required of those who have practiced in Texas for as much as one year before the act became operative.

 **622  Section 8 requires every one when he gets license to record the same in the office of the district clerk of the county in which he makes his residence, and shall display it in his regular place of business and prohibits any one from practicing until he records his license, and, if he does not record it within three months, it shall no longer be valid. It further requires that when one removes his residence from one county to another to likewise record his license in the county into which he removes; but authorizes those who have so registered their license in the county of their residence to go from one county to another on professional business without being required to register in such county where he temporarily goes.

It is unnecessary to state the provisions of sections 9 and 10 because they are as to the details of the clerk and officers of the board, etc.

Section 12 makes it an offense for any one to practice or attempt to practice veterinary medicine, surgery, and dentistry without first having complied with the provisions of this act, and that each day shall be a  *134  separate offense, and upon conviction the penalty fixed at a fine not less than $25 nor more than $200.

Section 13 prescribes who shall be regarded as practicing such professions, unnecessary to state. Then specifically states that the act shall not be construed to interfere with or punish veterinarians in the United States army or in the United States bureau of animal industry while so commissioned, nor to any lawfully qualified veterinarians residing in other states or countries from meeting veterinarians of this state in consultation, nor to any veterinarian residing on the border of a neighboring state and duly authorized under the laws thereof to practice extending into the limits of this state, provided such practitioner shall not open any office or appoint a place to meet patients within this state.

Stress is laid by appellant on that part of section 7 of the act which exempts persons from the payment of the $5 fee for a license, who have practiced veterinary surgery in Texas for one or more years before the act became operative, claiming especially that this is violative of the two provisions of the United States Constitution mentioned above. Many of the states in the passage of acts within the police power of the state, regulating the sale of intoxicating liquors have actually prohibited, as our law does, a license to be issued and a person to engage in the sale of intoxicating liquors, unless they are residents of the state. In other words, in the proper exercise of the police power, where deemed necessary by the Legislature, that to require a person to be a resident of this state for a given length of time before license can be issued to such person is not prohibited by the Constitution of the United States. Mette v. McGuckin, 37 L. Ed. 934 (not officially reported in the U. S. Sup. Ct. Rep.). In this case the Supreme Court of the United States sustained the validity of an act of the Nebraska Legislature and of the decision of the Supreme Court of the State of Nebraska on this point. See, also, Freund, Police Power, §§ 710, 711. Also the cases cited in the notes under said two sections. Also 1 Tiedeman on State and Federal Control of Persons and Property, p. 246, note 1.

The veterinarians in the United States army are officers thereof and their duties as such are prescribed by the acts of Congress. So are those in the bureau of animal industry of the United States. Such officers and their duties are prescribed under the act of Congress. It was entirely proper, therefore, that this act should expressly exempt such officers of the United States from its provisions while, as expressed in the act, they are so commissioned. This state could not require such officers to take out license and stand an examination under our law, for they are not practicing such as is attempted to be regulated under the provisions of this act, but they would be in the discharge of their official duties as officers of the United States army and of the United States. Even if such exemption had not been made  *135  in this act, this court would necessarily construe it as not applicable to such United States officers. And the exemptions of veterinarians, such as are made by section 13 of the act applicable to all under the same circumstances, are in no way violative of our Constitution or the Constitution of the United States. It occurs to us that section 11 of the act which authorizes the board of examiners to revoke any license it has issued upon evidence that it was secured by fraud, or the holder had been guilty of unprofessional or dishonorable conduct, is a reasonable and proper provision; but, even if that section of the act should for any reason be held unconstitutional, it could not, and would not, affect the other provisions of the act which appellant has violated.

[7] The only other question necessary to be noticed is appellant's contention that the board of examiners at the time the agreed statement of facts was filed in this case, November 20, 1911, consisted of only five members, and that three of them were

graduates of the same school, can neither affect the validity of the act nor justify appellant in the violation thereof. This court cannot assume and will not presume that the Governor, a co–ordinate branch, of the government, has violated his sworn duty. We do not understand that that section of the act which requires that no two members of the board shall be graduates of the same college means, or should be construed to mean, that while they might be graduates of the same school that they might not be graduates of some other school in addition. The object of **\*\*623** this provision, as we take it, was not to prevent the Governor from appointing persons who are graduates of the same school if as a matter of fact they were not only graduates of that school, but graduates of some other school too. The statement of facts does not disclose whether or not the other two members of the board had ever been appointed or had died, removed, or otherwise vacated their office, nor in any other way show that the Governor had violated his official duty. So far as the record discloses, it may be that the other two members of the board at that particular time had vacated their offices, but that does not show that the board up to that time had not been legally constituted and all of them appointed, nor that sufficient time had elapsed in case of such vacated office for the Governor to appoint their successor so as to complete and constitute a full board of seven members. And, besides this, so far as the record shows, the five members who were then on the board were without question a de facto board if not a de jure board. It may be that if appellant had shown that there was no legal board in existence, and that although he was ready and willing to go before one when constituted, and secure his license under the terms of the act, he could not do so because no legal board existed to authorize it, that he should not have been convicted. The statement of facts shows the reverse of this condition; that he in no way attempted to secure license, and did not intend to **\*136** do so, and that he not only defied the law, but has persistently, willfully, and intentionally violated it.

The judgment will be affirmed.

DAVIDSON, P. J., not sitting.

**All Citations**

68 Tex.Crim. 127, 150 S.W. 618

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 3

397 S.W.3d 184
Supreme Court of Texas.

Carla STRICKLAND, Petitioner,

v.

Kathryn and Jeremy MEDLEN, Respondents.

No. 12–0047.   |   April 5, 2013.

**Synopsis**

**Background:** Dog owners brought action against employee of animal shelter, alleging that employee negligently euthanized dog, and seeking non-economic damages for loss of companionship. The County Court at Law No. 1, Tarrant County, Don Pierson, J., dismissed action. Owners appealed. The Fort Worth Court of Appeals, 353 S.W.3d 576, reversed and remanded. Shelter employee petitioned for review.

**[Holding:]** The Supreme Court, Willett, J., held that dog owners could not recover non-economic damages for loss of companionship.

Reversed.

West Headnotes (2)

**[1]**     **Animals** 🔑 Civil liability

Owners of dog that had been negligently euthanized at animal shelter were not entitled to recover non-economic damages for loss of companionship; dog was personal property, loss of companionship was a component of loss of consortium, a type of damages available only for a few especially close family relationships, and rule allowing recovery for intrinsic value for loss of cherished heirlooms could not be extended to allow recovery for loss of a pet.

7 Cases that cite this headnote

**[2]**     **Animals** 🔑 Civil liability

Where a dog's market value is unascertainable, the correct measure of damages for loss of dog is the dog's special or pecuniary value, in other words its actual value: the economic value derived from its usefulness and services, not value drawn from companionship or other non-commercial considerations.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*185**  Alison M. Rowe, John Hill Cayce Jr., Mallory Ann Beagles, Paul Boudloche, for Petitioner.

Randall E. Turner, Sondrea King, Susan Bleil, for Respondent.

Justice WILLETT delivered the opinion of the Court. [*]

*Beauty without Vanity, Strength without Insolence, Courage*
*without Ferocity, And all the Virtues of Man without his Vices* [1]

Texans love their dogs. Throughout the Lone Star State, canine companions are treated—and treasured—not as mere personal property but as beloved friends and confidants, even family members. Given the richness that companion animals add to our everyday lives, losing "man's best friend" is undoubtedly sorrowful. Even the gruffest among us tears up (every time) at the end of *Old Yeller.* [2]

This case concerns the types of damages available for the loss of a family pet. If a cherished dog is negligently killed, can a dollar value be placed on a heartsick owner's heartfelt affection? More pointedly, may a bereaved dog owner recover emotion-based damages for the loss? In 1891, we effectively said no, announcing a "true rule" that categorized dogs as personal property, [3] thus disallowing non-economic damages. In 2011, however, a court of appeals said yes, [4] effectively creating a novel—and expansive—tort claim: loss of companionship for the wrongful death of a pet.

In today's case, involving a family dog that was accidentally euthanized, we must decide whether to adhere to our restrictive, 122–year–old precedent classifying pets as property for tort-law purposes, or to instead recognize a new common-law loss-of-companionship claim that allows noneconomic damages rooted solely in emotional attachment, a remedy the common law has denied those who suffer the wrongful death of a spouse, parent, or child, [5] and is available in Texas only by statute. [6]

We acknowledge the grief of those whose companions are negligently killed. Relational attachment is unquestionable. But it is also uncompensable. We reaffirm our long-settled rule, which tracks the overwhelming weight of authority nationally, plus the bulk of amicus curiae briefs from several pet-welfare organizations (who understand the deep emotional bonds between people and their animals): Pets are property in the eyes of the law, and we decline to permit non-economic damages rooted solely in an owner's subjective feelings. True, a beloved companion dog is **\*186** not a fungible, inanimate object like, say, a toaster. The term "property" is not a pejorative but a legal descriptor, and its use should not be misconstrued as discounting the emotional attachment that pet owners undeniably feel. Nevertheless, under established legal doctrine, recovery in pet-death cases is, barring legislative reclassification, limited to loss of value, not loss of relationship.

We reverse the court of appeals' judgment and render judgment in favor of the Petitioner.

## I. Factual and Procedural Background

In June 2009, Avery, a mixed-breed dog owned by Kathryn and Jeremy Medlen, escaped the family's backyard and was promptly picked up by Fort Worth animal control. Jeremy went to retrieve Avery but lacked enough money to pay the required fees. The shelter hung a "hold for owner" tag on Avery's cage to alert employees that the Medlens were coming for Avery and ensure he was not euthanized. Despite the tag, shelter worker Carla Strickland mistakenly placed Avery on the euthanasia list, and he was put to sleep.

Jeremy and his two children learned of Avery's fate a few days later when they returned to retrieve him. Devastated, the Medlens sued Strickland for causing Avery's death and sought "sentimental or intrinsic value" damages since Avery had little or no market value and "[could not] be replaced." Strickland specially excepted, contending such damages are unrecoverable in pet-death cases. The trial court directed the Medlens to amend their pleadings to "state a claim for damages recognized at law." The Medlens amended their petition to drop the words "sentimental value" but realleged damages for Avery's "intrinsic value."

Strickland specially excepted on the same basis, and the trial court, sure that Texas law barred such damages, dismissed the suit with prejudice.

The court of appeals reversed, becoming the first Texas court to hold that a dog owner may recover intangible loss-of-companionship damages in the form of intrinsic or sentimental-value property damages. Addressing our 1891 decision in *Heiligmann v. Rose,* [7] which pegged dog-loss damages to market value or a value ascertained from the dog's "usefulness and services," the court of appeals stated, "Texas law has changed greatly since 1891" and "sentimental damages may now be recovered for ... all types of personal property." [8] Specifically, the court said our more recent, non-dog property cases "explicitly held that where personal property has little or no market value, and its main value is in sentiment, damages may be awarded based on this intrinsic or sentimental value." [9] The court of appeals pivoted, too, on our expression in *Heiligmann* that the dogs "were of a special value to the owner," [10] and took from this phrase that special value "may be derived from the attachment that an owner feels for his pet." [11] Emphasizing these iron truths—that "[d]ogs are unconditionally devoted to their owners" [12] and owners, reciprocally, have a deep attachment "to their beloved family pets" [13]—the court of appeals declared **\*187** "the special value of 'man's best friend' should be protected." [14] Thus, given "the special position pets hold in their family, we see no reason why existing law should not be interpreted to allow recovery in the loss of a pet at least to the same extent as any other personal property." [15] Reinstating the Medlens' claim, the court of appeals concluded: "Because an owner may be awarded damages based on the sentimental value of lost personal property, and because dogs are personal property, the trial court erred in dismissing the Medlens' action against Strickland." [16]

This appeal followed, posing a single, yet significant, issue: whether emotional-injury damages are recoverable for the negligent destruction of a dog. [17]

## II. Discussion

America is home to 308 million humans [18] and 377 million pets. [19] In fact, "American pets now outnumber American children by more than four to one." [20] In a nation where roughly 62% of households own a pet—with about 78 million dogs and 86 million cats (and 160 million fish) [21]—it is unsurprising that many animal owners view their pets not as mere personal property but as full-fledged family members, and treat them as such:

- A study found that 70% of pet owners thought of their pets as family members. [22]

- 45% of dog owners take their pets on **\*188** vacation. [23]

- Over 50% of pet owners say they would rather be stranded on a deserted island with a dog or cat than with a human. [24]

- 50% of pet owners report being "very likely" to put their own lives in danger to save their pets, and 33% are "somewhat likely" to risk their lives. [25]

- In 2012, Americans spent roughly $53 billion on their pets. [26]

The human-animal bond is indeed powerful. As the Medlens' second amended petition states: "The entire Medlen family was devastated by the loss of Avery, who was like a family member to them." Countless Texas families share this pets-as-family view, but Texas law, for a century-plus, has labeled them as "property" for purposes of tort-law recovery.

### A. Our Precedent Limits Damages in Dog–Death Tort Cases to "Market Value, If the Dog Has Any," or "Special or Pecuniary Value" Linked to the Dog's "Usefulness and Services"

#### 1. Our 1891 Heiligmann Decision Ties "Special Value" to a Dog's Economic Attributes, Not Subjective or Emotional Considerations

 **[1]**   Our analysis begins with *Heiligmann v. Rose,* [27] our 1891 case upholding $75 in damages for the poisoning of three "well trained" Newfoundland dogs. *Heiligmann* articulated some key valuation principles for animal cases. First, we classified dogs as personal property for damages purposes, not as something giving rise to personal-injury damages. [28] Second, we declared a "true rule" for damages that flags two elements: (1) "market value, if the dog has any," [29] or (2) "some special or pecuniary value to the owner, that may be ascertained by reference to the usefulness and services of the dog." [30]

In *Heiligmann,* the dogs "were of fine breed, and well trained," with one using different barks to signal whether an approaching person was a man, woman, or child. While the owner could sell each dog for $5, they had no market value beyond that, but the Court upheld damages of $25 each:

> There is no evidence in this case that the dogs had a market value, but the evidence is ample showing the usefulness and services of the dogs, and that they were of special value to the owner. If the jury from the evidence should be satisfied that the dogs were serviceable and useful to the owner, they could infer their value when the owner, by evidence, fixes some amount upon which they could form a basis. [31]

The Medlens insist that *Heiligmann* does not limit recovery to an amount based *solely* on the dog's economic usefulness and services. Rather, when the Court mentioned certain dogs lacking market value but having "a special value to the owner," we meant something far broader and distinct from the dogs' commercial attributes. Similarly, argue the Medlens, when the Court in *Heiligmann* noted a  **\*189**  dog's "special or pecuniary value to the owner," the word "or" indicates two distinct categories of non-market value dogs—those with a special value to the owner, and those with a pecuniary value to the owner. We disagree.

Given its ordinary, contextual meaning, *Heiligmann* tied the recovery of "special or pecuniary value" to the dogs' "usefulness and services" [32]—their economic value, not their sentimental value. While we referenced evidence "showing the usefulness and services of the dogs, and that they were of a special value to the owner," [33] the next conditional sentence pegs the jury's valuation decision to the dogs' economic attributes: "If the jury from the evidence should be satisfied that the dogs were serviceable and useful to the owner...." [34] The decision never references, even by implication, any evidence regarding companionship or owner affection.

Thus, a dog's "special or pecuniary value" refers not to the dog-human bond but to the dollars-and-cents value traceable to the dog's usefulness and services. Such value is economic value, not emotional value based on affection, attachment, or companionship. In short, *Heiligmann's* use of the word "special" does not authorize "special damages" and does not refer generically to a dog's ability to combat loneliness, ease depression, or provide security. The valuation criteria is not emotional and subjective; rather it is commercial and objective.

#### 2. *Our Post–*Heiligmann *Cases Do Not Relax the No Emotional–Injury Damages Rule for Animal–Death Cases*

Alternatively, the Medlens assert that three post-*Heiligmann* decisions—*City of Tyler v. Likes,* [35] *Porras v. Craig,* [36] and *Brown v. Frontier Theatres, Inc.* [37]—viewed collectively, entitle property owners to seek intrinsic or sentimental-value damages for

certain destroyed property that lacks market value or "special or pecuniary" value. Because dogs are considered property under Texas law, they should be treated no differently, argue the Medlens. Accordingly, Avery's intrinsic value to them, including companionship, is recoverable. We decline to stretch our post-*Heiligmann* decisions this far.

Our decision a half-century ago in *Brown* involved irreplaceable family heirlooms such as a wedding veil, pistol, jewelry, hand-made bedspreads and other items going back several generations—in other words, family keepsakes that "have their primary value in sentiment." [38] Such one-of-a-kind memorabilia have a "special value ... to their owner," and damages may factor in "the feelings of the owner for such property." [39] Notably, on the same day we decided *Brown* fifty years ago, we reaffirmed in another case the default damages rule for destroyed non-heirloom property lacking market or replacement value: "the actual worth or value of the articles to the owner ... excluding any fanciful or sentimental considerations." [40]

While they rely chiefly on *Brown,* the Medlens also cite our decisions in *Porras* **\*190** and *Likes,* but neither offers much pertinent guidance here. In *Porras,* a landowner sued someone for clearing several large trees from his land. [41] The landowner testified about what the land meant to him and his wife, not in market terms but in personal terms. [42] We recognized that the landowner had been injured by the destruction of trees, even though the property's overall market value may have actually *increased.* [43] We remanded for a new trial to determine the "intrinsic value" of the felled trees—that is, its ornamental (aesthetic) value and its utility (shade) value. [44] That assessment concerning real property is not rooted in an owner's subjective emotions, as here. While *Porras* permitted recovery of the "intrinsic value" of the trees, the plaintiff did not seek, nor did the Court discuss, the trees' sentimental value. Here, the Medlens have suffered lost companionship and are seeking, as a form of "intrinsic value" property damages, recovery for Avery's role as a cherished family member. The court of appeals read too much into *Porras,* which did not import sentimental considerations into measuring "intrinsic value." And we decline to expand *Porras's* notion of "intrinsic value" to animal cases, specifically to include the subjective value a dog owner places on his pet's companionship, particularly when *Porras* itself excluded such subjective notions.

*Likes* is likewise uninstructive. In Likes, the plaintiff alleged that a municipality negligently flooded her house and destroyed "many personal irreplaceable items." [45] The principal issue was whether mental-anguish damages are recoverable for the negligent destruction of personal property. We answered no, though we acknowledged *Brown's* sentimental-value rule for property of which the "greater value is in sentiment and not in the market place." [46] Again, mental anguish is a form of personal-injury damage, unrecoverable in an ordinary property-damage case. The Medlens' emotion-based claim is, like the mental-anguish claim in *Likes,* based wholly on negligent damage to personal property. But *Likes* bars personal-injury-type damages in a case alleging negligent property damage. In short, neither *Porras* nor *Likes* provides the Medlens much support. Distilled down, the pivotal question today is straightforward: whether to extend *Brown's* special rules for family heirlooms to negligently destroyed pets.

*Heiligmann* remains our lone case directly on point, and after a century-plus we are loathe to disturb it. An owner's fondness for a one-of-a-kind, family heirloom is sentimental, existing at the time a keepsake is acquired and based not on the item's attributes but rather on the nostalgia it evokes, but an owner's attachment to a beloved pet is more: It is emotional, formed over time and based on the pet's specific attributes, namely the rich companionship it provides. Pets afford here-and-now benefits —company, recreation, protection, etc.—unlike a passed-down heirloom kept around chiefly to commemorate past events or passed family members. We agree with the amicus brief submitted by the American Kennel Club (joined by several other pet-welfare groups): "While no two pets are alike, the emotional attachments a person establishes with each pet cannot be shoehorned **\*191** into keepsake-like sentimentality for litigation purposes." Finally, as explained below, permitting sentiment-based damages for destroyed heirloom property portends nothing resembling the vast public-policy impact of allowing such damages in animal-tort cases.

Loss of companionship, the gravamen of the Medlens' claim, is fundamentally a form of *personal-injury* damage, not property damage. It is a component of loss of consortium, including the loss of "love, affection, protection, emotional support, services,

companionship, care, and society." [47] Loss-of-consortium damages are available only for a few especially close family relationships, [48] and to allow them in lost pet cases would be inconsistent with these limitations. Therefore, like courts in the overwhelming majority of other states, [49] the Restatement of the Law of Torts, [50] and **\*192** the other Texas courts of appeals that have considered this question, [51] we reject emotion-based liability and prohibit recovery for loss of the human-animal bond.

We do not dispute that dogs are a special form of personal property. That is precisely why Texas law forbids animal cruelty generally (both civilly [52] and criminally [53]), and bans dog fighting [54] and unlawful restraints of dogs specifically [55]—because animals, though property, are unique. Most dogs have a simple job description: provide devoted companionship. We have no need to overrule *Brown's* narrow heirloom exception today; neither do we broaden it to pet-death cases and enshrine an expansive new rule that allows recovery for what a canine companion meant to its owner. The Medlens find it odd that Texas law would permit sentimental damages for loss of an heirloom but not an Airedale. Strickland would find it odd if Texas law permitted damages for loss of a Saint Bernard but not for a brother Bernard. The law is no stranger to incongruity, and we need not jettison *Brown* in order to refuse to extend it to categories of property beyond heirlooms.

 **[2]** The "true rule" in Texas remains this: Where a dog's market value is unascertainable, the correct damages measure is the dog's "special or pecuniary value" (that is, its actual value)—the economic value derived from its "usefulness and services," [56] not value drawn from companionship or other non-commercial considerations. [57]

 **\*193** We recognize that the benefit of most family dogs like Avery is not financial but relational, and springs entirely from the pet's closeness with its human companions. Measuring the *worth* of a beloved pet is unquestionably an emotional determination —what the animal *means* to you and your family—but measuring a pet's *value* is a legal determination. We are focused on the latter, and as a matter of law an owner's affection for a dog (or ferret, or parakeet, or tarantula) is not compensable. [58]

## B. Compelling Pet Welfare and Social–Policy Reasons Counsel
## Against Permitting Emotion–Based Damages in Dog–Death Cases

This is a significant case not only for pet owners but also, as several animal-welfare groups underscore, for pets themselves. Appreciating this case's significant implications, numerous animal-advocacy organizations have submitted amicus curiae briefs. And while there is no unanimous "pro-pet" position—organizations committed to animal well-being are arrayed on both sides [59]—the vast majority of pet-friendly groups oppose the Medlens' request for emotion-based damages, [60] lest greater liability raise **\*194** the cost of pet ownership and ultimately cause companion animals more harm than good.

Several animal-welfare groups—organizations that understand the intense grief and despair occasioned by a pet's death—insist that relational-injury damages would adversely impact pet welfare. For example, the American Kennel Club, joined by the Cat Fanciers' Association and other pro-animal nonprofits, worry that "pet litigation will become a cottage industry," exposing veterinarians, shelter and kennel workers, animal-rescue workers, even dog sitters, to increased liability: "Litigation would arise when pets are injured in car accidents, police actions, veterinary visits, shelter incidents, protection of livestock and pet-on-pet aggression, to name a few." As risks and costs rise, there would be fewer free clinics for spaying and neutering, fewer shelters taking in animals, fewer services like walking and boarding, and fewer people adopting pets, leaving more animals abandoned and ultimately put down. The Texas Veterinary Medical Association sounds alarms of "vast unintended consequences," asserting its members would have no choice but to practice defensive medicine "to safeguard against potential claims of malpractice." The unfortunate outcome, they contend, would be higher prices for veterinary care, thus fewer owners bringing in their pets for needed treatment. Families, particularly lower-income families, will avoid preventive care for their pets, not seek needed care for ill or injured pets, and be more apt to euthanize a pet. The Texas Municipal League and other government associations worry about police officers and animal-service employees being second-guessed for split-second decisions they must make in the field when they encounter loose and potentially dangerous animals. Not all dogs are good-natured, they warn,

and government workers must be free to take swift action to protect citizens rather than worrying about lawsuits that, even if successfully defended, drain finite taxpayer resources. Various insurance groups caution that expanded damages would spike the cost of insurance across the board, not just for veterinarians but also for homeowners and automobile drivers, "inflat[ing] the value of property loss far above that which insurance contracts have been written to cover with serious consequences for the affordability and availability of insurance in Texas."

The opposing amici, including the Texas Dog Commission and eleven Texas law professors, emphasize that the court of appeals' judgment is consistent with our post-*Heiligmann* property-valuation precedent, which they contend allows for sentimental-value damages for the loss of a dog. On this heirloom point, the Medlens pose a unique hypothetical, asserting they could seek sentimental damages if a *taxidermied* Avery had been negligently destroyed. If property is property, and if they could seek sentimental value for a stuffed Avery destroyed long after death, why can't they recover for a euthanized Avery destroyed while alive? For the reasons stated above and below, we are unpersuaded.

A decade ago we explained: "When recognizing a new cause of action and the accompanying expansion of duty, we must **\*195** perform something akin to a cost-benefit analysis to assure that this expansion of liability is justified." [61] On this score, the pet-welfare amici make a forceful case. While recognizing that dogs are treasured companions whose deaths generate tremendous sorrow, we are persuaded that allowing loss-of-companionship suits raises wide-reaching public-policy implications that legislators are better suited to calibrate. Our carefulness is augmented by two legal-policy concerns: (1) the anomaly of elevating "man's best friend" over multiple valuable human relationships; and (2) the open-ended nature of such liability.

The court of appeals' decision works a peculiar result, effectively allowing "wrongful death" damages for pets. Loss of companionship is a component of loss of consortium [62]—a form of personal-injury damage, not property damage—and something we have "narrowly cabined" to two building-block human relationships: husband-wife [63] and parent-child. [64] The Medlens request something remarkable: that pet owners have the same legal footing as those who lose a spouse, parent, or child.

Moreover, they seek damages they plainly could not seek if other close relatives (or friends) were negligently killed: siblings, step-children, grandparents, dear friends, and others. [65] Our cases reject loss-of-consortium recovery for such losses. Losing one's pet, even one considered family, should not invite damages unavailable if an actual human family member were lost. Put differently, the Medlens seek emotion-based damages for the death of "man's best friend" when the law denies such damages for the death of a human best friend. For all their noble and praiseworthy qualities, dogs are not human beings, and the Texas common-law tort system should not prioritize human-animal relationships over intimate human-human relationships, particularly familial ones. Analogous would be anomalous.

It would also invite seemingly arbitrary judicial line-drawing. Certainly, if we anointed a common-law claim for loss of pet companionship, we could prescribe limits, but the issue is not whether the Court *can* draw lines, but whether it *should*. After all, people form genuine bonds with a menagerie of animals, so which "beloved family pets" (the court of appeals' description [66] ) would merit such preferred treatment? Domesticated dogs and cats only (as in a Tennessee statute [67] )? Furry, but not finned or feathered? What about goldfish? Pythons? Cockatiels? There seems to be no cogent stopping point, at least none that doesn't resemble judicial legislation.

Similarly, while statutory damage caps exist in various types of cases involving people, the court of appeals' decision leaves matters wholly unconfined. Such broad, unstructured liability would invite peculiar results. Under *Heiligmann,* for **\*196** example, if a Westminster best-of-breed champion with a $20,000 market value is negligently destroyed, that would be its owner's top-end recovery. But if a 15–year–old frail dog with no market value dies, the owner could sue for unlimited emotional-injury damages. We could impose damages limits, but such fine-tuning is more a legislative function than a judicial one. The Medlens and amici urge a damages model based on a pet's primary value, but that, too, invites gamesmanship. The owner of a well-trained dog with legitimate market or pecuniary value, like a service animal, would be better off saying his beloved pet was a "worthless mutt" (to avoid a less-rewarding recovery under *Heiligmann),* yet a lovable, part-of-the-family mutt that the

owner adored with all his heart (to maximize sentimental damages under *Brown* ). Our tort system cannot countenance liability so imprecise, unbounded, and manipulable.

### C. The Legislature Is Best Equipped to Weigh and Initiate Broad Changes to Social and Civil–Justice Policy, Including Whether to Liberalize Damages Recovery in Pet–Death Cases

The Medlens seek a sweeping alteration of Texas tort-law principles, upending a century-plus of settled rights, duties, and responsibilities. The judiciary, however, while well suited to adjudicate individual disputes, is an imperfect forum to examine the myriad policy trade-offs at stake here. Questions abound: who can sue, who can be sued, for what missteps, for what types of damages, for how much money? And what of the societal ripple effects on veterinarians, animal-medicine manufacturers, homeowners and drivers seeking insurance, pet owners, pet caretakers, and ultimately pets themselves? Animal-death suits portend fundamental changes to our civil-justice system, not incremental adjustments on a case-by-case basis. They require detailed findings and eligibility criteria, which in turn require the careful balancing of a range of views from a range of perspectives, something best left to our 181–member Legislature. If lawmakers wish, they can hold hearings and then, after hearing testimony and weighing arguments, craft meticulous, product-of-compromise legislation that allows non-economic damages to a controllable and predictable degree.

We also draw counsel from the history of Texas common law, which, though it has allowed sentimental damages for the loss of an heirloom, has not done so for the loss of a person, instead deferring to the Legislature. One explanation is that with heirlooms, the value is sentimental; with people, the value is emotional. The reason the common law historically declined to create a wrongful-death action is not because the common law is incapable of setting reasonable parameters, or because such parameters are impossible or necessarily capricious. Rather it is because such parameters are most optimally informed by policy- and value-laden judgments the Legislature is best equipped to make. The difficulties of measuring damages for the loss of human life and identifying the beneficiaries entitled to recover were deemed by the common law too great. Because the judiciary was an imperfect decider, courts decided legislatures should decide. And our Legislature did so, authorizing a statutory wrongful-death action for reasons it was better suited to gauge. [68] Having historically declined to **\*197** recognize a common-law action for the loss of a human, the common law should not, for mostly the same reasons, recognize one for the loss of a pet.

Our precedent on the legal valuation of companion animals has endured for 122 years, and while we decline today to expand the damages available to bereaved pet owners, we understand the strength of the human-animal bond. Few Texans consider their pets throw-away commodities. Perhaps the Legislature will enact a more generous valuation formula for family pets. Valuation derives fundamentally from values, and elected legislators may favor scrapping the "property" label and reclassifying companion pets as something more elevated. The Legislature has passed a wrongful-death statute for humans; it has not (yet) for animals. Given the competing public-policy considerations, we believe if there is to be expanded recovery in pet-death cases, it, too, should be confronted legislatively, not judicially.

In 2000, Tennessee enacted legislation authorizing non-economic damages, up to $5,000, when someone negligently or intentionally kills a companion animal. [69] The T–Bo Law [70] (named for the senate sponsor's beloved Shih Tzu) [71] narrowly defines "pet" as a domesticated dog or cat, limits recovery to "the deceased pet's owner or caretaker," and immunizes veterinarians and animal shelters from negligence liability. [72] The Maryland Legislature has likewise limited damages in pet cases, restricting damages to fair market value plus the necessary costs of veterinary care, not to exceed $7,500 total. [73] An Illinois statute allows non-economic damages, but it, too, tries to narrow them, allowing emotional-distress recovery only in cases of aggravated cruelty or torture or when an animal is injured or killed in bad faith when seized or impounded. [74] That is, it forbids non-economic damages for acts of ordinary negligence.

As a matter of Texas common law, emotion-based damages are unrecoverable, but whether to permit such liability statutorily is a quintessential legislative judgment. Societal attitudes inexorably change, and shifting public views may persuade the Legislature

to extend wrongful-death actions to pets. Amid competing policy interests, including the inherent subjectivity (and inflatability) of emotion-based damages, lawmakers are best positioned to decide if such a potentially costly expansion of tort law is in the State's best interest, and if so, to structure an appropriate remedy.

### III. Conclusion

*To his dog, every man is Napoleon; hence the constant popularity of dogs.* [75]

It is an inconvenient, yet inescapable, truth: "Tort law ... cannot remedy every wrong." [76] Lines, seemingly arbitrary, are required. No one disputes that a family **\*198** dog—"in life the firmest friend" [77]—is a treasured companion. But it is also personal property, and the law draws sensible, policy-based distinctions between types of property. The majority rule throughout most of America—including Texas since 1891—leavens warm-heartedness with sober-mindedness, applying a rational rule rather than an emotional one. For the reasons discussed above, we decline to (1) jettison our 122–year–old precedent classifying dogs as ordinary property, and (2) permit noneconomic damages rooted in relational attachment.

Under Texas common law, the human-animal bond, while undeniable, is uncompensable, no matter how it is conceived in litigation—as a measure of property damages (including "intrinsic value" or "special value ... derived from the attachment that an owner feels for his pet" [78]), as a personal-injury claim for loss of companionship or emotional distress, or any other theory. The packaging or labeling matters not: Recovery rooted in a pet owner's feelings is prohibited. We understand that limiting recovery to market (or actual) value seems incommensurate with the emotional harm suffered, but pet-death actions compensating for such harm, while they can certainly be legislated, are not something Texas common law should enshrine.

We reverse the court of appeals' judgment and render judgment in favor of Strickland.

### All Citations

397 S.W.3d 184, 56 Tex. Sup. Ct. J. 470

Footnotes

| | |
|---|---|
| * | CHIEF JUSTICE JEFFERSON joins all but footnote 58 and Part II–C of this opinion. JUSTICE JOHNSON joins all but Part II–C. |
| 1 | Lord Byron, Inscription on the Monument of a Newfoundland Dog, in 7 THE WORKS OF LORD BYRON: WITH HIS LETTERS AND JOURNALS, AND HIS LIFE 292–93 n. 2 (Thomas Moore ed., 1832). |
| 2 | OLD YELLER (Walt Disney 1957). |
| 3 | *Heiligmann v. Rose,* 81 Tex. 222, 16 S.W. 931, 932 (1891). |
| 4 | *Medlen v. Strickland,* 353 S.W.3d 576, 581 (Tex.App.–Fort Worth 2011). |
| 5 | *See Russell v. Ingersoll–Rand Co.,* 841 S.W.2d 343, 345 (Tex.1992) ("common law rule" was that "no cause of action [could] be brought for the death of another person"). |
| 6 | TEX. CIV. PRAC. & REM.CODE § 71.002. |
| 7 | 16 S.W. 931. |
| 8 | 353 S.W.3d at 576–80. |
| 9 | *Id.* at 578. |
| 10 | *Id.* at 580 (quoting *Heiligmann,* 16 S.W. at 932). |
| 11 | *Id.* |
| 12 | *Id.* |
| 13 | *Id.* |
| 14 | *Id.* at 580–81. |

15    *Id.* at 580.

16    *Id.* at 581.

17    Though no one disputes that Strickland was acting within the scope of her governmental employment, she did not move for dismissal under section 101.106(f) of the Texas Tort Claims Act, TEX. CIV. PRAC. & REM.CODE § 101.106(f), to which she would have been entitled, *Franka v. Velasquez,* 332 S.W.3d 367 (Tex.2011), as the Medlens concede. Instead, she sought dismissal based on her special exceptions, which the trial court sustained. Dismissal under section 101.106(f) is not automatic; Strickland was required to file a motion. *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Estate of Arancibia,* 324 S.W.3d 544, 551 (Tex.2010); *see also Univ. of Tex. Health Sci. Ctr. at San Antonio v. Bailey,* 332 S.W.3d 395, 401 (Tex.2011) ("Substitution of the [governmental body] as the defendant was not automatic; [plaintiff] was required to file a motion."). At the court of appeals, Strickland raised a cross-point urging dismissal on immunity grounds under section 101.106(f). 353 S.W.3d at 581. She requested that if the court of appeals reinstated the Medlens' action, it should remand the case to the trial court where she would file the required motion to dismiss. *Id.* The courts of appeals, however, went straight to the merits and declined to reach Strickland's jurisdictional issue, reasoning that it was remanding anyway by sustaining the Medlens' sole issue on appeal. *Id.* This appeal followed. As Strickland has not satisfied section 101.106(f)'s prerequisites for dismissal, we proceed to the only issue before us, the merits: whether emotion-based damages are recoverable.

18    *State and County Quick Facts,* U.S. CENSUS BUREAU (Mar. 14, 2013, 11:17 AM), http://quickfacts.census.gov/qfd/states/00000.html (listing the 2010 U.S. population as almost 309 million).

19    *Pet Industry Market Size & Ownership Statistics,* AM. PET PRODS. ASS'N, , http://www.americanpetproducts.org/press_industrytrends.asp (last visited Apr. 3, 2013).

20    JONATHAN V. LAST, WHAT TO EXPECT WHEN NO ONE'S EXPECTING: AMERICA'S COMING DEMOGRAPHIC DISASTER 2 (2013) (noting that as birth rates plummet in America—the so-called "baby bust" generation—pet ownership soars).

21    *Pet Industry Market Size & Ownership Statistics, supra* note 19.

22    William C. Root, *"Man's Best Friend": Property or Family Member? An Examination of the Legal Classification of Companion Animals and its Impact on Damages Recoverable for Their Wrongful Death or Injury,* 47 VILL. L.REV.. 423, 436 (2002).

23    *Id.* at 423.

24    *Id.*

25    *Id.*

26    *Pet Industry Market Size & Ownership Statistics, supra* note 19.

27    16 S.W. 931.

28    *Id.* at 932.

29    *Id.*

30    *Id.*

31    *Id.*

32    *Id.*

33    *Id.*

34    *Id.*

35    962 S.W.2d 489 (Tex.1997).

36    675 S.W.2d 503 (Tex.1984).

37    369 S.W.2d 299 (Tex.1963).

38    *Id.* at 304–05.

39    *Id.* at 305.

40    *Crisp v. Sec. Nat'l Ins. Co.,* 369 S.W.2d 326, 328 (Tex.1963).

41    675 S.W.2d at 504.

42    *Id.* at 505.

43    *Id.* at 506.

44    See *id.*

45    962 S.W.2d at 493.

46    *Id.* at 497 (quoting *Brown,* 369 S.W.2d at 304–05).

47    *Reagan v. Vaughn,* 804 S.W.2d 463, 467 (Tex.1990).

48    *See, e.g., Roberts v. Williamson,* 111 S.W.3d 113, 118 (Tex.2003); *Ford Motor Co. v. Miles,* 967 S.W.2d 377, 383–84 (Tex.1998); *Reagan,* 804 S.W.2d at 467.

49      *See Mitchell v. Heinrichs,* 27 P.3d 309, 312–14 (Alaska 2001); *Kaufman v. Langhofer,* 223 Ariz. 249, 222 P.3d 272, 278–79 (Ct.App.2009); *McMahon v. Craig,* 176 Cal.App.4th 1502, 97 Cal.Rptr.3d 555, 566–68 (2009); *Myers v. City of Hartford,* 84 Conn.App. 395, 853 A.2d 621, 626 (2004); *Naples v. Miller,* 2009 WL 1163504, at *2–4 (Del.Super.Ct. Apr. 30, 2009), *aff'd,* 992 A.2d 1237 (Del.2010); *Kennedy v. Byas,* 867 So.2d 1195, 1198 (Fla.Dist.Ct.App.2004); *Gill v. Brown,* 107 Idaho 1137, 695 P.2d 1276, 1277 (Ct.App.1985); *Jankoski v. Preiser Animal Hosp., Ltd.,* 157 Ill.App.3d 818, 110 Ill.Dec. 53, 510 N.E.2d 1084, 1087 (1987); *Lachenman v. Stice,* 838 N.E.2d 451, 461 (Ind.Ct.App.2005); *Nichols v. Sukaro Kennels,* 555 N.W.2d 689, 691 (Iowa 1996); *Ammon v. Welty,* 113 S.W.3d 185, 187–88 (Ky.Ct.App.2002); *Kling v. U.S. Fire Ins. Co.,* 146 So.2d 635, 642 (La.Ct.App.1962), *overruled in part by Holland v. Buckley,* 305 So.2d 113, 114 (La.1974); *Krasnecky v. Meffen,* 56 Mass.App.Ct. 418, 777 N.E.2d 1286, 1289–90 (2002); *Koester v. VCA Animal Hosp.,* 244 Mich.App. 173, 624 N.W.2d 209, 211 (2000); *Fackler v. Genetzky,* 257 Neb. 130, 595 N.W.2d 884, 891–92 (1999); *Harabes v. Barkery, Inc.,* 348 N.J.Super. 366, 791 A.2d 1142, 1145–46 (2001); *Wilcox v. Butt's Drug Stores, Inc.,* 38 N.M. 502, 35 P.2d 978, 979 (1934); *DeJoy v. Niagara Mohawk Power Corp.,* 13 A.D.3d 1108, 786 N.Y.S.2d 873, 873 (2004) (mem.); *Shera v. N.C. State Univ. Veterinary Teaching Hosp.,* 723 S.E.2d 352, 357–58 (N.C.Ct.App.2012); *Pacher v. Invisible Fence of Dayton,* 154 Ohio App.3d 744, 798 N.E.2d 1121, 1125–26 (2003); *Oberschlake v. Veterinary Assocs. Animal Hosp.,* 151 Ohio App.3d 741, 785 N.E.2d 811, 812–15 (2003); *Lockett v. Hill,* 182 Or.App. 377, 51 P.3d 5, 7–8 (2002); *Daughen v. Fox,* 372 Pa.Super. 405, 539 A.2d 858, 864–65 (1988); *Rowbotham v. Maher,* 658 A.2d 912, 912–13 (R.I.1995); *Scheele v. Dustin,* 188 Vt. 36, 998 A.2d 697, 700–04 (2010); *Goodby v. Vetpharm, Inc.,* 186 Vt. 63, 974 A.2d 1269, 1273–74 (2009); *Kondaurov v. Kerdasha,* 271 Va. 646, 629 S.E.2d 181, 187 (2006); *Sherman v. Kissinger,* 146 Wash.App. 855, 195 P.3d 539, 548, 549 n. 9 (2008); *Carbasho v. Musulin,* 217 W.Va. 359, 618 S.E.2d 368, 370–71 (2005); *Rabideau v. City of Racine,* 243 Wis.2d 486, 627 N.W.2d 795, 798–99, 801–02 (2001). *But see Knowles Animal Hosp., Inc. v. Wills,* 360 So.2d 37, 38 (Fla.Dist.Ct.App.1978) (per curiam); *Barrios v. Safeway Ins. Co.,* 97 So.3d 1019, 1022–24 (La.Ct.App.2012); *Corso v. Crawford Dog & Cat Hosp., Inc.,* 97 Misc.2d 530, 530–31, 415 N.Y.S.2d 182 (Civ.Cit.1979).

50      RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 47 cmt. m (2012)(emphasis in original):

         Recovery for emotional harm resulting from negligently caused harm to personal property is not permitted under this Section. Emotional harm due to harm to personal property is insufficiently frequent or significant to justify a tort remedy. While pets are often quite different from other chattels in terms of emotional attachment, an actor who negligently injures another's pet is not liable for emotional harm suffered by the pet's owner. This rule against liability for emotional harm secondary to injury to a pet limits the liability of veterinarians in the event of malpractice and serves to make veterinary services more readily available for pets. Although harm to pets (and chattels with sentimental value) can cause real and serious emotional harm in some cases, lines—arbitrary at times—that limit recovery for emotional harm are necessary. Indeed, injury to a close personal friend may cause serious emotional harm, but that harm is similarly not recoverable under this Chapter. However, recovery for *intentionally* inflicted emotional harm is not barred when the defendant's method of inflicting harm is by means of causing harm to property, including an animal. See § 46, Comment *d.*

51      In the 122 years since *Heiligmann,* five Texas courts of appeals have decided dog-death cases, and all but one (the court of appeals in this case) have concluded that Texas law prohibits non-economic damages. *See Petco Animal Supplies, Inc. v. Schuster,* 144 S.W.3d 554 (Tex.App.–Austin 2004, no pet.); *Zeid v. Pearce,* 953 S.W.2d 368 (Tex.App.–El Paso 1997, no writ); *Bueckner v. Hamel,* 886 S.W.2d 368 (Tex.App.–Houston [1st Dist.] 1994, writ denied); *Young's Bus Lines, Inc. v. Redmon,* 43 S.W.2d 266 (Tex.Civ.App.–Beaumont 1931, no writ).

52      TEX. HEALTH & SAFETY CODE §§ 821.021–.026.

53      TEX. PENAL CODE § 42.09–.092.

54      *Id.* § 42.10.

55      TEX. HEALTH & SAFETY CODE §§ 821.076–.081.

56      *Heiligmann,* 16 S.W. at 932.

57      *Id.* The Texas rule falls squarely within the national mainstream, which cuts overwhelmingly against sentimental-damages recovery. As noted earlier, most other states likewise do not allow pet owners to recover emotional-injury damages. *See supra* note 49. "Fair market value" remains the predominant measure of damages nationally. Some courts, though, have adopted an "actual value" approach when market value for the animal (1) is nonexistent, (2) cannot be ascertained, or (3) is not a true measure of its worth. *See, e.g., Mitchell,* 27 P.3d at 313–14; *Jankoski,* 110 Ill.Dec. 53, 510 N.E.2d at 1087; *Brousseau v. Rosenthal,* 110 Misc.2d 1054, 443 N.Y.S.2d 285, 286 (Civ.Ct.1980); *Shera,* 723 S.E.2d at 357–58; *Sokolovic v. Hamilton,* 195 Ohio App.3d 406, 960 N.E.2d 510, 513 (2011); *McDonald v. Ohio State Univ. Veterinary Hosp.,* 67 Ohio Misc.2d 40, 42–43, 644 N.E.2d 750 (1994). Other jurisdictions have permitted punitive damages where the wrongdoer injured or killed an animal with malice. *See* CAL. CIV.CODE § 3340 (West 2012); *Martinez v. Robledo,* 210 Cal.App.4th 384, 147 Cal.Rptr.3d 921, 926 (2012); *Plotnik v. Meihaus,* 208 Cal.App.4th 1590, 146 Cal.Rptr.3d 585, 600 (2012); *Bruister v. Haney,* 233 Miss. 527, 102 So.2d 806, 807 (1958).

While actual value cannot include the owner's "feelings," unlike *Brown's* narrow exception for one-of-a-kind heirlooms, 369 S.W.3d at 305, it *can* include a range of other factors: purchase price, reasonable replacement costs (including investments such as immunizations, neutering, training), breeding potential (if any), special training, any particular economic utility, veterinary expenses related to the negligent injury, and so on. *See Mitchell,* 27 P.3d at 313–14; *see also Heiligmann,* 16 S.W. at 932 (taking into account breed and special training in determining damages); *Nichols,* 555 N.W.2d at 692 ("In determining the measure of damages for injuries to a dog, factors include its market value, which may be based on purchase price, relatively long life of breed, its training, usefulness and desirable traits." (quoting 4 AM.JUR. 2d *Animals* § 162 (1964))). Emotional attachment, however, is not a component of actual value.

Supporting the Medlens (and thus favoring emotional-injury damages) are the Texas Dog Commission (TDC) and a group of law professors. The TDC says the court of appeals' decision follows *Heiligmann* and tracks prevailing law. The law professors say *Heiligmann* divided personal property into three categories, "based on where the greatest value of the property lies"—(1) personal property with market value, (2) personal property with use value, and (3) personal property that has sentiment as its primary value—"and created a different damages test for each." This case, they contend, falls neatly within category three in light of our post-*Heiligmann* cases that allow intrinsic value when market or pecuniary valuations are out of place.

Supporting Strickland (and thus opposing emotional-injury damages) are the Texas Municipal League, the Texas City Attorneys Association, and the City of Arlington, Texas (collectively "Municipal Amici"); the American Kennel Club, Cat Fanciers' Association, Animal Health Institute, American Veterinary Medical Association, National Animal Interest Alliance, American Pet Products Association, and Pet Industry Joint Advisory Council (collectively "AKC"); the Texas Veterinary Medical Association (TVMA); the Texas Civil Justice League (TCJL); and the Property Casualty Insurers Association of America, American Insurance Association, and National Association of Mutual Insurance Companies (collectively "Insurer Amici").

The Municipal Amici argue the court of appeals' ruling essentially allows "wrongful death" damages for dogs that are barred for human beings. Also, such damages would irrationally expose to unrestricted damages municipalities, veterinarians, and other service providers who must make difficult, on-the-fly decisions in the field. The AKC warns that allowing such liability will necessarily increase the costs of pet "health care, pet products, and other pet services." The TVMA says allowing emotion-based damages may actually harm pets "by driving up the basic costs of pet ownership," and that litigation and insurance costs will cause veterinarians to boost prices to offset the threat of noneconomic damages. The TCJL contends such damages offend well-settled law, put Texas jurisprudence far outside the mainstream, and force a radical policy change better left to the Legislature. The Insurer Amici assert that allowing subjective, emotional-injury damages for harmed personal property will skew "the underwriting of risk, the setting of rates, and the payment of claims." This abrupt imbalance, they argue, will impact not only veterinary insurance, but insurance more generally, particularly homeowner's and automobile coverage.

61      *Roberts,* 111 S.W.3d at 118.

62      *See Reagan,* 804 S.W.2d at 467.

63      *Whittlesey v. Miller,* 572 S.W.2d 665, 667 (Tex.1978).

64      *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 551 (Tex.1985) (allowing a child to recover loss-of-companionship damages when a parent dies), *overruled in part on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 533 (Tex.1998); *Sanchez v. Schindler,* 651 S.W.2d 249, 252–53 (Tex.1983) (allowing a parent to recover such damages when a child dies).

65      *See Miles,* 967 S.W.2d at 382–84 (refusing to allow loss-of-consortium recovery by siblings and step-parents).

66      353 S.W.3d at 580.

67      TENN.CODE ANN. § 44–17–403 (2012).

68      *See* TEX. CIV. PRAC. & REM.CODE §§ 71.001–.011 (current version of the Texas wrongful-death statute).

69      TENN.CODE ANN. § 44–17–403 (2012).

70      2000 Tenn. Pub. Acts Ch. 762.

71      *See* Susan Cover, *Maine Bill Would Raise Status of Pets That Are Killed,* PORTLAND PRESS HERALD (Feb. 15, 2013), http://www.pressherald. com/politics/bill-would-raise-status-of-pets-that-are-killed_2013–02–16. html.

72      TENN.CODE ANN. § 44–17–403.

73      MD.CODE ANN., CTS. & JUD. PROC. § 11–110 (2012).

74      510 ILL. COMP. STAT. ANN.N. 70/16.3 (West 2013).

75      Aldous Huxley, *as quoted in* ROBERT ANDREWS, THE CONCISE COLUMBIA DICTIONARY OF QUOTATIONS 83 (1990).

76      *Roberts,* 111 S.W.3d at 118.

77      Lord Byron, *supra* note 1, at 293.

78      353 S.W.3d at 580.

**End of Document**                                                       © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 4

375 S.W.3d 464
Court of Appeals of Texas,
Austin.

TEXAS BOARD OF CHIROPRACTIC EXAMINERS, Glenn Parker, Executive Director, and Texas Chiropractic Association, Appellants
v.
TEXAS MEDICAL ASSOCIATION, Texas Medical Board, and the State of Texas, Appellees.

No. 03–10–00673–CV. | July 6, 2012.

**Synopsis**
**Background:** Medical association brought action against Texas Board of Chiropractic Examiners (TBCE) seeking declarations that various provisions of the scope-of-practice rule that permitted needle electromyography (EMG) and manipulation under anesthesia (MUA) were invalid because they exceeded the statutory scope of chiropractic and constituted the unlawful practice of medicine. The District Court, Travis County, Stephen Yelenosky, J., invalidated rules. TBCE appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] TBCE exceeded its authority in promulgating rules allowing chiropractors to perform needle EMG;

[2] MUA was a surgical procedure excluded from the statutory scope of chiropractic;

[3] rule allowing chiropractors to make certain diagnosis regarding the biomechanical condition of the spine or musculoskeletal system fell within the statutory scope of chiropractic; and

[4] rule allowing chiropractors to diagnose a subluxation complex of the spine or musculoskeletal system fell within the statutory scope of chiropractic.

Affirmed in part, reversed in part, and remanded; rehearing denied.

West Headnotes (6)

**[1]** **Health** Chiropractors
**Health** Regulation of Professional Conduct; Boards and Officers

Texas Board of Chiropractic Examiners (TBCE) exceeded its authority in promulgating rules allowing chiropractors to perform needle electromyography (EMG); some types of EMG needles had beveled, blade-like edges, which were designed to slice or cut through tissue, and thus, the use of the needles constituted an "incisive" procedure that was excluded by statute from the scope of chiropractic. V.T.C.A., Occupations Code § 201.002(b–c); 22 TAC § 75.17(a)(3).

Cases that cite this headnote

**[2]**     **Health** 🗝 Chiropractors

**Health** 🗝 Regulation of Professional Conduct; Boards and Officers

Manipulation under anesthesia (MUA) was a "surgical procedure" excluded from the statutory scope of chiropractic, and thus, rules promulgated by the Texas Board of Chiropractic Examiners (TBCE) allowing chiropractors to perform MUA were invalid, where the American Medical Association's annual Current Procedural Terminology (CPT) Codebook listed MUA as a medical procedure in the surgery section of the Codebook. V.T.C.A., Occupations Code §§ 201.002(a)(4), 201.154; 22 TAC § 75.17(e)(2)(O).

2 Cases that cite this headnote

**[3]**     **Constitutional Law** 🗝 To non-governmental entities

**Health** 🗝 Validity

Statute regarding scope of chiropractic practice incorporated the 2004 version of American Medical Association's (AMA) Current Procedural Terminology (CPT) Codebook in defining "surgical procedure," rather than the CPT Codebook in whatever manner the AMA might revise or amend it in the future, and thus, the Legislature did not improperly delegate its authority in a way that violated the separation-of-powers clause of the Texas Constitution. Vernon's Ann.Texas Const. Art. 3, § 1; V.T.C.A., Occupations Code § 201.002(a)(4).

Cases that cite this headnote

**[4]**     **Health** 🗝 Chiropractors

**Health** 🗝 Regulation of Professional Conduct; Boards and Officers

In the absence of a separate notice of appeal filed by medical association, appellate court lacked jurisdiction to consider medical association's claim that the statutory scope of chiropractic did not include "diagnosing" a condition, as opposed to analyzing, examining, or evaluating it, where claim sought relief beyond that which association was afforded in the district court's judgment, which granted motions for partial summary judgment and rendered a take-nothing judgment as to association's claims for a declaration that the use of "diagnosis" in itself rendered applicable rule invalid. Rules App.Proc., Rule 25.1(c); 22 TAC § 75.17(d).

2 Cases that cite this headnote

**[5]**     **Health** 🗝 Chiropractors

**Health** 🗝 Regulation of Professional Conduct; Boards and Officers

Rule promulgated by the Texas Board of Chiropractic Examiners (TBCE) allowing chiropractors to make certain diagnosis restricted any such diagnosis to the biomechanical condition of the spine or musculoskeletal system, and thus, the rule fell within the statutory scope of chiropractic. V.T.C.A., Occupations Code § 201.002(b)(1); 22 TAC § 75.17(d)(1)(A).

2 Cases that cite this headnote

**[6]**     **Health** 🗝 Chiropractors

**Health** 🗝 Regulation of Professional Conduct; Boards and Officers

Although the definition of subluxation complex as used in rule promulgated by the Texas Board of Chiropractic Examiners (TBCE) allowing chiropractors to make certain diagnosis indicated that its existence might have functional or pathological consequences or that it might affect essentially every part of the body, the rule itself only allowed chiropractors to render an analysis, diagnosis, or other opinion regarding a subluxation complex of the spine or

musculoskeletal system, and thus, the rule fell within the statutory scope of chiropractic. V.T.C.A., Occupations Code § 201.002(b); 22 TAC § 75.17(d)(1)(B).

2 Cases that cite this headnote

**West Codenotes**

**Held Invalid**
22 TAC § 75.17(a)(3), (e)(2)(O).

**Attorneys and Law Firms**

**\*465**  Jason D. Ray, Jennifer S. Riggs, Riggs, Aleshire & Ray, P.C., Joe H. Thrash, Assistant Attorney General, Environmental Protection & Administrative Law Division, Matt C. Wood, Baker Botts, L.L.P., Austin, TX, for appellant.

David F. Bragg, Law Offices of David F. Bragg, P.C., Bastrop, TX, Nancy K. Juren, Angela V. Colmenero, Assistant Attorney General, General Litigation Division, Donald P. Wilcox, Andrea Schwab, C.J. Francisco, Office of General Counsel, Texas Medical Association, Austin, TX, for appellee.

**\*466**  Before Chief Justice JONES, Justices PEMBERTON and HENSON.

*OPINION*

BOB PEMBERTON, Justice.

We withdraw our opinion and judgment dated April 5, 2012, and substitute the following in its place. The motion for rehearing filed by appellee Texas Medical Association is denied.

The Texas Board of Chiropractic Examiners (TBCE), its executive director, and the Texas Chiropractic Association appeal a final district court judgment invalidating portions of TBCE's recently adopted administrative rule defining the scope of practice of chiropractic. *See* 22 Tex. Admin. Code § 75.17 (2011) (Tex. Bd. of Chiropractic Exam'rs, Scope of Practice). The rule provisions at issue purport to authorize TBCE's licensees to perform procedures known as manipulation under anesthesia and needle electromyography, and to "diagnose" certain conditions. *See id.* § 75.17(a)(3), (c)(2)(D), (c)(3)(A), (d)(1)(A)–(B), (e)(2)(O). We will affirm the judgment in part and reverse and remand in part.

BACKGROUND

Article XVI, section 31 of the Texas Constitution authorizes the Legislature to "pass laws prescribing the qualifications of practitioners of medicine in this State," with the caveat that "no preference shall ever be given by law to any schools of medicine." Tex. Const. art. XVI, § 31. In turn, the Legislature has enacted the Medical Practice Act, in which it has delegated broad authority to the Texas Medical Board (TMB) to regulate the "practice of medicine" in this state, mandated that a person cannot lawfully "practice medicine" without a TMB-issued license, and imposed rigorous education and training requirements as a prerequisite to licensing eligibility. *See* Tex. Occ.Code Ann. §§ 151.001–.056 (West 2004 & Supp. 2011) (Medical Practice Act); *id.* §§ 151.003(2) (providing that TMB "should remain the primary means of licensing, regulating, and disciplining physicians."), 152.001(a) (West Supp. 2011) (designating TMB as agency with power to regulate the practice of medicine), 153.001(3) (West 2004) (granting TMB the authority to adopt rules to regulate the practice of medicine), 155.001 (West 2004) (requiring license to practice medicine), 155.003 (West Supp. 2011) (setting forth requirements for license to practice medicine).

The Legislature has defined "practicing medicine" under the Medical Practice Act as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions" by a person who either "directly or indirectly charges money or other compensation for those services" or publicly professes to be a physician or surgeon. *See id.* § 151.002(a)(13).

However, the Legislature has carved out of this broad definition of "practicing medicine"—and, thus, exempted from the Medical Practice Act's education, training, and licensing standards and the TMB's regulatory authority—a variety of other health-related fields on which it has imposed different legal requirements and regulations. *See id.* § 151.052. Such exemptions, our Texas high courts have reasoned, do not amount to an unconstitutional "preference ... to any school[ ] of medicine" to the extent the exempted treatment or method does not extend to the "whole body." *See Schlichting v. Texas State Bd. of Med. Exam'rs,* 158 Tex. 279, 310 S.W.2d 557, 564 (1958); *Ex parte Halsted,* 147 Tex.Crim. 453, 182 S.W.2d 479, 486 (1944). Among the exemptions, the Legislature **\*467** has included "a licensed chiropractor engaged strictly in the practice of chiropractic as defined by law." *See* Tex. Occ.Code Ann. § 151.052(a)(3). Chiropractors are currently regulated under chapter 201 of the occupations code, which defines the permissible scope of chiropractic practice, imposes its own set of educational and licensing requirements, and delegates authority to TBCE to administer the regime. *See id.* §§ 201.001–.606 (West 2004 & Supp. 2011).

The net effect of the statutory interplay is that a person licensed by TBCE as a chiropractor but not by the TMB to "practice medicine" (i.e., as a physician [1] ) can lawfully do things that would otherwise constitute "practicing medicine" as long as he remains within the statutory scope of chiropractic under chapter 201. However, to the extent he exceeds the statutory scope of chiropractic, he would subject himself to the Medical Practice Act—and practice medicine unlawfully. *See id.* §§ 151.002(a)(13), 201.002;[2] *see also Teem v. State,* 79 Tex.Crim. 285, 183 S.W. 1144 (1916) (involving prosecution of chiropractor for unlawfully practicing medicine prior to Texas's legislative recognition and legalization of chiropractic). Another consequence of this statutory interplay is a long history of professional, scientific, or economic antagonism between chiropractors and the medical community, and resultant disputes, spanning all three branches of government, regarding where any legal line between chiropractic and the practice of medicine is or should be. Key participants in these disputes have included the two professional associations that are parties to this appeal, the Texas Chiropractic Association (TCA) and the Texas Medical Association (TMA), which advocate on behalf of the respective interests of chiropractors and physicians and their sometimes-competing views of patient welfare.

Chiropractic was historically rooted in a theory that a wide range of human health problems stem from spinal misalignment —or a broader category of spinal disorders termed "subluxations"—and can be cured through manipulation of vertebrae. [3] At its 1949 inception, Texas's statutory regime defining and regulating chiropractic reflected **\*468** this traditional focus on ascertaining spinal problems and manipulating vertebrae as an intended means of cure. [4] However, over the ensuing decades, Texas chiropractors evidently came to engage in identifying and treating a wider range of musculoskeletal problems with a wider range of procedures or methods. In 1989, the Legislature saw fit to take account of these developments through amendments to the statutory definition of chiropractic practice that expanded the focus of chiropractic beyond the spine to the more general "biomechanics" of the "musculoskeletal system," and added somewhat broader language regarding the treatments or methods chiropractors could perform. *See* Act of May 12, 1989, 71st Leg., R.S., ch. 227, §§ 1–3, 1989 Tex. Gen. Laws 1005, 1005– 06. [5] Although procedures entailing "surgery, drugs that require a prescription to be dispensed, x-ray therapy, or therapy that exposes the body to radioactive material" were expressly excluded from the practice, chiropractors were now permitted to use (1) "objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body" and (2) "adjustment, manipulation, or other **\*469** procedures in order to improve subluxation or the biomechanics of the musculoskeletal system." *See id.* §§ 1, 3, 1989 Tex. Gen. Laws at 1005–06.

In the aftermath of the 1989 amendments, a number of controversies arose concerning whether particular examination or treatment procedures exceeded the statutory scope of chiropractic and, relatedly, the extent to which TBCE, by permitting chiropractors to perform them, was abetting unlawful encroachments upon the practice of medicine. Areas of dispute included the extent to which chiropractors could perform procedures entailing the insertion of needles into the human body, such as

acupuncture and a procedure known as needle electromyography, or "needle EMG." Simply described, needle EMG entails the insertion of needle electrodes into a patient's muscle and transmitting a small electric current as a means of evaluating nerve conductivity. Another subject of controversy was a treatment method known as manipulation under anesthesia, or "MUA." As the term suggests, MUA entails a chiropractor's manipulation of the musculoskeletal system while the patient is under general anesthesia so as to facilitate a greater range of motion than if the patient was feeling pain or resisting. [6]

Against this backdrop, in 1995 the Legislature made several important amendments to the statutory scope of chiropractic. These included specifying that the treatment methods that defined the scope of chiropractic were "nonsurgical, nonincisive procedures, including but not limited to adjustment and manipulation, in order to improve the subluxation complex or the biomechanics of the musculoskeletal system," and likewise excluding "incisive or surgical procedures" from the scope of chiropractic practice. *See* Act of May 29, 1995, 74th Leg., R.S., ch. 965, §§ 13, 18, 1995 Tex. Gen. Laws 4789, 4802–03 (current version at Tex. Occ.Code Ann. § 201.002(b)–(c)). The Legislature defined or described "incisive or surgical procedures" as follows:

> In this act, "incisive or surgical procedure" includes but is not limited to making an incision into any tissue, cavity or organ by any person or implement. It does not include the use of a needle for the purpose of drawing blood for diagnostic testing.

*See id.* § 18, 1995 Tex. Gen. Laws at 4803. Additionally, the Legislature prohibited TBCE from "adopt[ing] a process to certify chiropractors to perform manipulation under anesthesia." *See id.* § 19, 1995 Tex. Gen. Laws at 4803. These provisions were later codified in sections 201.002 and 201.154 of the occupations code. *See* Tex. Occ.Code Ann. §§ 201.002(a)(3) (" 'Incisive or surgical procedure' includes making an incision into any tissue, cavity or organ by any person or implement. The term does not include the use of a needle for the purpose of drawing blood for diagnostic testing."), .002(c) ( "The practice of chiropractic does not include ... incisive or surgical procedures."), .154 ("Notwithstanding any other provision of this chapter, the [TBCE] may not adopt a process to certify chiropractors to perform manipulation under anesthesia."). [7]

**\*470** In the aftermath of these changes to the statutory scope of chiropractic, TBCE issued what it styled as informal "statements" or "memoranda" advising its licensees of its view that the 1995 amendments had not rendered needle EMG, acupuncture, or MUA beyond the scope of chiropractic practice. [8] Meanwhile, the Attorney General issued opinions reasoning that, to the contrary, any procedure involving the insertion of a needle into the body (other than the excepted blood draw for diagnostic use) was "incisive" and thus excluded it from the scope of chiropractic. [9] Applying this reasoning, for example, the Attorney General opined that acupuncture was an "incisive" procedure and thus excluded from the scope of chiropractic. [10] Thereafter, the Legislature amended the statutory definition of acupuncture, which had previously been stated in terms of "the insertion of an acupuncture needle," *see* Act of May 30, 1993, 73d Leg., R.S., ch. 862, § 37, 1993 Tex. Gen. Laws 3374, 3400, to refer instead to "the *nonsurgical, nonincisive* insertion of an acupuncture needle." *See* Act of May 28, 1997, 75th Leg., R.S., ch. 1170, § 1, 1997 Tex. Gen. Laws 4418 (emphasis added) (current version at Tex. Occ.Code Ann. § 205.001(2)(A) (West Supp. 2011)); *see also* Tex. Att'y Gen. Op. No. DM–471 (1998) (concluding that the **\*471** 1997 amendment served to ensure that the practice of acupuncture would be within the practice of chiropractic, thereby superseding the prior opinion). But the broader underlying disagreement concerning the use of needles in chiropractic remained, [11] as did the controversy regarding whether chiropractors could perform MUA. However, due in part to the advisory nature of the administrative pronouncements and related jurisdictional and procedural limitations, the controversies eluded judicial resolution for several years. [12]

The Legislature returned to chiropractic scope-of-practice issues in 2005 when TBCE came up for sunset review. Although it did not address either needle EMG or MUA through statutory amendments expressly mentioning either procedure, the Legislature did add a new description of the "surgical procedures" that were excluded from chiropractic:

> "Surgical procedure" includes a procedure described in the surgery section of the common procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

*See* Act of May 27, 2005, 79th Leg., R.S., ch. 1020, § 1, 2005 Tex. Gen. Laws 3464, 3465 (codified at Tex. Occ.Code Ann. § 201.002(a)(4)). The Legislature also mandated that TBCE "adopt rules clarifying what activities are included within the scope of the practice of chiropractic and what activities are outside of that scope," including "clearly specify[ing] the procedures that chiropractors may perform" and "any equipment and the use of that equipment that is prohibited." *See id.* § 8, 2005 Tex. Gen. Laws at 3466 (codified at Tex. Occ.Code Ann. §§ 201.1525–.1526). Among other implications, this rule-making mandate ensured that TBCE would issue scope-of-practice directives to its licensees in a form that opponents could test in court to determine whether they exceeded the underlying statutory scope of chiropractic. *See* Tex. Gov't Code Ann. § 2001.038 (West 2008) (creating cause of action for declaratory relief regarding "the validity or applicability of a rule" where "it is alleged that the rule or its threatened **\*472** application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff"); *see also Texas Orthopaedic Ass'n v. Texas State Bd. of Podiatric Med. Exam'rs,* 254 S.W.3d 714, 718 n. 1 (Tex.App.-Austin 2008, pet. denied) (recognizing physician's standing to challenge validity of podiatric board rule that included ankle within the definition of "foot" and ultimately holding that rule exceeded board's rule-making authority). [13]

In response to this rule-making mandate, TBCE promulgated a "Scope of Practice" rule authorizing chiropractors to perform both needle EMG and MUA. *See* 22 Tex. Admin. Code § 75.17. [14] Invoking section 2001.038 of the Administrative Procedures Act, TMA sued TBCE [15] seeking declarations that various provisions of the scope-of-practice rule that permitted needle EMG and MUA were invalid because they exceeded the statutory scope of chiropractic and, therefore, constituted the unlawful practice of medicine. [16] TMA also asserted similar claims concerning a provision of the rule permitting chiropractors to "diagnose" certain conditions. In the alternative, if any of the challenged rule provisions proved to be within TBCE's statutory authority, TMA sought declarations that the underlying statutes granted chiropractors a "preference" over physicians in practicing "medicine" in violation of article XVI, section 31 of the Texas Constitution. TMA further sought injunctive relief barring enforcement of the challenged rules or, alternatively, statutes.

On petition of TMA, the TMB was joined in the suit as a plaintiff. After TBCE was unsuccessful in challenging TMA's standing, TCA intervened as a defendant and also asserted its own affirmative claims for declarations that each of the challenged rules were within the statutory scope of chiropractic. In the alternative, TCA sought a declaration that a statutory definition of "surgical" added by the Legislature in the 2005 Sunset legislation was unconstitutional on grounds that included **\*473** improper delegation of legislative authority to a private entity. *See Texas Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 465–75 (Tex.1997).

TMA, joined by TMB (hereafter, the "Physician Parties"), sought traditional partial summary judgment on their claims seeking to invalidate, as beyond the statutory scope of chiropractic, TBCE's rules authorizing chiropractors to perform needle EMG and MUA. The district court granted the motion as to these claims.

In the same motion, the Physician Parties similarly sought summary judgment invalidating TBCE's rule permitting chiropractors to make "diagnoses" as beyond the statutory scope of chiropractic. TBCE and TCA (hereafter the "Chiropractor Parties") countered with a cross-motion for partial summary judgment dismissing the Physician Parties' claims challenging whether TBCE's rules permitting "diagnoses" were within the statutory scope of chiropractic. [17] The district court denied the Physician Parties' motion and granted the Chiropractor Parties' motion in part "as to the Chiropractic Board's use of the word 'diagnosis' in its rule." "However," the court emphasized, it "reserve[d] judgment regarding 'diagnosis' as it related to *scope of practice.*" (Emphasis in original.) Following a second round of summary-judgment filings, however, the district court granted summary judgment for the Physician Parties as to a narrower portion of the "diagnosis" rule than they had challenged previously.

In the meantime, the Attorney General had intervened on behalf of the State of Texas to defend against each side's alternative constitutional claims, *see* Tex. Civ. Prac. & Rem.Code Ann. § 37.006(b) (West 2008), and the Attorney General and various other parties had filed pleadings attacking those claims. After the district court indicated its intended disposition of the second round of partial summary-judgment motions, but before it signed an order, TCA non-suited its affirmative claims for relief.

In light of TCA's non-suit, and concluding that the Physician Parties' "constitutional challenges" had been rendered "moot" by its summary-judgment rulings, the district court rendered a final judgment incorporating its summary-judgment rulings and declaring the aforementioned rule provisions concerning needle EMG, MUA, and "diagnoses" "invalid and void." Both of the Chiropractor Parties filed notices of appeal.

## ANALYSIS

In five issues on appeal, TCA challenges the district court's judgment invalidating TBCE rules regarding needle EMG, MUA, and "diagnoses." TBCE brings three issues challenging only the portions of the judgment invalidating the needle-EMG and MUA rules.

**Standard of review**

The challenged portions of the district court's judgment are predicated on its rulings granting or denying motions for partial summary judgment. We review the district court's summary judgments de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter **\*474** of law. Tex.R. Civ. P. 166a(c). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.,* 164 S.W.3d at 661; *Knott,* 128 S.W.3d at 215. When parties file cross-motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we review the summary-judgment evidence supporting both motions and determine all questions presented and preserved. *See FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000). We "should render the judgment that the trial court should have rendered." *Id.*

In this case, the parties' respective entitlements to summary judgment turn principally on whether the rules in question were within TBCE's statutory authority to adopt. To resolve such questions, we consider whether each rule: (1) contravened specific statutory language; (2) ran counter to the general objectives of the underlying statute, chapter 201 of the occupations code; or (3) imposed additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *See City of Garland v. Public Util. Comm'n,* 165 S.W.3d 814, 819 (Tex.App.-Austin 2005, pet. denied).

Statutory construction presents a question of law that we review de novo. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). Our primary objective in statutory construction is to give effect to the Legislature's intent. *See id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn,* 209 S.W.3d 83, 85 (Tex.2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009) (op. on reh'g) (citing *Shumake,* 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson,* 209 S.W.3d 644, 651–52 (Tex.2006)). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired; otherwise we construe the words according to their plain and common meaning unless a contrary intent is apparent from the context. *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625–26 (Tex.2008). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Texas Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 635 (Tex.2010); *Shook v. Walden,* 304 S.W.3d 910, 917 (Tex.App.-Austin 2010, no pet.). Our analysis of the statutory text may also be informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," *see* Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, "common law or former statutory provisions, including laws on the same or similar subjects," "consequences of a particular construction," and the enactment's "title," *id.* § 311.023(1)-(5), (7) (West 2005). However, only when the statutory text is

ambiguous—i.e., susceptible to more than one reasonable interpretation—"do we 'resort to rules of construction or extrinsic aids.' " *See Entergy Gulf States, Inc.,* 282 S.W.3d at 437 (quoting *In re Estate of Nash,* 220 S.W.3d 914, 917 (Tex.2007)).

As the Chiropractor Parties emphasize, in certain circumstances courts may be required to defer to an administrative agency's construction of its own statutory authority. *See Railroad Comm'n v. Texas* **\*475** *Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 624–25 (Tex.2011).* But these principles apply only where the statute in question is ambiguous and only to the extent that the agency's interpretation is one of those reasonable interpretations. *See id.* "Consequently, to determine whether this rule of deference applies, a reviewing court must first make a threshold determination that the statute is ambiguous and the agency's construction is reasonable—questions that turn on statutory construction and are reviewed de novo." *City of Waco v. Texas Comm'n on Envtl. Quality,* 346 S.W.3d 781, 800 (Tex.App.-Austin 2011, pet. filed) (citing *Texas Citizens,* 336 S.W.3d at 625).* Additionally, this Court has recognized that these principles of deference may be subject to further qualifications where the subject matter is not within any specialized expertise of the agency, *see id.* (citing *Texas Citizens,* 336 S.W.3d at 630),* and where "a nontechnical question of law" is involved, *see Rogers v. Texas Bd. of Architectural Exam'rs,* –––S.W.3d –––, –––, 2011 WL 3371543 (Tex.App.-Austin 2011, no pet. h.) (citing *Rylander v. Fisher Controls Int'l, Inc.,* 45 S.W.3d 291, 302 (Tex.App.-Austin 2001, no pet.)).

To the extent our analysis turns on administrative construction of the rules themselves, we defer to an agency's interpretation of its own rules unless that interpretation is plainly erroneous or inconsistent with the text of the rule or underlying statute. *See Public Util. Comm'n v. Gulf States Utils. Co.,* 809 S.W.2d 201, 207 (Tex.1991); *Tennessee Gas Pipeline Co. v. Rylander,* 80 S.W.3d 200, 203 (Tex.App.-Austin 2002, pet. denied).* We construe administrative rules in the same manner as statutes because they have the force and effect of statutes. *Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248, 254 (Tex.1999).*

**Needle EMG**

TCA's second issue and TBCE's first two issues challenge the district court's summary judgment invalidating rules relating to needle EMG.

As previously noted, the statutory scope of chiropractic practice includes "using objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body," *see* Tex. Occ.Code Ann. § 201.002(b)(1); *see also* 22 Tex. Admin. Code § 75.17(a)(1)(A) (tracking the same language in TBCE's scope-of-practice rule), but excludes any "incisive or surgical procedure," *see* Tex. Occ.Code Ann. § 201.002(c)(1); *see also* 22 Tex. Admin. Code § 75.17(a)(2)(A), (c)(4), (d)(2), (e)(3) (tracking same exclusion in scope-of-practice rule), a term that:

includes making an incision into any tissue, cavity, or organ by any person or implement....

[but] does not include the use of a needle for the purpose of drawing blood for diagnostic testing.

Tex. Occ.Code Ann. § 201.002(a)(3) (formatting altered for emphasis).

In its scope-of-practice rule, TBCE construed and defined the term "incision"—i.e., that which characterizes an "incisive procedure"—as "[a] cut or a surgical wound; also, a division of the soft parts made with a knife or hot laser." 22 Tex. Admin. Code § 75.17(b)(3). TBCE further determined that the insertion of a needle into the human body might or might not "cut" the body or be "incisive" in the sense of the exclusion, or be "surgical," and promulgated a standard, found in subparagraph (a)(3) of the rule, for distinguishing "incisive" or "surgical" needle insertions from non-incisive and non-surgical ones:

(3) Needles may be used in the practice of chiropractic under standards set **\*476** forth by the [TBCE] but may not be used for procedures that are incisive or surgical.

(A) The use of a needle for a procedure is incisive if the procedure results in the removal of tissue other than for the purpose of drawing blood.

(B) The use of a needle for a procedure is surgical if the procedure is listed in the surgical section of the CPT Codebook.

*Id.* § 75.17(a)(3). The "CPT Codebook" is defined elsewhere in the rule as "the American Medical Association's annual Current Procedural Terminology Codebook (2004) .... adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services as Level I of the common procedure coding system." *See id.* § 75.17(b)(2).

Applying this standard, TBCE concluded that needle EMG was neither an "incisive" nor "surgical" procedure and, thus, was not excluded from the scope of chiropractic practice. Premised on that conclusion, TBCE promulgated two additional rule provisions addressing needle EMG specifically. The first, paragraph (c)(2)(D), listed "electro-diagnostic testing" among several examples of testing and measurement procedures that chiropractic licensees were permitted to use in evaluating or examining patients. *See id.* § 75.17(c)(2)(D). In the second provision, paragraph (c)(3)(A), TBCE imposed certification and supervision requirements on any licensees who administered "electro-neuro diagnostic testing" that varied according to whether the testing was "surface (non-needle)" or involved the use of needles. *See id.* § 75.17(c)(3)(A). The import or effect of paragraphs (c)(2)(D) and (c)(3)(A), as the parties agree, was that chiropractors with specified training and certification could utilize needle EMG in evaluating or examining patients.

In their live petition and summary-judgment motions, the Physician Parties challenged the validity of the two rule provisions specifically addressing needle EMG—75.17(c)(2)(D) and (c)(3)(A)—plus the general standard regarding use of needles —75.17(a)(3)—based on the assertions that each rule permitted chiropractors to perform needle EMG, and needle EMG was an "incisive" procedure excluded from the statutory scope of chiropractic. The district court granted the motions and rendered judgment declaring that "22 Tex. Admin. Code §§ 75.17(a)(3), 75.17(c)(2)(D) and 75.17(c)(3)(A), concerning needle electromyography, are ... invalid and void." The Physician Parties did not challenge, and the district court did not invalidate, TBCE's definition of "incision" as a "cut," "surgical wound," or "division of the soft parts." *See id.* § 75.17(b)(3).

In holding that the three rules improperly permitted chiropractors to perform an "incisive" procedure, the district court, the Chiropractor Parties assert, misconstrued unambiguous statutory language or at least erred in failing to give required deference to TBCE's reasonable construction of ambiguous language. They concede that the last sentence of occupations code section 201.002(a)(3)—"[an incisive or surgical procedure] does not include the use of a needle for the purpose of drawing blood for diagnostic testing"—negatively implies that the use of a needle to draw blood for diagnostic testing would otherwise have been considered an "incisive" procedure in the view of the Legislature, as otherwise the exception created in that sentence would have amounted to a redundant nullity. *See DeQueen,* 325 S.W.3d at 638 ("Courts 'do not lightly presume that the Legislature may have done a useless act.' " (quoting *Liberty Mut. Ins.* **\*477** *Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 485 (Tex.1998)); *Sultan v. Mathew,* 178 S.W.3d 747, 751 (Tex.2005) ("We must avoid, when possible, treating statutory language as surplusage."). But the fact that this procedure involving use of a needle would be considered "incisive," the Chiropractor Parties insist, does not imply that *every* procedure involving the insertion of a needle into the human body necessarily is. They urge that any such construction or inference ignores the Legislature's 1997 amendments to the statutory definition of acupuncture. In those amendments, as previously explained, the Legislature, with evident reference to its prior exclusion of "incisive" and "surgical" procedures from the practice of chiropractic, changed the definition of acupuncture to refer to "the nonsurgical, nonincisive insertion of an acupuncture needle ... to specific areas of the human body." *See* Act of May 28, 1997, § 1, 1997 Tex. Gen. Laws at 4418 (codified at Tex. Occ.Code Ann. § 205.001(2)(A)); Tex. Att'y Gen. Op. No. DM–471 (1998) (observing that 1997 amendment responded to prior opinion concluding that acupuncture was an "incisive" procedure outside the scope of chiropractic). By expressly contemplating, in a related statute, that the insertion of a needle into the human body may be "nonincisive" (not to mention "nonsurgical"), the Legislature, in the Chiropractor Parties' view, confirmed that needle insertions may either be "incisive" or "nonincisive" within the meaning of the statutory exclusion from chiropractic. And it follows, they add, that the mere fact a needle insertion creates some degree of hole or separation of tissue along the length of the inserted instrument, as all needle insertions will, cannot in itself be the criterion that distinguishes an "incisive" needle insertion from a "nonincisive" one within the Legislature's contemplation.

The Chiropractor Parties add that TBCE's standard for distinguishing "incisive" from "nonincisive" needle use, which focuses on whether the procedure results in the removal of tissue, *see* 22 Tex. Admin. Code § 75.17(a)(3), is consistent with this statutory framework. They reason that (1) if using needles for blood draws for diagnostic use is an "incisive" procedure (again, the negative implication of the Legislature's exception of blood draws from "incisive or surgical" procedures, *see* Tex. Occ.Code Ann. § 201.002(a)(3)), (2) but needle insertion in itself cannot be what makes the procedure "incisive" (as implied by the statutory definition of acupuncture as entailing "nonincisive" needle insertion into the body, *see* Tex. Occ.Code Ann. § 205.001(2)(A)), (3) then the "incisive" character of a needle blood draw must relate to the fact that it results in the separation and removal of the blood itself or, more generally, tissue, as blood is considered to be a form of connective tissue. That distinguishing feature, the Chiropractor Parties assert, is properly reflected in TBCE's standard for determining "incisive" needle use. In striking down that standard, they argue, the district court overlooked the unambiguous text of the relevant statutes, or at least failed to give required deference to TBCE's reasonable construction of ambiguous text. And the same error, they add, led the district court to improperly strike down the two rules permitting needle EMG, as it is undisputed that the procedure does not entail the removal of tissue.

The Physician Parties' core contention in response, as it was in their summary-judgment motions, is that occupations code section 201.002(a)(3)'s express exception for needle blood draws for diagnostic purposes from the "incisive or surgical" procedures excluded from chiropractic reflects the Legislature's intent that all other procedures involving needle usage, including **\*478** needle EMG, be excluded from the scope of chiropractic practice. Such a construction, they reason, is necessary both to give effect to the exclusion, *see Liberty Mut. Ins. Co. v. American Emp'rs Ins. Co.,* 556 S.W.2d 242, 245 (Tex.1977) (in context of construing a contract, observing "the purpose of an exclusion is to take something out ... that would otherwise have been included in it"), and by the canon of statutory construction known as *expressio unius est exclusio alterius*—literally "the specific mention of one is the exclusion of the other"—under which we would presume that the Legislature's explicit mention or inclusion of one thing signals its intention to exclude the other or the alternative thing. *See Johnson v. Second Injury Fund,* 688 S.W.2d 107, 108–09 (Tex.1985) (citing *Bryan v. Sundberg,* 5 Tex. 418, 422–23 (Tex.1849)). They similarly rely on the more general principle that courts must assume that the Legislature chose its words carefully and deliberately, and included or excluded particular words purposefully. *See, e.g., DeQueen,* 325 S.W.3d at 635; *USA Waste Servs. of Houston, Inc. v. Strayhorn,* 150 S.W.3d 491, 494 (Tex.App.-Austin 2004, pet. denied).

In further support, the Physician Parties emphasize the legislative history of the 1995 amendments that added the exclusion and description of "incisive or surgical procedures." In their view, this history confirms the Legislature's intent to forbid chiropractors from performing needle EMG and any other procedure entailing the insertion of needles into the human body. In reply, the Chiropractor Parties remind us that statutory construction turns not on the statements of individual legislators but on the text of the statutes the Legislature collectively enacts. *See Ojo v. Farmers Grp., Inc.,* 356 S.W.3d 421, 435 (Tex.2011) (noting that courts should apply "text-centric model" when construing statutes, using extrinsic aids such as legislative history only when text is not clear). And that statutory text, they urge, stops well short of evidencing intent to outlaw needle EMG by chiropractors, especially considering that the procedure has been performed by Texas chiropractors since the early 1990s and been a frequent concern of the medical community for much of that time. If the Legislature had truly meant to prohibit chiropractors from performing needle EMG, they suggest, it presumably would have said so more clearly and directly instead of condemning "incisive" procedures and delegating power to TBCE to promulgate scope-of-practice rules.

As for the implications of the acupuncture statute's reference to "nonsurgical, nonincisive" needle insertions, the Physician Parties first suggest that this language is simply irrelevant because chiropractors acting within the scope of their license are exempted from the acupuncture statutes.[18] They similarly question the premise of the Chiropractor Parties (and the Attorney General)[19] that the definition of acupuncture as "nonsurgical" and "nonincisive" under the statutes regulating its practice necessarily resolves whether or not it is "incisive" under the meaning of the chiropractic statutes. However, the Physician Parties have also relied on the narrower point (so to speak) that the types of needles used in needle EMG have physical **\*479** features that materially distinguish them from those used in acupuncture.

In support of their summary-judgment motion, TMA presented the affidavit of Dr. Sara G. Austin, a physician, who compared the characteristics of acupuncture needles versus those used in needle EMG. Attached to her affidavit were photographs comparing what she averred were "a standard needle used in performing acupuncture" alongside "two of the types of needles I use in performing EMG." The photographs reflected that the two needle-EMG needles were longer and somewhat thicker than the acupuncture needle, with one of the needle-EMG needles appearing to extend four or five times the length of the acupuncture needle. [20] Austin further testified that the tips of the types of needles used in needle EMG "typically are beveled"—i.e., have an angled side or end, characteristic of a blade or cutting edge [21]—and, consequently, "incise tissue" (in the sense of cutting it like a blade) when they are inserted during the EMG examination. [22] She did not, however, speak directly to the types of tips found on acupuncture needles.

The Physician Parties portray this summary-judgment evidence as establishing conclusively that needle-EMG needles characteristically have a beveled or cutting edge. Consequently, they reason, the insertion of such a needle into the human body effects a "cut" or "incision" and, thus, is an "incisive procedure" within the meaning of the statutory exclusion. In reply, the Chiropractor Parties emphasize Dr. Austin's deposition testimony, which they presented with their summary-judgment response. During her deposition, Austin acknowledged that while she used needle-EMG needles that have a beveled, blade-like edge, some other practitioners performing the procedure instead used needles having a tapered or blunt edge.

 [1]    Our analysis of the parties' competing contentions begins, in the first instance, with a threshold question of whether the Legislature intended the term "incisive" procedure as used in the statutory exclusion to be afforded its ordinary meaning or a somewhat narrower technical meaning. *See City of Rockwall,* 246 S.W.3d at 625–26. Especially in the context of health care, "incisive" is used to refer to the act of cutting, usually tissue. *See Stedman's Medical Dictionary* 700 (5th Unabridged Lawyers' ed. 1982) (defining "incisive" as "cutting; having the power to cut"); *Dorland's Illustrated Medical Dictionary* 940 (31st ed. 2007) (defining "incisive" as "having the power or quality of cutting," and listing under its heading for "incision" various types of **\*480** medical tissue incisions). By contrast, the ordinary meaning of "incisive" embraces not only the concept of cutting, but also "piercing" ("run[ning] into or through as a pointed instrument ... does, stab [bing] ...[,] mak[ing] a hole in or through") and "penetrating" ("pass[ing] into or through"). [23] A needle insertion into the human body would quite obviously satisfy the ordinary meaning of "incisive," as such a procedure would plainly "penetrate" tissue, if not also "pierce" it. But it is a closer question whether a needle insertion likewise "cuts" tissue and meets the narrower, technical definition.

In this case, our choice between the ordinary and technical meaning of "incisive" has been narrowed somewhat by TBCE's rule provision, unchallenged by the Physician Parties and undisturbed by the district court's judgment, construing the related term "incision." *See* Tex. Occ.Code Ann. § 201.002(c) (providing that " '[i]ncisive or surgical procedure' includes making an *incision* into any tissue, cavity, or organ by any person or implement ...) (emphasis added). Consistent with the technical meaning of "incisive," TBCE has defined "incision" to mean, in relevant part, "a cut or surgical wound." *See* 22 Tex. Admin. Code § 75.17(b)(3). Consequently, whether the use of a needle is "incisive" so as to be excluded from chiropractic turns on whether such use "cuts" or makes a "surgical wound" "into any tissue, cavity, or organ." And, in light of this rule definition, our analytical focus must shift to determining whether the three invalidated rules permitting needle EMG are premised on a construction and application of "cut" that is clearly erroneous or inconsistent with the rule's text and underlying statutes. *See TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 438 (Tex.2011) ("If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, ... we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule."); *Rodriguez,* 997 S.W.2d at 254 ("While we defer to the Commission's interpretation of its own regulation, we cannot defer to an administrative interpretation that is 'plainly erroneous or inconsistent with the regulation.' " (quoting *Gulf State Utils. Co.,* 809 S.W.2d at 207)).

Here the summary-judgment evidence becomes relevant to our analysis. Although the summary-judgment evidence falls short of establishing conclusively that *all* needle-EMG needles have a beveled, blade-like edge, Dr. Austin's testimony remains undisputed that at least *some* of the types of needles used by practitioners in performing that procedure do have that feature. And the very purpose of having such an edge on a needle, as Austin further explained, is to make the needle cut or slice through

tissue, like a blade or knife. This evidence conclusively establishes that at least some types of needles used in needle EMG "cut" into tissue under any conceivable definition of that term. In its ordinary usage, "cut" with reference to something being inserted into or applied to tissue means "to penetrate with or as if an edged instrument" or to separate into parts with a sharp instrument. *See Webster's Third New Int'l Dictionary* 560 (2002) (defining "cut" as "to penetrate with or as if with an edged instrument .... **\*481** make an incision in .... to separate into parts"); *American Heritage College Dictionary* 341 (2000) (defining "cut" as "to penetrate with a sharp edge; .... [t]o separate into parts with or as if with a sharp-edged instrument; sever"); *Random House Dictionary of the English Language* 494 (2d ed. 1987) (defining "cut" as "to penetrate with or as if with a sharp-edged instrument or object ... to divide with or as if with a sharp-edged instrument or object"). We also observe that in the context of health care, needles with beveled edges are said to "cut" or have a "cutting edge," as contrasted with differently edged needles that do not "cut." *Compare Dorland's* at 1255 (defining "cope needle" as "blunt-ended hook like needle with a concealed cutting edge and snare" *and* "Hagedorn's needles" as "surgical needles that are flat from side to side with a straight, cutting edge near the point") *with id.* (defining "spatula needle" as "minute needle with a flat or slightly curved concave surface that does not cut or pierce"). Further, while the question of whether acupuncture is within the chiropractic scope of practice is not before us, nor does the summary-judgment evidence address whether or not acupuncture needles have a beveled edge, this distinction between beveled, "cutting" needles and other kinds that do not "cut" would perhaps explain how, in the Legislature's view, acupuncture needles would be capable of being inserted into the body in a "nonincisive" and "nonsurgical" manner. *See* Tex. Occ.Code Ann. § 205.001(2)(A).

In contending that needle EMG is not a "cutting" or "incisive" procedure, the Chiropractor Parties ultimately rely upon an asserted distinction predicated on the size of a needle's cutting edge as compared to that of scalpels, knives, or other larger cutting instruments. As they explain their position on appeal, "[a] 'cut' or 'wound' involves an appreciable separation of tissue in at least two directions, as when a knife cuts into and along the body at the same time," (citing dictionary definition of "cut" as "an opening made with an edged instrument"), "[b]ut a needle entry typically creates an appreciable separation of tissue in only one direction—along the length of the needle—because the width of most needles is small." Consequently, in their view, "[t]he resulting hole is not obviously a 'cut,' " creating "a conceptually difficult question of interpretation: when does a needle entry qualify as a 'cut' or 'wound' (and hence become 'incisive')," answered in turn by TBCE's "rational" conclusion focused on tissue removal. But these musings about needle points ultimately miss the point—regardless of the relative size of the instrument, or whether its effects on tissue are "obvious," it remains that the insertion of a needle EMG needle having a beveled edge would "cut" tissue, as it is designed to do, under any definition of that term. It would, therefore, be an "incisive" use of a needle. Consequently, the Chiropractor Parties' construction is contrary to the text of its own definition of "incision" as well as the underlying statutes. *See Gulf State Utils. Co.,* 809 S.W.2d at 207; *City of Garland,* 165 S.W.3d at 819.

It follows that the three challenged rule provisions purport to authorize chiropractors to perform "incisive" procedures that are beyond chiropractic's statutory scope—75.17(c)(2)(D) and 75.17(c)(3)(A) authorize chiropractors to perform needle EMG, and 75.17(a)(3) states that a procedure involving a needle is "incisive" only if it results in removal of tissue. In so doing, these rules exceed the statutory limits of chiropractic by, at a minimum, authorizing chiropractors to perform needle EMG with beveled-edged needles that are made to cut or incise tissue. They were, accordingly, beyond TBCE's statutory authority and void. *See* **\*482** *Gulf States Utils. Co.,* 809 S.W.2d at 207. The district court did not err in granting summary judgment to that effect. We overrule the Chiropractor Parties' issues concerning needle EMG.

## MUA

**[2]** TCA's first and TBCE's third issue challenge the district court's summary judgment invalidating a provision of the scope-of-practice rule, subsection 75.17(e)(2)(O), that included MUA among the treatment procedures or services that chiropractors are expressly authorized to perform. *See* 22 Tex. Admin. Code § 75.17(e)(2)(O). As previously noted, chiropractors are generally authorized to "perform[ ] nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system." *See* Tex. Occ.Code Ann. § 201.002(b)(2); *see also* 22 Tex. Admin. Code § 75.17(a)(1)(B) (tracking the same language in TBCE's scope-of-practice rule). In their summary-judgment motions, the Physician Parties sought to invalidate the rule's authorization of MUA on two basic grounds. First, they asserted that the authorization was contrary to the prohibition in occupations code section 201.154 barring TBCE from "adopt[ing] a

process to certify chiropractors to perform manipulation under anesthesia." *See* Tex. Occ.Code Ann. § 201.154. Second, the Physician Parties urged that MUA was a "surgical" procedure excluded from the scope of chiropractic. *See id.* § 201.002(b)(2), (c)(1). In this regard, they relied on the definition or description of "surgical procedure" added by the Legislature in 2005: " '[s]urgical procedure' includes a procedure described in the surgery section of the common procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services." *Id.* § 201.002(a)(4). The district court did not specify in its summary-judgment order and judgment the ground or grounds on which it relied. [24] The Chiropractor Parties challenge both grounds on appeal, which they perceive to be related to one another.

Regarding section 201.154's ban on TBCE "adopt[ing] a process to certify chiropractors to perform [MUA]," the Chiropractor Parties insist that a ban on "certifying" chiropractors to perform MUA means only that TBCE cannot create some sort of advanced training or "certification" process beyond licensing minimums as a prerequisite to being allowed to perform MUA, but does not prohibit chiropractors from performing the procedure itself. They add that such a ban further implies that MUA itself could not be banned anywhere in chapter 201, as otherwise section 201.154's "certification" ban would be redundant surplusage. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex.2008) (citing general rule that courts should avoid statutory constructions that create surplusage or fail to give effect to provisions).

As for the implications of occupations code 201.002(a)(4)'s definition or description of "surgical procedure" (i.e., the language added in 2005), TBCE in its scope-of-practice rule elaborated that "the common **\*483** procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services," referenced in the statute, referred to "the American Medical Association's annual Current Procedural Terminology Codebook (2004)," which "has been adopted by the Centers for Medicare and Medicaid Services ... as Level 1 of the common procedure coding system." *See* 22 Tex. Admin. Code § 75.17(b)(2) (defining "CPT Codebook"). Simply described, the CPT Codebook identifies several thousand medical procedures and services and provides a five-digit code and brief description for each. The American Medical Association began the development of the CPT coding system in 1966 to—

> encourage the use of standard terms and descriptors to document procedures in the medical record; help[ ] communicate accurate information on procedures and services to agencies concerned with insurance claims; provide[ ] the basis for a computer oriented system to evaluate operative procedures; and contribute [ ] basic information for actuarial and statistical purposes.

American Medical Association, *CPT Coding Billing & Insurance, CPT Application Process FAQ,* http://www.ama-assn.org/ama/pub/physician-resources/solutions-managing-your-practice/coding-billing-insurance/cpt/cpt-process-faq/code-becomes-cpt.page (last visited Mar. 13, 2012). Currently, the CPT is used "to report medical procedures and services under public and private health insurance programs ... [and] is also used for administrative management purposes such as claims processing and developing guidelines for medical care review." *Id.* The AMA updates the CPT each year, effective January 1, to reflect new developments in medical procedures and services. *See id.; Practice Mgmt. Info. Corp. v. American Med. Ass'n,* 121 F.3d 516, 517 (9th Cir.1997). The summary-judgment record contains excerpts from what appears to be a CPT Codebook for 2007, [25] one of the versions in effect during the course of this litigation.

The five-digit codes in the CPT are divided into three categories: Category I covers medical services and procedures; Category II includes codes related to performance measurement; and Category III lists the temporary codes for new and emerging technology. Category I is further divided into six sections—"evaluation," "anesthesia," "radiology," "pathology," "medicine," and, of relevance here, "surgery." *See* American Medical Association *Current Procedural Terminology (CPT®) 2007* xiv (4th ed. 2006). Within each section, procedures are arranged to enable the user to locate the code number readily. In the "surgical" section, the procedures are grouped according to the body system on which surgery is performed.

On appeal, TBCE concedes that "MUA is listed in the surgery section of the CPT Codebook and [is] thus a surgical procedure under the Chiropractic Act." *See also* 31 Tex. Reg. 4615 (2006) (Texas Bd. of Chiropractic Exam'rs) (stating the same thing). Nonetheless, TBCE insists that we must "harmonize" occupations code 201.002(a)(4), which would otherwise serve to exclude

MUA from the scope of chiropractic, *see* Tex. Occ.Code Ann. § 201.002(c)(1), with the general statutory authorization of chiropractors to perform "adjustment and manipulation," *see id.* § 201.002(b)(2), and what it perceives to be **\*484** an implicit authorization or recognition in occupations code 201.154 that chiropractors can perform MUA because, as previously explained, TBCE maintains that the section's ban on "certification" of chiropractors to perform MUA would otherwise be redundant surplusage. Relatedly, TBCE also invokes the principle that when statutory provisions irreconcilably conflict, the "more specific" provision—what they view as the implicit authorization of MUA present in section 201.154—should control over the "general" statutory exclusion of surgical procedures from chiropractic. *See* Tex. Gov't Code Ann. § 311.026(b) (West 2005) (providing that specific provision prevails over general); *MBM Fin. Corp. v. Woodlands Operating Co., L.P.,* 292 S.W.3d 660, 670 n. 56 (Tex.2009) (citing to government code section 311.026(b) for same proposition).

In contrast to TBCE, TCA vigorously disputes that MUA is "described in the surgery section" of the CPT Codebook in any sense relevant to chiropractors. While not disputing that the "surgery" section of the book has contained a description of MUA at all times relevant to our inquiry here, [26] TCA insists that the reference "does not encompass chiropractic procedures." It emphasizes a cross-reference that appears in the 2007 CPT Codebook's description of MUA:

### Manipulation

(For spinal manipulation without anesthesia, use 97140)

**22505** Manipulation of spine requiring anesthesia, any region

American Medical Association, *2007 Current Procedural Terminology (CPT®) 2007* 85 (4th ed. 2006). TCA represents that the referenced code "97140" does not apply to chiropractors because there are different codes—98940 through 98943 —that cover "chiropractic manipulative treatment." And because manipulation by chiropractors is not covered by the cross-referenced code 91740, it reasons, the "manipulation of spine requiring anesthesia" code from which the reference is made must likewise not apply to chiropractors. *See id.* at xiv, 85 (describing the "Surgery" section of the CPT codebook as including code numbers 10021 through 69990). The portions of the CPT Codebook concerning chiropractic manipulation do not appear in our record. Regardless, assuming that TCA's description of those codes is accurate, and even assuming it is correct in concluding that code 22505 ("manipulation of the spine requiring anesthesia," i.e., MUA) would not actually be the code applied by a chiropractor who was billing for the treatment, it remains undisputed that this code and accompanying description have appeared in the CPT Codebook's "surgery" section at all relevant times. This is all that the Legislature has required in order for MUA to be deemed a "surgical" procedure excluded from the scope of chiropractic: " '[s]urgical procedure' includes a procedure described in the surgery section of the [CPT Codebook]." *See* Tex. Occ.Code Ann. § 201.002(a)(4); 22 Tex. Admin. Code § 75.17(b)(2). The Legislature did not condition this requirement on the identity or type of health-care provider who performs the procedure. And in the face of this unambiguous statutory language, it is simply irrelevant whether, as TCA insists, a chiropractor **\*485** would actually bill under code 22505. To the contrary, such a fact would, if anything, further confirm that the Legislature intended procedures "described" in the Codebook's "surgical" section be off-limits to chiropractors.

Nor should we construe section 201.002(a)(4) any differently to "harmonize" or avoid "conflict" with section 201.154, the provision barring TBCE from "adopt[ing] a process to certify chiropractors to perform [MUA]." As an initial observation, the gravamen of the Chiropractor Parties' position concerning section 201.154 is that the Legislature, despite its *specific* prohibition barring chiropractors from performing procedures listed under the CPT surgery codes, intended to *impliedly* allow chiropractors to perform one of the listed procedures. Their position further suggests that the Legislature intended (without explicitly saying so) that chiropractors be allowed to perform MUA, yet went out of its way to bar TBCE from requiring any additional training or qualifications beyond licensing minimums to ensure that chiropractors perform that procedure safely. Such a construction yields what approaches "absurd results" that we presume the Legislature could not possibly have intended. *See Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011) ( "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." (citing *City of Rockwall,* 246 S.W.3d at 625–26)). It is also unsupported by the text of section 201.154 itself.

The Chiropractor Parties' construction of section 201.154 assumes that the word "certify" expresses an intent to grant some special or additional type of authority to perform MUA beyond that conveyed through licensing. But "certify" simply means "to designate as having met the requirements for pursuing a certain kind of study or work." *See Webster's* 367 (defining "certify" and comparing to "license"); *see also Black's Law Dictionary* 258 (9th ed. 2009) (describing "certify" as "attest as being true or as meeting certain criteria"). It does not necessarily require some underlying, preexisting authority that would be enhanced, as it were, by the certification. In fact, the plain language of section 201.154—i.e., "the board may not adopt a process to certify chiropractors *to perform* [MUA]"—suggests that without certification, chiropractors lack the authority *to perform* MUA. *See* Tex. Occ.Code Ann. § 201.154 (emphasis added).

If the Legislature had intended "certify" to have the meaning that the Chiropractor Parties suggest here—i.e., that "certification" contemplates some special designation and presumes a status quo in which chiropractors can perform the procedure—a clearer statement of that intent would have been a prohibition against TBCE adopting a process to certify chiropractors, for example, "as an MUA specialist" or "in the field of MUA." *See, e.g.,* Tex. Occ.Code Ann. § 205.303(a) (West 2004) ("The medical board may certify a person *as an* acudetox *specialist....*") (emphasis added); *id.* § 1701.404(b) (West Supp. 2011) ("The commission may certify a sheriff, sheriff's deputy, constable, other peace officer, county jailer, or justice of the peace *as a special* officer for offenders with mental impairments....") (emphasis added). But the plain language of section 201.154 does not do this. Rather, it merely forbids TBCE from designating chiropractors as having met the requirements *to perform* MUA. Therefore, it does not necessarily follow that chiropractors already have the authority to perform MUA.

For similar reasons, we also reject the TBCE's related contention that the "more specific" language of section 201.154 **\*486** should control over the statute's general ban on surgical procedures. But even if we were to apply this canon of construction, section 201.154 cannot be said to be "more specific" than the ban on surgical procedures with regard to whether chiropractors may perform MUA. At best, section 201.154 implies that chiropractors may perform MUA, but section 201.002(a)(4) specifically provides that chiropractors may not perform MUA. Thus, 201.002(a)(4) is the specific provision that should control.

Although our construction here could appear, at first glance, to render section 201.154 superfluous given the Act's ban on MUA as a surgical procedure, it also can be viewed as reinforcing the Legislature's intent that chiropractors not perform MUA. *See Nash,* 220 S.W.3d at 917–18 (noting that "there are times when redundancies are precisely what the Legislature intended"); *In re City of Georgetown,* 53 S.W.3d 328, 335–36 (Tex.2001) (construing duplicative provisions of the Open Records Act and concluding that "the Legislature repeated itself out of an abundance of caution, for emphasis or both"). In any event, occupations code section 201.002(a)(4) means what it says, and we cannot ignore this clear expression of legislative intent in the cause of avoiding any redundancy with section 201.154. *See City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex.2003) (" 'It is an elementary rule of construction that, *when possible to do so,* effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous.' ") (quoting *Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 601 (1915)).

Based on the unambiguous text of occupations code section 201.002(a)(4), we conclude that MUA is a "surgical procedure" excluded from the statutory scope of chiropractic and that occupations code section 201.154 is not to the contrary. Although the Physician Parties also emphasize the anecdotal legislative history of section 201.154, the statutory text is dispositive here. *See DeQueen,* 325 S.W.3d at 635 (noting that courts should look first to the plain meaning of statutory text as expressing legislative intent); *Alex Sheshunoff,* 209 S.W.3d at 652 n. 4 (noting that reliance on secondary materials such as legislative history should be avoided when text is unambiguous). We must, however, consider one final argument asserted by TCA.

 **[3]** TCA urges that if we construe section 201.002(a)(4) to deem MUA performed by chiropractors a "surgical procedure," we must invalidate the provision as an improper delegation of legislative authority that violates the separation-of-powers clause of the Texas Constitution. [27] *See* Tex. Const. art. III, § 1 (vesting the legislative power in the Senate and House of Representatives). [28] Specifically, the Chiropractor Parties assert that by effectively incorporating a coding system developed by the AMA—a private association (not to mention a longtime professional rival to chiropractors and chiropractic)—to supply

a definition or description of "surgical procedure," the Legislature has delegated its **\*487** authority to the AMA in a manner that fails the eight-factor balancing test articulated by the supreme court in *Texas Boll Weevil Eradication Foundation, Inc.,* 952 S.W.2d at 472, for delegations of authority to private entities.[29] Although we agree that a delegation of unbridled discretion to the AMA to define "surgical procedures" would potentially raise constitutional concerns, *see id.* at 471–75, we disagree that the Legislature has delegated its authority in this situation.

Whether the Legislature has, in fact, delegated its authority to define "surgical procedures" to the AMA depends initially on whether section 201.002(a)(4) incorporates (1) some fixed version of the CPT Codebook or (2) the CPT Codebook in whatever manner the AMA may revise or amend it in the future. If the former, the Legislature has not delegated its authority to define "surgical procedure," but has instead defined that term itself, albeit by reference to another source. *See Ex parte Elliott,* 973 S.W.2d 737, 741 (Tex.App.-Austin 1998, pet. ref'd). This sort of cross-reference to fixed external fact, source, or standard is no more a delegation of legislative authority than a statutory reference to a measure of time or volume.

Although no party has emphasized it, we observe that TBCE's scope-of-practice rule defines the "CPT Codebook" as the version published by the AMA in 2004. *See* 22 Tex. Admin. Code § 75.17(b)(2) (identifying "the American Medical Association's annual Current Procedural Terminology CodeBook (2004)"). That is, in fact, the version of the CPT Codebook that was in effect when the Legislature adopted section 201.002(a)(4) in May 2005.[30] Thus, TBCE has interpreted section 201.002(a)(4) to incorporate a fixed version of the CPT Codebook. *See Ex parte Elliott,* 973 S.W.2d at 741. Moreover, we would reach the same conclusion even in the absence of this rule. In *Ex parte Elliott,* we considered, in the context of a habeas proceeding, whether the Legislature's incorporation of the Environmental Protection Agency's definition of "hazardous waste" was an unconstitutional delegation of legislative authority. *See id.* at 741. We held that the Legislature intended to adopt the EPA's definition of hazardous waste that existed on the date the relevant legislation was enacted. *See id.* In reaching our holding, we relied on supreme court precedent that (1) a statute that **\*488** adopts another statute by reference adopts the referenced statute as it exists at the time of adoption, but not as it may be amended in the future, *see id.* (citing *Trimmier v. Carlton,* 116 Tex. 572, 296 S.W. 1070, 1074 (1927)), and that (2) we must construe a statute subject to varying interpretations in a manner that assumes the Legislature's intent to enact a constitutional statute. *See id.* at 742 (citing *Brady v. Fourteenth Court of Appeals,* 795 S.W.2d 712, 715 (Tex.1990)); *see also* Tex. Gov't Code Ann. § 311.021(1) (West 2005) (establishing presumption that the Legislature intended for statutes to be constitutional); *but see id.* § 311.027 (West 2005) (providing that statutory references to a statute or rule applies to revisions or amendments to the statute or rule). In this case, we would similarly construe section 201.002(a)(4) so as to avoid the potential constitutional infirmities and hold that it references the version of the CPT Codebook in effect on the date of its enactment, May 27, 2005. Under that construction, no delegation of the Legislature's authority to define "surgical procedure," much less an unlawful one, has occurred. *See Ex parte Elliott,* 973 S.W.2d at 742.

TCA counters that construing section 201.002(a)(4) to adopt a fixed version of the CPT Codebook poses due-process concerns because the AMA updates the CPT Codebook annually and prior versions of the CPT Codebook are "inaccessible." We simply note that, in addition to the fact that there is no summary-judgment evidence in the record that the 2004 edition of the CPT Codebook was inaccessible to any party, our own independent research on the delegation question has confirmed that this specific publication is available through public sources, including interlibrary loan from the Texas State Law Library. Thus, although not as readily accessible as the current version of the CPT Codebook, the 2004 CPT Codebook is not inaccessible.

As previously noted, there is no dispute that MUA was described in the "surgical" section of the CPT Codebook throughout the period at issue, including in its 2004 version. As there is no constitutional barrier to section 201.002(a)(4)'s enforcement, we must give it effect and hold that MUA is a "surgical procedure" excluded from the statutory scope of chiropractic practice. *See* Tex. Occ.Code Ann. § 201.002(b)(2), (c)(1). Consequently, subsection 75.17(e)(2)(O), which purports to authorize chiropractors to perform MUA, is beyond TBCE's statutory authority and void. *See Gulf States Utils. Co.,* 809 S.W.2d at 207. The district court did not err in granting summary judgment to that effect. We overrule the Chiropractor Parties' issues concerning MUA.

**"Diagnosis"**

In its remaining issues, TCA (but not TBCE) challenges the district court's judgment invalidating rules authorizing chiropractors to make certain "diagnoses." In addition to responding to TCA's issues, the Physician Parties assert what they term a "cross-point" urging affirmance based on the grounds they raised in their first motion for partial summary judgment, and also what is substantively a motion to dismiss one of TCA's issues for lack of subject-matter jurisdiction. Before turning to the parties' competing contentions, it is necessary to clarify, at some length, the specific rules at issue, the scope of the district court's ruling, and the procedural posture of the remaining issues on appeal.

The statutory scope of chiropractic, again, includes "us[ing] objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body" and "perform[ing] nonsurgical, nonincisive procedures ... to improve **\*489** the subluxation complex or the biomechanics of the musculoskeletal system." *See* Tex. Occ.Code Ann. § 201.002(b)(1), (2). In subpart (d)(1) of its scope-of-practice rule, TBCE construed these provisions to permit chiropractors to render certain "analyses," "diagnoses," and "other opinions":

(d) Analysis, Diagnosis, and Other Opinions

(1) In the practice of chiropractic, licensees may render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following:

(A) An analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system including, but not limited to, the following:

(i) the health and integrity of the structures of the system;

(ii) the coordination, balance, efficiency, strength, conditioning and functional health and integrity of the system;

(iii) the existence of structural pathology, functional pathology or other abnormality of the system;

(iv) the nature, severity, complicating factors and effects of said structural pathology, functional pathology, or other abnormality of the system;

(v) the etiology of said structural pathology, functional pathology or other abnormality of the system; and

(vi) the effect of said structural pathology, functional pathology or other abnormality of the system on the health of an individual patient or population of patients;

(B) An analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system including, but not limited to, the following:

(i) the nature, severity, complicating factors and effects of said subluxation complex;

(ii) the etiology of said subluxation complex; and

(iii) the effect of said subluxation complex on the health of an individual patient or population of patients;

(C) An opinion regarding the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(D) An opinion regarding the likelihood of recovery of a patient or condition under an indicated course of treatment;

(E) An opinion regarding the risks associated with the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(F) An opinion regarding the risks associated with not receiving the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(G) An opinion regarding the treatment procedures that are contraindicated in the therapeutic care of a patient or condition;

(H) An opinion that a patient or condition is in need of care from a medical or other class of provider;

(I) An opinion regarding an individual's ability to perform normal job functions and activities of daily living, and the assessment of any disability or impairment;

(J) An opinion regarding the biomechanical risks to a patient, **\*490** or patient population from various occupations, job duties or functions, activities of daily living, sports or athletics, or from the ergonomics of a given environment; and

(K) Other necessary or appropriate opinions consistent with the practice of chiropractic.

22 Tex. Admin. Code § 75.17(d)(1). In a subpart (d)(2) to the rule, however, TBCE described several examples of "analyses," "diagnoses," or "other opinions" that would be, in its view, outside the permissible scope of chiropractic practice:

(2) Analysis, diagnosis, and other opinions regarding the findings of examinations and evaluations which are outside the scope of chiropractic include:

(A) incisive or surgical procedures;

(B) the prescription of controlled substances, dangerous drugs, or any other drug that requires a prescription;

(C) the use of x-ray therapy or therapy that exposes the body to radioactive materials; or

(D) other analysis, diagnosis, and other opinions that are inconsistent with the practice of chiropractic and with the analysis, diagnosis, and other opinions described under this subsection.

*Id.* § 75.17(d)(2).

In their live pleadings, the Physician Parties sought two declarations that 75.17(d) was invalid for exceeding the scope of chiropractic practice and permitting chiropractors to practice medicine without a medical license, in turn violating the Medical Practice Act and, alternatively, article XVI, section 31 of the Texas Constitution. First, they sought a declaration that 75.17(d)'s use of "diagnosis" in itself rendered this rule and various related rules invalid, reasoning that the statutory scope of chiropractic permits licensees to "analyze, examine, or evaluate" certain conditions, but not to "diagnose" them, and that "diagnose" is instead reserved to the practice of medicine and certain other health care professions. *Compare* Tex. Occ.Code Ann. § 201.002(b)(1) (providing that one practices chiropractic if he or she "uses objective or subjective means to analyze, examine, or evaluate ...") *with id.* § 151.002(a)(3) (" '[p]racticing medicine' means the diagnosis, treatment, or offer to treat ..."). Second, they sought a narrower declaration that 75.17(d) exceeded the statutory scope of chiropractic by permitting licensees to "diagnose" conditions beyond the biomechanical condition of the spine and musculoskeletal system. Additionally, in the event 75.17(d) (or any of the challenged rules) were held to be within the statutory scope of chiropractic, TMA asserted an alternative constitutional challenge to the underlying statutes themselves under article XVI, section 31 of the Texas Constitution.

In their first motion for partial summary judgment, the Physician Parties sought judgment on their broader declaratory claim challenging 75.17(d). The Chiropractor Parties countered with their own motion for partial summary judgment seeking dismissal of the Physician Parties' claims that the use of the term "diagnosis" in its scope-of-practice rule exceeded chiropractic's statutory scope. They asserted that "diagnosis" in its ordinary meaning broadly denoted a process of analysis and evaluation and was, therefore, included or implicit in the express statutory authorizations of chiropractors to "analyze," "examine," and "evaluate," if not also the authorizations to treat certain conditions. The district court denied the Physician Parties' motion and granted the Chiropractors' motions "in part as to the Chiropractic **\*491** Board's use of the word 'diagnosis' in its rule." "However," the court emphasized in its order, it "reserve[d] judgment regarding 'diagnosis' as it relates to *scope of practice.*" (Emphasis in original.)

Subsequently, the Physician Parties filed a second motion for partial summary judgment seeking relief only as to two portions of 75.17(d)—(d)(1)(A), which authorized "analysis, diagnosis or other opinion" concerning a list of six specific subjects "regarding the biomechanical condition of the spine or musculoskeletal system"; and (d)(1)(B), which authorized "analysis, diagnosis or other opinion" concerning a list of three specific subjects "regarding a subluxation complex of the spine or musculoskeletal system." *See* 22 Tex. Admin. Code § 75.17(d)(1)(A), (B). In this motion, they relied on their narrower claim that these provisions exceeded chiropractic's statutory scope of practice and also violated article XVI, section 31 of the Texas Constitution by permitting chiropractors to "diagnose" conditions, such as diseases, that were beyond the "biomechanical condition[s] of the spine and musculoskeletal system of the human body" that chiropractors were statutorily permitted to "analyze, examine, or evaluate." *See* Tex. Occ.Code Ann. § 201.002(b)(1). The Chiropractor Parties countered with a joint "supplemental" motion for partial summary judgment and request for judicial notice urging that "diagnose" (which, again, they viewed as synonymous or implicit in "analyze," "examine," and "evaluate") encompassed diagnosis of diseases and any other matter listed in 75.17(d)(1) and (2). [31] Without stating the specific grounds on which it relied, the district court granted the Physician Parties' second motion for partial summary judgment and, as before, denied the Chiropractor Parties' motions except to the extent of granting them "as to the use of the word 'diagnosis' in the rule." Both summary-judgment rulings were merged into and expressly memorialized in the final judgment, which further declared "22 Tex. Admin. Code §§ 75.17(d)(A) and (B), concerning diagnosis, ... invalid and void" and ordered that the parties take nothing on any claims for relief not awarded therein.

In its third issue, TCA urges that the district court erred in concluding that (d)(1)(A) (concerning "analysis, diagnosis or other opinion" regarding what were termed aspects of "the biomechanical condition of the spine or musculoskeletal system") exceeded chiropractic's statutory scope of practice. In its fourth issue, it advances a similar contention as to the district court's invalidation of (d)(1)(B) (concerning "analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system"). In its fifth and final issue, TCA challenges the Physician Parties' alternative summary-judgment ground that (d)(1)(A) and (B) violated article XVI, section 31 of the Texas Constitution.

 **[4]**    In addition to joining issue on the merits of TCA's third and fourth issues, the Physician Parties assert what they style as a "cross-point" urging that we affirm the summary judgment as to (d)(1)(A) and (B) on the ground, originally presented in their first motion for partial summary judgment, that the statutory scope of chiropractic does not include "diagnosing" a condition, as opposed to "analyzing, examining, or evaluating" it. TCA **\*492** replies, and we agree, that the Physician Parties' "cross-point" seeks relief beyond that which they were afforded in the district court's judgment, which explicitly granted the Chiropractor Parties' motion for partial summary judgment and rendered a take-nothing judgment as to the Physician Parties' claims for a declaration that the use of "diagnosis" in itself rendered 75.17(d) invalid. Consequently, to raise this contention on appeal, the Physician Parties were required to file their own notice of appeal. *See* Tex.R.App. P. 25.1(c) ("A party who seeks to alter the trial court's judgment ... must file a notice of appeal."); *Lubbock County, Tex. v. Trammel's Lubbock Bail Bonds,* 80 S.W.3d 580, 584 (Tex.2002); *Quimby v. Texas Dep't of Transp.,* 10 S.W.3d 778, 781 (Tex.App.-Austin 2000, pet. denied). They did not do so. We thus lack jurisdiction to consider the Physician Parties' "cross-point" and dismiss it. [32] *See Tarrant Restoration v. TX Arlington Oaks Apartments, Ltd.,* 225 S.W.3d 721, 733–34 (Tex.App.-Dallas 2007, pet. dism'd w.o.j.).

Conversely, the Physician Parties suggest that we lack subject-matter jurisdiction to consider TCA's fifth issue challenging the potential summary-judgment ground that 75.17(d)(1)(A) and (B) violate article XVI, section 31 of the Texas Constitution. Citing the portion of the district court's judgment stating that its summary-judgment rulings had rendered "moot" "TMA's and TMB's constitutional challenges," the Physician Parties accuse TCA of seeking an "advisory opinion" regarding a claim or issue that the district court never reached. We observe that while TMA's alternative constitutional challenges to the underlying statutes were never adjudicated below and would indeed have been mooted by the district court's summary-judgment rulings, it is unclear whether the district court's reference to "moot" "constitutional challenges" was intended also to refer to the constitutional challenge to rule 75.17(d)(1)(A) and (B), as opposed to the statutes, that the Physician Parties had presented as a ground for partial summary judgment. Regardless, we ultimately agree with the Physician Parties that TCA's fifth issue is moot, if for no other reason than that the Physician Parties, by taking the position that the district court never reached their summary-judgment ground concerning the constitutionality of 75.17(d)(1)(A) and (B), have conceded that we cannot affirm the summary judgment invalidating those provisions on that basis.

Having thus clarified and narrowed the matters in dispute, the sole dispositive questions remaining before us in regard to 75.17(d)(1)(A) and (B) are whether those rule provisions exceed the statutory scope of chiropractic—assuming, as we must do in the present procedural posture, that TBCE's use of the term "diagnosis" does not in itself cause the provision to exceed the statutory or permissible constitutional scope of chiropractic practice.

***"Diagnoses" and "opinions" regarding the "biomechanical condition of the spine or musculoskeletal system"***

 **[5]**    Subpart (d)(1)(A) of TBCE's scope-of-practice rule allows a chiropractor, again, to render "an analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system" and provides a non-exclusive list of examples of such analyses, diagnoses, and opinions that TBCE has determined fit within this provision. *See* 22 Tex. Admin. Code § 75.17(d)(1)(A). Although the  **\*493**  district court did not specify the grounds on which it relied to find this provision invalid, the Physician Parties argued in support of their motion for summary judgment, and also in their briefs to this Court, that this provision improperly allows chiropractors to diagnose diseases that cannot be considered biomechanical conditions of the spine or musculoskeletal system. On appeal, TCA responds that when read in the context of the rule as a whole, subpart (d)(1)(A) does not exceed the statutory scope of chiropractic because it limits chiropractors to making diagnoses only regarding the biomechanical condition of the spine or musculoskeletal system, consistent with the statutory scope of chiropractic. *See* Tex. Occ.Code Ann. § 201.002(b)(1); 22 Tex. Admin. Code § 75.17(d)(1)(A). We agree.

The effect of our procedurally required assumption that TBCE's use of the term "diagnosis" does not in itself cause the scope-of-practice rule to exceed the statutory scope of chiropractic is that the word "diagnose" is synonymous with the phrase "analyze, examine, or evaluate" in the statutory scope of chiropractic. *See* Tex. Occ.Code Ann. § 201.002(b)(1). As such, subpart (d)(1)(A) effectively tracks the Legislature's scope of chiropractic:

| Tex. Occ.Code Ann. § 201.002(b)(1) | 22 Tex. Admin. Code § 75.17(d)(1)(A) |
| --- | --- |
| (b) A person practices chiropractic under [the Chiropractic Act] if the person: | (1) In the practice of chiropractic, licensees may render and analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following: |
| (1) uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body[.] | (A) An analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system including, but not limited to, the following [list of examples]. |

*Id.;* 22 Tex. Admin. Code § 75.17(d)(1)(A). Thus, the plain language of (d)(1)(A) limits chiropractors to diagnosing—i.e., "analyzing, examining, or evaluating"—biomechanical conditions of the spine or musculoskeletal system. Further, because the list of non-exclusive examples of such "diagnoses" are grammatically dependent on or otherwise stem from the paragraph's initial statement that the diagnosis *regard* the biomechanical condition of the spine or musculoskeletal system, the listed examples are likewise limited to the biomechanical condition of the spine or musculoskeletal system of the human body. In other words, the non-exclusive list of example opinions or diagnoses cannot be read in isolation; rather, they must be read as being dependent upon or bounded by the restriction that they also regard the biomechanical condition of the spine or musculoskeletal system. To that extent, this complies with the statutory scope of chiropractic.

The Physician Parties counter that this provision does not restrict chiropractors to the biomechanical condition of the spine or musculoskeletal system because it allows them to diagnose diseases without limitation. In support of this contention, they point to the rule's "expansive definitions" of "musculoskeletal system" [33] and "subluxation  **\*494**  complex," [34] the rule's "broad catch-all phrases "including but not limited to," "structural pathology," "functional pathology," and "etiology," and finally to their assertion that the common, ordinary meaning of the word "diagnose" incorporates identification of diseases, *see Webster's*

at 622 (defining "diagnose" as "to identify (as a disease or condition) by symptoms or distinguishing characteristics"); *American Heritage College Dictionary* at 383 (defining "diagnosis" as "act or process of determining the nature and cause of a disease or injury through examination of a patient"). Specifically, they assert that because "biomechanical" refers only to the application of mechanical principles—i.e., the action of forces on matter or material, *see Webster's* at 1401 (defining "mechanics" and "mechanical")—to living bodies and does not involve diseases of any kind, chiropractors may not render a diagnosis, which by definition involves the identification of a disease. Relatedly, they point to the rule's use of "pathology" and "etiology," which also involve the study of disease, *see Dorland's* at 690 (defining "etiology" as "the study or theory of the factors that cause disease"), 1416 (defining "pathology" as "the branch of medicine that deals with the essential nature of disease"), to argue that this provision of the scope-of-practice rule allows chiropractors to diagnose a wide range of diseases and conditions, including various cancers, arthritis, osteoporosis, gout, ALS, and bone fractures.

But apart from the fact that the common, ordinary meaning of "diagnosis" also includes the identification of a "condition" or an "injury," *see Webster's* at 622; *American Heritage College Dictionary* at 383, the Physician Parties' argument presumes that "disease" would extend beyond the biomechanical condition of the spine or musculoskeletal system of the human body. This construction, as previously suggested, ignores the plain language of the rule restricting any such diagnosis to the biomechanical condition of the spine or musculoskeletal system. The text and format of this provision plainly shows that "the system" discussed in each of the examples is "the biomechanical condition of the spine and musculoskeletal system" referred to at the beginning of the provision. Stated another way, each of the listed examples is limited to the Legislature's standard of "biomechanical condition of the spine and musculoskeletal system." Thus, regardless of whether diagnosis, pathology, or etiology invoke concepts of disease as the Physician Parties suggest, the bottom line is that paragraph (d)(1)(A) limits chiropractors to diagnoses regarding "the biomechanical condition of the spine and musculoskeletal system" as required by the statutory scope of chiropractic. Accordingly, the provision does not exceed the statutory scope of chiropractic.

In a related argument, the Physician Parties challenge TBCE's use of the phrase "could include, but are not limited to" in subpart (d)(1) of the scope-of-practice rule, suggesting that it, in combination with the issues discussed above, eviscerates any purported limitation on chiropractors' authority to diagnose by allowing chiropractors to "diagnose any diseases (pathology) that relate to the biomechanical condition of the spine and musculoskeletal system (redefined to include nerves and other tissues), determine their origins **\*495** (etiology) and provide a prognosis on the disease's effect." But this argument requires reading 75.17(d)(1) in an unnecessarily strained manner.

As set forth above, paragraph (d)(1) states that chiropractors "may render an analysis, diagnosis, or other opinion *regarding* the findings of examinations and evaluations. *Such opinions* could include, but are not limited to, the following[.]" *See* 22 Tex. Admin. Code § 75.17(d)(1) (emphases added). "But are not limited to" as it is used here merely means that the list of examples that follows is not a comprehensive list of every type of authorized opinion—i.e., there could be other types of opinions that fit within the parameters of the provision that are not mentioned in the list. Also, use of this phrase does not alter the limitation in the rule that the "diagnosis" referred to must regard the findings of "examinations and evaluations," a phrase that itself is described earlier in the scope-of-practice rule in terms of the statutory scope of chiropractic:

(c) Examination and Evaluation

(1) In the practice of Chiropractic, licensees of this board provide necessary examination and evaluation services to:

(A) Determine the bio-mechanical condition of the spine and musculoskeletal system of the human body including, but not limited to, the following....

....

(B) Determine the existence of subluxation complexes of the spine and musculoskeletal system of the human body and to evaluate their condition including, but not limited to....

*Id.* § 75.17(c)(1)(A), (B). Thus, the plain language of 75.17(d)(1) provides that chiropractors may render diagnoses regarding findings and examinations within the statutory scope of chiropractic, and offers a non-exclusive list of examples of *such* opinions. It does not, by its plain language, allow them to render diagnoses that do not involve the statutory scope of chiropractic. As such, it does not exceed the statutory scope of chiropractic.

We sustain TCA's third issue.

***"Diagnoses" and "opinions" regarding "a subluxation complex of the spine or musculoskeletal system"***

 **[6]**    Relatedly, the Physician Parties argued successfully to the district court that the following paragraph of TBCE's scope-of-practice rule, (d)(1)(B), also exceeds the statutory scope of chiropractic:

> (1) In the practice of chiropractic, licensees may render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following:
>
> ...
>
> (B) An analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system including, but not limited to, the following: [list of examples].

22 Tex. Admin. Code § 75.17(d)(1)(B). Initially, the Physician Parties argue that this paragraph of the scope-of-practice rule is invalid because it allows chiropractors to *diagnose* a subluxation complex despite the fact that the statutory scope of chiropractic only allows chiropractors to *treat* the subluxation complex. *Compare* Tex. Occ.Code Ann. § 201.002(b)(1) (allowing chiropractors "*to analyze, examine, or evaluate* the biomechanical condition of the spine or musculoskeletal system") (emphasis added) *with id.* § 201.002(b)(2) (allowing chiropractors "*to ... perform procedures* **\*496**  to improve the subluxation complex or the biomechanics of the musculoskeletal system) (emphasis added). Stated another way, the Physician Parties argue that while chiropractors—again assuming our procedural limitations as to "diagnosis"—may diagnose the biomechanical condition of the spine or musculoskeletal system, they can only treat, but not diagnose, the subluxation complex. We find this argument unpersuasive.

This argument suggests that the Legislature intended to allow chiropractors to treat a condition that is undisputedly unique to the practice of chiropractic, while also deliberately depriving them of the ability to analyze, examine, evaluate, or (given our procedural posture) "diagnose" that condition. We cannot see how a chiropractor would know *to treat* a subluxation complex if he had not first determined from an analysis, examination, or evaluation/ "diagnosis" that there was a problem with the subluxation complex that needed chiropractic treatment. A more logical interpretation, and one supported by the text of both the occupations code and TBCE's scope-of-practice rule and by the summary-judgment evidence, is that a subluxation complex is part of the biomechanical condition of the spine or musculoskeletal system of the human body and, thus, may be analyzed, evaluated, examined, and diagnosed by chiropractors.

TBCE's unchallenged definition of "subluxation complex" establishes that it is a—

> neuromusculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or neuro-physiological reflections of these articular structures, their proximal structures, and/or other body systems that may be directly or indirectly affected by them.

22 Tex. Admin. Code § 75.17(b)(7). The rule also defines "musculoskeletal system" as the "system of muscles and tendons and ligaments and bones and joints and associated tissues and nerves that move the body and maintain its form." *See id.* § 75.17(b)(4). "Neuro-" is a prefix meaning "nerve," *see Dorland's* at 1284, and "articular" refers to joints, *see id.* at 160. To a certain extent, then, use of the prefix "neuro-" with the adjective "articular" in connection with "musculoskeletal" is redundant in that

TBCE's definition of "musculoskeletal system" already includes both nerves and joints. Nevertheless, the bottom line here is that 75.17(d)(1)(B) allows chiropractors to diagnose a condition that under unchallenged rules is part of the musculoskeletal system of the human body. To that extent, it comports with the statutory scope of chiropractic.

The Physician Parties also contend that the language of paragraph (d)(1)(B) allows chiropractors, in violation of the statutory scope of chiropractic, to diagnose neurological conditions, pathological and neuro-physiological consequences that effect the spine and musculoskeletal system, and "other body systems" that are affected by subluxation. We disagree that this provision sweeps so broadly. Although the definition of "subluxation complex" indicates that its existence may have functional or pathological consequences or that it may affect essentially every part of the body, the rule itself only allows chiropractors to render an analysis, diagnosis, or other opinion regarding a subluxation complex of the spine or musculoskeletal system. Accordingly, it does not exceed the statutory scope of chiropractic.

We sustain TCA's fourth issue.

## CONCLUSION

Having determined that, in the procedural posture of this appeal, the district **\*497** court erred in its judgment invalidating subparts 75.17(d)(1)(A) and (B) of TBCE's scope-of-practice rule, we reverse that portion of the judgment. In light of our reversal of the district court's summary judgment invalidating subparts 75.17(d)(1)(A) and (B) of the scope-of-practice rule, we remand the case for further proceedings regarding the Physician Parties' alternative constitutional challenges. Having otherwise overruled each of the Chiropractor Parties' issues on appeal, we affirm the remainder of the district court's judgment that subparts 75.17(a)(3), (c)(2)(D), (c)(3)(A), and (e)(2)(O) of TBCE's scope-of-practice rule are void.

## All Citations

375 S.W.3d 464

Footnotes

1    *See* Tex. Occ.Code Ann. § 151.002(a)(12) (West Supp. 2011) ("physician" refers to a licensee under the Medical Practice Act).

2    Conversely, physicians do not subject themselves to chapter 201 if their conduct comes within the statutory scope of chiropractic. *See id.* § 201.003(b) (West 2004) (Chapter 201 "does not limit or affect the rights and powers of a physician licensed in this state to practice medicine.").

3    While different cultures throughout history have employed manipulation of human bones and tissue as an intended means of improving health, David D. Palmer is typically credited with originating the modern theory of chiropractic in 1895, when he reportedly restored a man's hearing by using spinal manipulation. *See* Walter I. Wardwell, *Chiropractic: History & Evolution of a New Profession* 2 (1992); Erland Pettman, *A History of Manipulative Therapy,* 15 The Journal of Manual & Manipulative Therapy 165, 165–66 (2007); Judith Turner, *Gale Encyclopedia of Medicine: Chiropractic* (2006). Palmer concluded that misalignment or "subluxations" in the spine created pressure on or irritation of nerves that, in turn, could lead to various health problems, disease, or disability. Wardwell at 2; Pettman at 168. Based on this theoretical premise, Palmer sought to develop a procedure for adjusting misaligned vertebrae as a means of improving health and, eventually, founded this country's first chiropractic school, the Palmer School of Cure in Davenport, Iowa, currently known as the Palmer College of Chiropractic. *See* Palmer College of Chiropractic, http://www.palmer.edu/History (last visited Mar. 13, 2011). While today's chiropractors typically recognize the importance of other factors in disease causation, they still manipulate spines to correct musculoskeletal problems. *See* Wardwell at 2.

4    The 1949 enactment defined the practice of chiropractic as follows:
     Any person shall be regarded as practicing chiropractic within the meaning of this Act who shall employ objective or subjective means without the use of drugs, surgery, X-ray therapy or radium therapy, for the purpose of ascertaining the alignment of the vertebrae of the human spine, and the practice of adjusting the vertebrae to correct any subluxation or misalignment thereof, and charge therefor, directly or indirectly, money or other compensation; or who shall hold himself out to the public as a chiropractor

or shall use either the term "chiropractor," "chiropractic," "doctor of chiropractic," or any derivative of any of the above in connection with his name.

See Act of Apr. 21, 1949, 51st Leg., R.S., ch. 94, § 1, 1949 Tex. Gen. Laws 160, 160–61. The Texas Legislature first enacted a statute recognizing chiropractic and exempting it from the laws governing the practice of medicine in 1943. See Act of May 5, 1943, 48th Leg., R.S., ch. 359, §§ 1–17, 1943 Tex. Gen. Laws 627. The 1943 statute authorized chiropractors to treat the "spinal column, and its connecting tissues." Id. § 3, 1943 Tex. Gen. Laws at 628–29. The Court of Criminal Appeals later invalidated this law as an unconstitutional "preference" to chiropractic, reasoning that "the spinal column *and its connecting tissues* embraces the entire body and all organs thereof." See *Ex parte Halsted,* 147 Tex.Crim. 453, 182 S.W.2d 479, 486 (1944) (emphasis added). The current statutory regime defining and regulating chiropractic traces back to the 1949 enactment.

5 The amended definition provided:

A person shall be regarded as practicing chiropractic within the meaning of this Act if the person:

(1) uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body;

(2) uses adjustment, manipulation, or other procedures in order to improve subluxation or the biomechanics of the musculoskeletal system; or

(3) holds himself out to the public as a chiropractor or uses the term "chiropractor," "chiropractic," "doctor of chiropractic," "D.C.," or any derivative of those terms in connection with his name.

Act of May 12, 1989, 71st Leg., R.S., ch. 227, § 1, 1989 Tex. Gen. Laws 1005. Excluded from the scope of chiropractic practice, however, were the provision of "surgery, drugs that require a prescription to be dispensed, x-ray therapy, or therapy that exposes the body to radioactive material." *See id.* § 3, 1989 Tex. Gen. Laws at 1006. Amendment proponents evidently touted the changes as necessary to modernize the "outdated" statutory definition to "reflect the education, training, and clinical expertise of chiropractors today" and to account for a study showing that "86.8% of the conditions treated by chiropractors can be classified as musculoskeletal problems" rather than spinal misalignment. *See* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. S.B. 169, 71st Leg., R.S. (1989).

6 The anesthesia itself is evidently administered by a qualified health-care professional other than a chiropractor, including an anesthesiologist, a physician.

7 TMA and TMB, in particular, place great emphasis on the legislative history of these amendments. Although versions of the changes had appeared in earlier bills considered by the Seventy–Fourth Legislature, the amendments' immediate origins were a House floor amendment that Representative Tom Uher proposed to add to a bill that had theretofore focused chiefly on rural health-care issues. Although containing the same limitation of treatment methods to "nonsurgical, nonincisive procedures" and exclusion of "incisive or surgical procedures" that ultimately appeared in the final, enacted version, Uher's amendment defined "incisive procedure" to "include[ ] entry into any tissue, cavity, or organ by any person or implement," subject to some broad exceptions:

["incisive procedure"] does not include examination of the ear, nose, and throat, drawing blood for the purposes of diagnostic testing, or acupuncture or needle EMG if the chiropractor is certified to perform acupuncture or needle EMG under ... this Act.

Floor Amendment No. 9 to Tex. S.B. 673, at 2, 74th Leg., R.S. (May 22, 1995). Additionally, as the exceptions contemplated, other provisions of Uher's proposed amendment would have required TBCE to adopt procedures and standards for "certifying" chiropractors to perform needle EMG and acupuncture. *See id.* at 6. The amendment imposed a similar mandate requiring TBCE to adopt procedures to certify chiropractors to perform MUA. *See id.* at 5.

In response to Uher's proposed amendment, then-Representative (later Senator) Kyle Janek, a physician, proposed to amend Uher's amendment to, in relevant part, (1) delete the exceptions for needle EMG and acupuncture in Uher's definition or description of "incisive" procedures; (2) delete the mandate that TBCE adopt processes for certifying chiropractors to perform needle EMG and acupuncture; and (3) invert the mandate that TBCE "shall adopt" processes for certifying chiropractors to perform MUA into an explicit prohibition that TBCE "shall not" adopt processes to "certify" chiropractors to perform MUA. *See* Floor Amendment No. 12 to Tex. S.B. 673, 74th Leg., R.S. (May 22, 1995). During the debate on these amendments, Representative Janek expressed his opinion that "[t]his amendment would take out any ability by the chiropractors to put needles in people." Debate on S.B. 673 on the Floor of the House, 74th Leg., R.S. (May 22, 1995) (statement of Rep. Janek) (transcript available from Senate Staff Services). The House of Representatives ultimately adopted Uher's amendment with Janek's modifications and a few additional, less sweeping changes and refinements. *See* Floor Amendment Nos. 9–14 to Tex. S.B. 673 (May 22–24, 1995). These changes, in turn, were ultimately enacted into law, as described above.

8 *See* Tex. Bd. of Chiropractic Exam'rs, *Acupuncture, MUA, and Needle EMG* (ratified September 11, 1997, amended May 7, 1998, and May 1999); Tex. Bd. Chiropractic Exam'rs, *RE: Scope of Practice Clarification regarding Nerve Conduction Studies* (Jan. 25, 2002) (memo. to all Texas chiropractic licensees).

9 *See, e.g.,* Tex. Att'y Gen. Op. No. DM–472, at 3 (1998).

10    *See* Tex. Att'y Gen. Op. No. DM–415, at 4–6 (1996).

11    *See* Tex. Att'y Gen. Op. No. DM–472, at 6 (concluding that "the use of a needle ... for any purpose other than the drawing of blood for diagnostic purposes or the practice of acupuncture is not within the scope of practice of a licensed Texas chiropractor.").

12    *See O'Neal v. Texas Bd. of Chiropractic Exam'rs,* No. 03–03–00270–CV, 2004 WL 2027787, at *3, 2004 Tex.App. LEXIS 8254, at *9 (Tex.App.-Austin Sept. 10, 2004, no pet.) (mem. op.) (holding that suit by chiropractor against TBCE seeking declaration that needle EMG was within the scope of chiropractic practice did not present a justiciable controversy "where the ... Board indisputably agrees with the legal interpretation ... that [the chiropractor] seeks" and there was no more than speculation that it would change that view; also observing that Attorney General opinions did not in themselves present a justiciable controversy); *Continental Cas. Co. v. Texas Bd. of Chiropractic Exam'rs,* No. 03–00–00513–CV, 2001 WL 359632, at *1, 2001 Tex.App. LEXIS 2336, at *2 (Tex.App.-Austin Apr. 12, 2001, no pet.) (mem. op., not designated for publication) (holding court lacked jurisdiction to hear insurance company's claim that TBCE improperly authorized chiropractors to perform MUA and needle EMG because there was no justiciable controversy where company was not a licensee or otherwise subject to TBCE); *see also Texas Mut. Ins. Co. v. Stelzer,* No. 03–06–00675–CV, 2010 WL 142501, at *1–3, 2010 Tex.App. LEXIS 236, *2–10 (Tex.App.-Austin 2010, no pet.) (mem. op.) (rejecting carrier's challenge to workers' compensation division order requiring reimbursement of chiropractor for needle-EMG procedure; holding that division properly deferred to TBCE interpretation of statutory scope of practice and that underlying scope-of-practice dispute was not properly before the court).

13    In fact, one of the Sunset recommendations preceding the 2005 amendments had criticized TBCE's "practice of issuing Board opinions" to define the scope of chiropractic and recommended that the agency be required to promulgate administrative rules instead. *See* Sunset Advisory Comm'n, Sunset Comm'n Decisions: Tex. Bd. of Chiropractic Exam'rs (May 2004) at 3; Sunset Advisory Comm'n: Tex. Bd. of Chiropractic Exam'rs, Staff Report, at 5 (Feb. 2004).

14    When it initially promulgated the scope-of-practice rule in 2006, TBCE purported to leave MUA unaddressed pending further rule-making while also emphasizing in the rule's preamble that MUA "ha[d] been part of the practice of chiropractic in Texas for more than 25 years" and that the agency was leaving this "status quo" undisturbed. *See* 31 Tex. Reg. 4613 (2006) (proposed Dec. 16, 2005), *amended in part by* 34 Tex. Reg. 4331 (2009) (proposed Jan. 2, 2009) (former 22 Tex. Admin. Code § 75.17). This former version of the rule was the subject of the interlocutory jurisdictional appeal we addressed in *Texas Board of Chiropractic Examiners v. Texas Medical Association,* 270 S.W.3d 777, 780–83 (Tex.App.-Austin 2008, no pet.). During the pendency of the litigation, TBCE amended the text of the rule to include an explicit authorization for chiropractors to perform MUA, discussed above. *See* 34 Tex. Reg. 4331 (2009) (codified at 22 Tex. Admin. Code § 75.17) (proposed Jan. 2, 2009).

15    TMA also named TBCE's executive director as a defendant, and he appears in his official capacity as a party to this appeal. Because any distinction between the two parties is not material to this appeal, for convenience we will use "TBCE" hereinafter to refer both to the agency itself and the agency and executive director collectively.

16    TMA also sought a declaration that TBCE had failed to provide an adequate "reasoned justification" for the challenged rules, as required by the Administrative Procedure Act. These claims are not at issue on appeal.

17    The district court's final judgment also references cross-motions purportedly filed by the Chiropractor Parties concerning the needle-EMG and MUA issues. However, no such motions appear in the appellate record, nor does the docket sheet reflect that any such motions were ever filed.

18    *See* Tex. Occ.Code Ann. § 205.003 (West 2004) (government code chapter 205, the chapter regulating acupuncture, "does not apply to a health care professional licensed under another statute and acting within the scope of the license").

19    *See* Tex. Att'y Gen. Op. No. DM–471 (1998); Tex. Att'y Gen. Op. No. DM–472 (1998).

20    The photographic depictions show the acupuncture needle as approximately three-quarters to one inch long, one of the needle-EMG needles appears to be roughly one-and-a-half inches long, and the remaining needle-EMG needle is approximately four or five inches long. However, Austin indicated that while the photographs accurately depicted the needles' comparative sizes, shapes, and configurations, the "photocopying process" had created some differences from their actual sizes.

21    Austin also referenced an attached magnified image of a needle tip showing such an edge.

22    Austin did not purport to opine as to whether the needle would be "incisive" in the sense that term is used in the statutory exclusion. To the extent her testimony might be so construed, we note that the testimony would amount to an incompetent legal conclusion. *See LMB, Ltd. v. Moreno,* 201 S.W.3d 686, 689 (Tex.2006) (holding that bare legal conclusion is not competent summary-judgment evidence); *see also City of San Antonio v. Pollock,* 284 S.W.3d 809, 816 (Tex.2009) (observing that unsupported legal conclusions are not competent evidence and may not support a judgment even in the absence of an objection).

23    *See Webster's Third New Int'l Dictionary* 1142 (defining "incisive" as "having a cutting edge or a piercing point"), 1670 (defining "penetrate"), 1712 (defining "pierce") (2002); *American Heritage College Dictionary* 687 (defining "incisive" as penetrating), 1010 (defining "penetrate" as "to enter or force a way into; pierce"), 1035 (defining "pierce" as "to cut or pass through with or as if with a sharp instrument; stab or penetrate") (2000).

24     Although both sides reference explanatory letters from the district court that preceded its summary-judgment order and judgment, they acknowledge that the letters do not impact the standard or scope of our appellate review. *See Cherokee Water Co. v. Gregg County Appraisal Dist.,* 801 S.W.2d 872, 878 (Tex.1990) (holding that trial court's letter to parties was not competent evidence of the trial court's basis for judgment); *Summers v. Fort Crockett Hotel, Ltd.,* 902 S.W.2d 20, 25 (Tex.App.-Houston [1st Dist.] 1995, writ denied) (refusing to consider trial court's letter to parties explaining reasons why judge would grant summary judgment).

25     *See* American Medical Association, *Current Procedural Terminology (CPT®) 2007* (4th ed. 2006).

26     In fact, the 1970 edition of the CPT Codebook lists "22505 MANIPULATION SPINE ANY REGION, REQUIRING ANESTHESIA" in the surgery section using the same five-digit code used in the most current version of the CPT. *See* American Medical Association, *Current Procedural Terminology* 135 (2d ed. 1970); American Medical Association, *Current Procedural Terminology CPT® 2012* 75 (4th ed. 2011) ("**22505** Manipulation of spine requiring anesthesia, any region").

27     As was the case with TCA's assertion that MUA performed by chiropractors is not described in the surgical section of the CPT Codebook, TBCE does not join in this argument.

28     Both the Physician Parties and the State of Texas assert that TCA waived this argument by non-suiting its affirmative claims for relief. To the contrary, TCA also raised this contention defensively, as a ground for denying the Physician Parties' summary-judgment motion, thereby preserving it for appeal. *See* Tex.R. Civ. P. 166a(c). Furthermore, in its notice of non-suit, TCA explicitly disclaimed any intent to waive its right to assert any defensive arguments.

29     Although the text of section 201.002(a)(4) itself refers to an agency of the federal government rather than the AMA ("the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services"), there is no dispute that at all relevant times CMS has fully incorporated the AMA's CPT coding system, as TBCE has acknowledged in its rules. *See* Department of Health & Human Services Medical Data Code Sets Rule, 45 C.F.R. § 162(b)(1) (2012) (adopting AMA's CPT codebook for the period from October 16, 2003 through September 30, 2013); 22 Tex. Admin. Code § 75.17(a)(4) (2011) (Tex. Bd. of Chiropractic Exam'rs, Scope of Practice); *see also* HCPCS–General Information, Centers for Medicare & Medicaid Servs., https://www.cms. gov/ MedHCPCSGenInfo (last visited Mar. 13, 2012) ("Level I of the HCPCS is comprised of CPT (Current Procedural Terminology), a numeric coding system maintained by the American Medical Association (AMA)."). Consequently, the statutory reference to the "common procedure coding system adopted" by CMS was, at least at the time of the statute's 2005 enactment, tantamount to incorporating the AMA's CPT Codebook.

30     According to the evidence in the record, the AMA publishes the CPT Codebook annually in the late summer or early fall, to be effective January 1. Thus, the CPT Codebook in effect for the calendar year 2005—i.e., *CPT 2005*—would have had a publication date of 2004. *See, e.g.,* American Medical Association *Current Procedural Terminology CPT 2012* (4th ed. 2011) (designated as "CPT 2012," but published in 2011).

31     Additionally, in the meantime, TBCE filed a motion for partial summary judgment seeking dismissal of the Physician Parties' constitutional claims challenging 75.17(d) and, alternatively, its underlying statutes. However, we cannot discern from the record that TBCE ever obtained a ruling on this motion.

32     We emphasize that we express no opinions regarding the merits of the cross-point that the Physician Parties attempt to assert.

33     "The system of muscles and tendons and ligaments and bones and joints and associated tissues and nerves that move the body and maintain its form." 22 Tex. Admin. Code § 75.17(b)(4).

34     "[A] neuromusculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or neuro-physiological reflections of these articular structures, their proximal structures, and/or other body systems that may be directly or indirectly affected by them." *Id.* § 75.17(b)(7).

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 5

2013 WL 1785492 (TX.St.Off.Admin.Hgs.)

State of Texas

Office of Administrative Hearings
Texas Commission on Environmental Quality

Texas Board of Veterinary Medical Examiners, Petitioner

v.

Melanie Mercer, D.V.M., Respondent

SOAH Docket No. XXX-XX-XXXX
April 15, 2013

**PROPOSAL FOR DECISION**

**\*1** The Staff of the Texas Board of Veterinary Medical Examiners (Board) seeks to impose disciplinary sanctions against Melanie Mercer (Respondent), a veterinarian licensed by the Board. Staff alleges that Respondent violated the standard of care when she failed to completely sterilize a dog during a neuter surgery. Staff also alleges that Respondent failed to keep proper patient records relating to that surgery, and failed to act with "honesty, integrity, and fair dealing" in how her clinic charged the client. The Administrative Law Judge (ALJ) concludes that Staff has established Respondent's violation of the standard of care and record-keeping requirements. The ALJ recommends that an informal reprimand and a $1,500 administrative penalty be imposed against Respondent, and that Respondent be required to complete two three-hour continuing education classes addressing the subjects of her violations.

### I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

There are no contested issues of notice or jurisdiction in this proceeding. Therefore, those matters are addressed in the findings of fact and conclusions of law without further discussion here.

The hearing on the merits was held January 16-17, 2013, before ALJ Sarah Starnes at the hearing facilities of the State Office of Administrative Hearings (SOAH), 300 West 15th Street, Fourth Floor, Austin, Texas. Staff was represented by Jonathan Crabtree, Staff Attorney. Respondent was represented by attorney Donald A. Ferrill. After post-hearing closing statements were filed by the parties, the record closed on February 27, 2013. [1]

### II. APPLICABLE STATUTES AND RULES

The Board is authorized to take disciplinary action against a Texas veterinarian who has engaged in conduct that violates the Board's rules of professional conduct. [2] Among the Board's disciplinary powers is the power to revoke or suspend a license, reprimand a license holder, impose administrative penalties, and require license holders to participate in continuing education programs. [3]

In this case, Staff alleges that Respondent violated three Board rules that were in effect in 2006, when the conduct at issue took place. First, Staff alleges that Respondent violated Rule 573.22, which provides:

> Veterinarians shall exercise the same degree of humane care, skill, and diligence in treating patients as are ordinarily used in the same or similar circumstances by average members of the veterinary medical profession in good standing in the locality or community in which they practice, or in similar communities. [4]

**\*2** Second, Staff alleges that Respondent violated Rule 573.52, which sets the required standards for patient record keeping. Specifically, Staff alleges that, for a neuter surgery she performed on a dog, Respondent's medical records failed to adequately reflect the "names, dosages, concentration, and routes of administration of each drug prescribed, administered and/or dispensed," and failed to record "other details necessary to substantiate the examination, diagnosis, and treatment provided, and/or surgical procedure performed" as required by that rule. [5]

Finally, Staff alleges that Respondent violated Rule 573.26, which requires veterinarians to "conduct their practice with honesty, integrity, and fair dealing to clients in time and services rendered, and in the amount charged for services, facilities, appliances and drugs." [6]

### III. EVIDENCE [7]

#### A. Respondent's Veterinary Practice

Respondent is a licensed veterinarian with license number 9738 issued by the Board. Respondent graduated from veterinary school in 1989, and is currently licensed as a veterinarian in Missouri and Texas. Respondent has been practicing in Texas for nearly ten years, and currently has a small-animal veterinary practice. She testified that she is certified in canine rehabilitation therapy and has a special interest in theriogenology, or animal reproduction. She also testified to having extensive experience with spaying and neutering small animals, both from her general pet practice and from time spent working for animal shelters and low-cost clinics. She estimated that she has performed thousands of canine neuter surgeries.

#### B. Sarge's Neuter Surgery

For approximately a year and a half, Respondent worked for the Kaufman County Animal Awareness Project, a low-cost, spay-and-neuter clinic. On November 14, 2006, while working at the clinic, Respondent performed a neuter surgery on "Sarge," a thirteen-month-old German Shepherd.

Respondent testified that, because so much time has lapsed, she has no specific memory of Sarge's neuter surgery. [8] However, she testified to her general practice in performing canine neuter procedures. She said that she will generally perform a "closed" procedure on smaller dogs (where the tunic is left on the testicle and one ligation is used to sever the cremaster muscle, blood vessels, and spermatic cord) and an "open" procedure on larger dogs (where the tunic is opened and the muscle, vessels, and cord are each separately ligated). [9] Respondent testified that, when she removes the testicles, her habit is to place them on the table next to the dog. When the surgery is over, she checks to make sure there are two testicles on the table, then throws them in the trash. [10] Respondent testified that she recalls nothing unusual about Sarge's surgery, nor do her medical records reflect anything out of the ordinary. [11] Because of this, she believes that she removed two testicles from Sarge's scrotum during his neuter surgery, as required to satisfy the standard of care. [12]

#### C. Sarge's Illness and Unexpected Testicle

**\*3** Sarge's owner, Kathleen Odle, testified that Sarge did not seem to recover from his neuter surgery. She took him to Lake Ray Hubbard Emergency Clinic on November 25th (over the Thanksgiving holiday), eleven days after his neuter surgery. He was hospitalized there over the weekend. That clinic's medical record states that Sarge had been vomiting and had not been eating for several days. The medical record also noted that, when he was examined on November 25th, Sarge's abdomen and urogenital system appeared "normal" to the veterinarian, and that abdominal palpation was painful for Sarge. [13] Blood tests performed at the clinic suggested that Sarge was experiencing "severe acute renal failure." [14] The veterinarian noted that he "relayed [a] guarded prognosis" to Sarge's owner, "due to severity of renal failure and dehydration." [15]

The following Monday, November 27, 2006, Sarge was transferred from the emergency clinic to the Animal Diagnostic Clinic in Mesquite, Texas. There, he was seen by Dr. Brandy Porterpan, a veterinarian Board-certified in small-animal internal medicine. Dr. Porterpan testified that, in examining Sarge, she palpated his scrotum and discovered that he still had a testicle that appeared to be attached to a spermatic cord. This surprised her because she was aware that Sarge had been neutered approximately two weeks earlier. She asked a colleague, a Board-certified surgeon, to examine the scrotum, and he agreed that Sarge still had a testicle. An ultrasound also confirmed there was testicular tissue in Sarge's scrotum, and that the spermatic cord was attached to the testicle. [16] Dr. Porterpan estimated that the testicle was between four and five centimeters in diameter, or approximately the size of a small tomato. [17]

Dr. Porterpan called Respondent to report the situation and inquire about Sarge's neuter surgery. According to Dr. Porterpan, Respondent stated that there had been no complications during the surgery thirteen days earlier, and explained that she must have been distracted during the surgery and forgotten to remove the remaining testicle. [18] Respondent had a similar recollection of this conversation. She testified that, when Dr. Porterpan called, her first response was "oh, my God, I must have left one." [19]

Dr. Porterpan said that, after she discussed Sarge's condition with his owner and relayed Sarge's "guarded" prognosis, the owner elected to euthanize the dog. Dr. Porterpan testified that Sarge probably had chronic kidney disease (pyelonephritis), and that Respondent could not have detected this because her low-cost clinic did not do the types of pre-surgery bloodwork that would have revealed Sarge's elevated renal values. Dr. Porterpan suspects that the anesthesia he was given during the neuter surgery pushed Sarge into acute renal failure, from which he could not recover.

### D. The Disciplinary Complaint and Respondent's Hypothesis

 **\*4**  In June 2009, Ms. Odle filed a complaint with the Board, reporting that Respondent had performed an incomplete neuter procedure on Sarge. [20] When asked to respond, Respondent wrote a letter to the Board, dated July 16, 2009, and acknowledged her mistake, writing:
First, let me say how embarrassed I was at learning of my mistake in only removing one of Sarge's testicles. ...

I can assure the Board that at no time during the surgery did I ever leave Sarge unattended on the operating room table. Due to the passage of time, I do not recall the exact nature of any "distraction" during Sarge's surgery but I strongly suspect that I was distracted by questions from staff members. In any event, the surgery, though not complete, was otherwise performed according to the standard of care ....

....

While I sincerely regret leaving a testicle in Sarge, it could not be the cause of his pyelonephritis, kidney failure and subsequent euthanasia. [21]

As the complaint made its way through the disciplinary process, however, Respondent developed another theory for why a testicle was found in Sarge nearly two weeks after she performed a neuter surgery: he might have had a polyorchid, cryptorchid testicle-in layman's terms, a third, undescended testicle-that descended into his scrotum sometime after Respondent performed the neuter surgery, but before Dr. Porterpan treated Sarge. If true, that would explain how Respondent could have removed two testicles from Sarge's scrotum on November 14th, yet there could still be an intact testicle in Sarge's scrotum when Dr. Porterpan examined him thirteen days later.

In her testimony at the hearing, Respondent admitted that this is unlikely. On cross-examination from Staff, she was asked, "Would you say it's more likely that you left [a testicle] in there or that the dog was polyorchid?" Respondent answered, "It's

more likely that I left one in there, but I cannot prove either - either occurrence at this point." [22] She also acknowledged that "statistically" it is more likely that she simply forgot to remove one of Sarge's testicles. [23] Nonetheless, she insisted that it is theoretically, physiologically possible that Sarge had a third, undescended testicle that made its way into his scrotum after she performed the neuter surgery.

### E. The Experts' Views

In addition to the testimony of Respondent and Dr. Porterpan, two other veterinarians testified at the hearing. Staff offered expert testimony from Dr. Kirk Lewis and Dr. Mark Stickney, both of whom have extensive experience in performing canine neuter procedures. Dr. Lewis is a small-animal practitioner with approximately twenty years' experience performing small-animal surgeries, and an estimated sixteen years' experience performing low-cost spay and neuter surgeries. He testified that he performs canine neuter procedures daily and has performed in excess of 70,000 spay and neuter procedures during his career. He has worked for Animal Trustees of Austin for over a decade and said he may perform more than twenty procedures a day when he is working in their spay/neuter clinic. Dr. Stickney has been a licensed veterinarian since 1997, and has practiced principally small-animal surgery, including spaying and neutering, since 2002. Dr. Stickney is currently the director of general surgery at the Texas A&M University College of Veterinary Medicine and teaches surgical techniques to veterinary students there. He said he performs canine neuter surgeries "daily," and estimates that he has performed over 8,000 such procedures in his career.

### 1. An Anatomically Normal Dog

**\*5** According to Dr. Lewis and Dr. Stickney, during the first six months of an anatomically normal dog's life, two testicles gradually move from the dog's abdomen, through the inguinal rings and inguinal canal (a narrow opening between the dog's abdomen and scrotum), and into the scrotum. Dr. Stickney explained that the testicle is pulled through the inguinal rings by the gubernaculum, a rubber-band-like structure that attaches on one end to the external inguinal ring, and to the testicle on the other end. During the first twelve weeks or so of the dog's life, the gubernaculum gradually contracts and gets shorter, pulling the testicles to the scrotum. After twelve weeks of age, the gubernaculum stops contracting and ultimately dissolves and will no longer pull a testicle toward the scrotum. There may still be some gradual movement of the testicles until the dog is four to six months of age, but after six months of age, Dr. Stickney testified, testicles will no longer descend. [24]

Dr. Porterpan explained that, before six months of age, the dog's testicles are relatively small and can pass easily through the inguinal canal. But according to Drs. Lewis, Stickney, and Porterpan, the inguinal canal gets smaller as the dog grows larger, and by the time a dog is thirteen months old (as Sarge was in November 2006), the inguinal canal would have closed to the point where a testicle could no longer pass through. Dr. Lewis estimated that, after six months, the inguinal canal opening in most dogs would be only about half a centimeter wide, just large enough to hold the vessels that provide a blood supply to the testicles.

### 2. A Polyorchid, Cryptorchid Dog

Respondent, Dr. Porterpan, Dr. Lewis, and Dr. Stickney testified at length to the confluence of abnormal conditions that would have to occur for a testicle to be present in Sarge's scrotum some two weeks after Respondent believes she removed two testicles during his neuter surgery.

Sometimes, a testicle does not descend into the scrotum, resulting in a cryptorchid testicle, which is a testicle that is stuck in the dog's abdomen or inguinal area. Respondent testified that, though abnormal, cryptorchidism is "moderately common," meaning that an "average veterinarian" might see cryptorchidism once a month or so. [25] Dr. Lewis explained that in "abdominal cryptorchids," the testicle never traveled out of the abdomen into the inguinal canal, while in "inguinal cryptorchids" a testicle made it out of the abdominal cavity, but remained in the inguinal canal. Dr. Porterpan explained that cryptorchidism can occur, for example, when the testicle has grown too large to pass through the narrowing inguinal canal. Dr. Stickney testified that cryptorchidism occurs when the gubernaculum has failed to respond normally, and has failed to pull the testicle into the scrotum.

Because Respondent believes she removed two testicles when she neutered Sarge, she contends that Sarge must have had a third, cryptorchid testicle in his abdomen or inguinal canal that descended into his scrotum only after his neuter surgery on November 14th, but before Dr. Porterpan examined him on November 27th. In her testimony, Respondent acknowledged that the condition of having more than two testicles-polyorchidism-is extremely rare. Respondent said she has never seen a polyorchid dog in her twenty-four years of practice, with the possible exception of Sarge. Drs. Porterpan, Lewis, and Stickney also testified that, in all of their years as practicing veterinarians, none had ever diagnosed polyorchidism. Only Dr. Stickney had even heard of the condition before this case, and he testified that "there are about 18 dogs in the entire world that have been reported" as cases of polyorchidism in decades of published veterinary medicine journals. [26]

 **\*6**  Even if, as Respondent suggests, Sarge was a polyorchid and his third testicle was cryptorchid, Staffs witnesses all agreed that it would be virtually impossible for such a testicle to descend into the scrotum of a thirteen-month-old dog.

Dr. Porterpan testified that a testicle in a thirteen-month-old German Shepherd would ordinarily be too large to pass through the inguinal canal, both because the canal has mostly closed by that age, and because the testicle would have grown larger than it was before six months of age, when it would ordinarily have descended before the inguinal canal closed. Dr. Stickney agreed that the testicle of a thirteen-month-old dog could not move into the scrotum because, by that age, the inguinal rings around the inguinal canal have closed, making it impossible for the testicle to pass through into the scrotum. Moreover, according to Dr. Stickney, the gubernaculum would have ceased contracting by age thirteen months, and could not create the pull or pressure required to draw the testicle down into the scrotum.

According to Dr. Lewis, the only way a polyorchid, cryptorchid testicle could have moved into Sarge's scrotum when he was thirteen months old would be if Sarge had a "very large" inguinal hernia, or an exceptionally large opening in his inguinal canal. Dr. Lewis testified that such a large inguinal hernia would have been unusual, and would have been obvious to any veterinarian examining Sarge. [27]  In her testimony, Respondent acknowledged that "[a]ny inguinal hernia is abnormal," and her medical records make no note of finding an inguinal hernia when she saw Sarge on November 14, 2006. [28]  There was no testimony from any veterinarian at the Lake Ray Hubbard clinic, but Dr. Porterpan testified that based on her review of that clinic's records, there is no indication that either of the two veterinarians who examined Sarge there diagnosed an inguinal hernia, either. [29] Dr. Porterpan testified that she has experience examining and diagnosing dogs with inguinal hernias, and that she specifically palpated to look for an inguinal hernia on her initial physical examination of Sarge, and she did not detect an obvious inguinal hernia. In addition to performing that physical examination, she testified, she also performed an abdominal ultrasound and, after Sarge was euthanized, an autopsy; at no point in those procedures did she diagnose an inguinal hernia.

Assuming Sarge did have an inguinal hernia, some amount of increased intra-abdominal pressure would have been required to move a cryptorchid testicle through the hernia and into the scrotum. Dr. Lewis testified that the amount of pressure required would depend on the size of the hernia. If there was a large hernia-that is, a hernia close to the size of an adult German Shepherd's testicle-then very little pressure would have been required to move the testicle into the scrotum. But, as described above, such a large hernia would have been obvious, and none of the four veterinarians who examined Sarge between November 14 and November 27, 2006, at the Kaufman County Animal Awareness Project, Lake Ray Hubbard Emergency Clinic, or the Animal Diagnostic Clinic found such a large hernia or noted one in their medical records. [30]  Absent such a notably large hernia, Dr. Lewis testified that significant intra-abdominal pressure would have been required to move a cryptorchid testicle to the scrotum, an amount of pressure that he would associate only with a "significant trauma," comparable to being hit by a car. [31]

 **\*7**  Respondent suggested several things that could have created pressure in Sarge's abdomen sufficient to move a cryptorchid testicle into his scrotum: vomiting, straining to defecate or urinate, or vigorous, rough palpation of his abdomen. [32] Dr. Porterpan acknowledged that her abdominal palpation of Sarge would have caused some increase the intra-abdominal pressure, and also that increased intra-abdominal pressure could potentially result in a hernia. However, Respondent testified that pushing something (like a testicle) through the inguinal canal would require more vigorous palpation than she would expect a veterinarian

to do to a sick dog; she admitted she does not necessarily believe rough palpation caused Sarge's testicle to move through his inguinal canal and into his scrotum. [33] Dr. Porterpan and Dr. Lewis both agreed that vomiting and straining to defecate can potentially increase intra-abdominal pressure to some degree, and Lake Ray Hubbard's medical records indicate that Sarge was constipated and had been vomiting. [34] However, Dr. Lewis testified that he believes it is highly unlikely-perhaps a one percent chance-that vomiting, constipation, or palpation by Lake Ray Hubbard veterinarians could have created sufficiently strong intra-abdominal pressure to move a testicle from Sarge's abdomen into his scrotum. [35]

Respondent also testified that, although she has never seen a polyorchid, cryptorchid dog with a testicle that descended after the dog was over a year old, she has read literature documenting, at least anecdotally, similar conditions in dogs and other species, including humans, horses, cats, and "at least one goat." [36] Dr. Lewis said that, in researching to prepare for his testimony in this case, he had found just two case studies involving polyorchidism in dogs. Dr. Lewis and Dr. Stickney also said they had read a case in which a testicle had been found in a horse's scrotum after castration where two testicles had been removed. [37] While acknowledging the theoretical possibility that a normal testicle could appear in the scrotum after removal of two testicles during neutering, Dr. Lewis and Dr. Stickney nonetheless maintained that it was virtually impossible that this could have happened to Sarge, both because a dog's testicles will not descend after six months of age [38] and because there was no indication that Sarge had the kind of "very large" inguinal hernia that would have to have been present for a four-to-five centimeter testicle to pass through the inguinal canal of a sexually mature, thirteen-month-old dog. [39]

## IV. ANALYSIS

### A. Standard of Care Allegation

Staff has alleged that Respondent left one testicle in Sarge's scrotum when performing his neuter surgery, and thereby failed to meet the standard of care for a neuter procedure in violation of Board Rule 573.22.

### 1. Constitutional Validity of Rule 573.22

 **\*8** According to Respondent, Rule 573.22 imposes a professional standard of care that is equivalent to a simple-negligence standard, while the enabling statute authorizes Board discipline only if a veterinarian has committed "gross negligence" or "a pattern of acts that indicate consistent malpractice, negligence, or incompetence in the practice of veterinary medicine." [40] Therefore, Respondent contends, the Board exceeded its constitutional rulemaking authority when it enacted Rule 573.22, and Staff should not be able to rely on this rule as a basis for disciplining Respondent for one isolated act of alleged simple negligence.

SOAH ALJs do not have authority to rule on the constitutionality of the Board's rules and regulations; instead, such challenges must be raised in the judicial branch. [41] Accordingly, the ALJ will not address Respondent's challenge to the constitutionality of Rule 573.22.

### 2. Was the Standard of Care Met?

The four veterinarians who testified at the hearing all agreed that the standard of care requires a veterinarian performing a canine neuter surgery to remove two testicles from the scrotum and, if two testicles cannot be found in the scrotum, to look for the missing testicle(s) in the dog's abdomen. [42] Three of those veterinarians also agreed that, if two testicles are found and removed from the scrotum, the standard of care does not require a veterinarian to search in the dog's abdomen for a possible third testicle. [43]

To establish that Respondent violated Rule 573.22, it was Staffs burden to show, by a preponderance of the evidence, that Respondent failed to meet this standard of care or, as the rule phrases it, failed to "exercise the same degree of humane care, skill, and diligence in treating patients as are ordinarily used in the same or similar circumstances by average members of the veterinary medical profession."[44] The preponderance of the evidence standard is satisfied when a fact is established by "the greater weight of the credible evidence," or when the evidence establishes that a fact is "more likely true than not true."[45]

Staff contends that the evidence establishes that it is "more likely true than not true" that Respondent simply forgot to remove one of Sarge's testicles when she performed his neuter surgery, which is clearly a violation of the standard of care. In her testimony, Respondent candidly admitted that this is most likely what happened.[46] She also, at least initially, admitted making this mistake when she wrote to the Board expressing her embarrassment "at learning of my mistake in only removing one of Sarge's testicles."[47]

Despite these admissions, however, Respondent asserts that Staff cannot meet its burden of proof because Staff cannot *disprove* her alternate theory that Sarge had an undiagnosed polyorchid, cryptorchid testicle that descended into his scrotum after his neuter surgery and shortly before Dr. Porterpan examined him. While conceding it is possible that she forgot to remove one of Sarge's testicles, Respondent contends that her alternative theory is also possible and, because there is no direct evidence establishing which actually transpired, Staff cannot meet its burden of proof to show she violated the standard of care. In support of this argument, Respondent relies on two Texas Supreme Court cases, *Schaefer v. Texas Employers' Insurance Association,*[48] and *Lenger v. Physician's General Hospital, Inc.*[49] In those cases, the court held that personal-injury claims should not have been submitted to the jury because the plaintiffs, who bore the burden of proof, had no proof beyond their experts' conjecture that the defendants' negligence had proximately caused the plaintiffs' injuries. In both cases, the fact finders were presented with more than one reasonable explanation for what caused the plaintiffs' injuries, and no evidence establishing which possibility was more or less probable. In *Schaefer*, the court concluded that the plaintiff had no evidence of causation because his expert did "no more than suggest a possibility" as to how the plaintiff had contracted his disease, and so the expert's opinion "is not based upon reasonable medical probability but relies on mere possibility, speculation, and surmise."[50] Similarly, in *Lenger*, the court looked for a "reasonable probability" that the plaintiffs medical complications had been caused by the defendants' negligence and, because his expert had testified to three equally reasonable explanations for plaintiffs injuries, the court concluded that there was no evidence from which a jury could determine that one causation explanation was more likely than not.[51]

 **\*9**  The ALJ does not consider these cases controlling here because, unlike the evidence in *Lenger* and *Schaefer*, the evidence in this case clearly points to only one reasonable explanation for why a testicle was found in Sarge's scrotum two weeks after Respondent purportedly neutered him: Respondent forgot to remove one of his testicles during her neuter surgery. Respondent herself acknowledged that this is the most probable explanation, and the other expert witnesses all agreed. The only other explanation offered-that Sarge had an undiagnosed third, cryptorchid testicle that descended through a remarkably large and previously undetected inguinal hernia when Sarge was at an age when it would be extraordinarily rare for a testicle to descend at all-is too unlikely to be regarded as a reasonable and equally probable explanation.

Alternatively, even if the polyorchid, cryptorchid theory could be deemed a reasonable one, the circumstantial evidence nonetheless leads the ALJ to conclude that it is more reasonable to infer that Respondent simply forgot to remove one of Sarge's two testicles. As a majority of the Texas Supreme Court has held, "[i]f circumstantial evidence will support more than one reasonable inference, it is for the [fact-finder] to decide which is more reasonable...,"[52] Here, while Respondent can point to circumstantial evidence that leaves room to infer that Sarge might have had a late-descending third testicle, the same evidence leaves equal room to support contradictory inferences.

For example, Respondent testified that it is her ordinary practice to remove two testicles during her neuter surgeries, and she recalls nothing out of the ordinary about Sarge's surgery, nor do her medical records indicate that anything unusual transpired. Respondent argues that this evidence supports an inference that there must have been only two testicles in the dog's scrotum,

she removed them both, and the third testicle Dr. Porterpan discovered thirteen days later was a polyorchid, cryptorchid testicle that had not yet descended when Respondent neutered Sarge. However, these same facts are also consistent with the theory that Respondent somehow became distracted during Sarge's surgery and forgot to remove one of his testicles. Because Respondent was unaware of her mistake until Dr. Porterpan alerted her to it thirteen days after the surgery, there would be no reason for Respondent to recall making the mistake during Sarge's surgery, nor would she have noted it on his medical records.

Respondent also suggested that the medical records from Lake Ray Hubbard Emergency Clinic-which contain no notation that Sarge had a testicle in his scrotum when he was examined there on November 25, 2005-support her theory that Sarge had a cryptorchid testicle that descended sometime after he was examined that afternoon, but before Dr. Porterpan examined him in the morning of November 27, 2006. According to Respondent, when presented with a sick dog who had recently had surgery, a competent veterinarian would examine the area associated with the surgery to determine if the dog was experiencing complications from the surgery; therefore, she believes the Lake Ray Hubbard veterinarian must have examined Sarge's scrotum since he had recently been neutered. Because the veterinarian's notes at the emergency clinic described Sarge as urogenitally "normal," and because it would be decidedly abnormal to find a testicle after a neuter surgery, Respondent concludes that Sarge must not have had a testicle present when he was examined at the emergency clinic. However, there is no evidence to suggest one way or the other whether the Lake Ray Hubbard veterinarians actually examined Sarge's scrotum. Dr. Lewis testified that the emergency clinic veterinarians would "not necessarily" have examined Sarge's scrotum because a testicle would be unrelated to the symptoms of kidney failure that brought Sarge into their clinic. [53] Thus, while Respondent would infer from the records that Sarge's scrotum was examined and no testicle was present, the same records support the equal and opposite inference that a testicle was present but the Lake Ray Hubbard veterinarians overlooked it because they never examined Sarge's scrotum.

**\*10** Here, because Respondent can point to some circumstantial evidence to support her alternative theory, and because the expert veterinarians acknowledged at least the hypothetical possibility (albeit a remote one) that it could have occurred, the ALJ cannot say that there is no evidence to support the notion that a third testicle might have descended into Sarge's scrotum shortly before Dr. Porterpan examined him. However, this possibility is so remote and so unlikely that the ALJ concludes that the preponderance of the evidence establishes what all four veterinarian witnesses agreed most likely occurred: Respondent forgot to remove one of Sarge's testicles, and breached the standard of care by making that error.

### B. Medical Records Claim

Staff has also alleged that Respondent violated Board Rule 573.52 by (a) failing to include in her medical records the concentration and route of administration of each drug that was given to Sarge, and (b) failing to substantiate her examination and treatment of Sarge and the surgical procedure she performed in sufficient detail in her medical records.

### 1. The Board's Prior Investigation is Not Relevant to this Case

Respondent argues that Board should be essentially estopped from challenging the sufficiency of Sarge's medical records because the Board declined to move forward with disciplinary charges against her in a separate Board investigation involving substantially similar records. In December 2007, the owner of a dog named "Harley Girl" filed a complaint asserting that Respondent had over-sedated her dog during a spay surgery. In response to that complaint, two licensed-veterinarian Board members reviewed Respondent's medical records for Harley Girl and recommended that no disciplinary charges should be pursued, and that the case should be closed "with the notation of 'no violation.'" [54] The investigator's report for that case noted that Harley Girl's "patient records appear to meet the Board's requirements." [55] In the form he submitted to the Board noting his recommendation regarding Harley Girl's care, the Board's Director of Enforcement checked a box indicating his belief that there was "[c]lose to no violation"; he did not check a box that would have reported "Insufficient Patient Records." [56] Respondent contends that she used the same medical record forms for Sarge that were used for Harley Girl's surgery, and because the Board did not challenge the sufficiency of the medical records in that investigation, the same forms cannot be found deficient in this proceeding.

The ALJ rejects this argument for three reasons. First, the determination that the Harley Girl complaint did not warrant further disciplinary proceedings bears no indicia of an agency-wide policy that might be relied upon in subsequent proceedings. For example, the notation that there was "close to no violation" contains no specific statement of Board policy regarding what kinds of records do or do not comply with Rule 573.52. [57] Even if the Harley Girl case did somehow indirectly indicate approval of Respondent's medical forms, there is no evidence that such approval constitutes a Board policy that has been applied in any other cases. [58] Nor is there any evidence that such a policy has been adopted or ratified by anyone other than the two Board members who conducted the initial review of the Harley Girl complaint. [59] The ALJ concludes that the decision not to initiate disciplinary proceedings against Respondent regarding her records for Harley Girl cannot be regarded as an expression of policy by the Board or its executive director regarding the sufficiency of Respondent's medical-record forms with respect to any other patients.

 **\*11**  Second, the Board cannot be estopped from enforcing a rule in this case simply because it declined to enforce the same rule in another case. "Legislative prerogative would be undermined if a government agent could-through mistake, neglect, or an intentional act-effectively repeal a law by ignoring, misrepresenting, or misinterpreting a duly enacted statute or regulation." [60] Thus, even if Harley Girl's medical records were deficient and could have prompted disciplinary action, the Board's failure to take such action in that case does not estop the Board from subsequently enforcing the rules that require Respondent to maintain adequate records for her other patients.

Finally, while the estoppel argument fails as a matter of law because it cannot be invoked against a government entity, the argument also fails as a matter of fact. The party asserting estoppel must show that she has detrimentally relied upon some false representation by the other party. *Trudy's Tex. Star, Inc. v. City of Austin*, 307 S.W.3d 894, 906 (Tex. App.-Austin 2010, pet. denied). The Board's investigation relating to Harley Girl was closed in June 2008, more than a year and a half after Respondent performed Sarge's neuter surgery and prepared the medical records at issue here. Resp. Ex. 1, Staff Ex. 2. Thus, Respondent could not have been relying upon the Board's determination regarding Harley Girl's medical records when Sarge's medical records were made. Therefore, the ALJ concludes that evidence relating to Respondent's medical records for Harley Girl, and the outcome of the Board's review of that complaint, have no relevance to or collateral estoppel effect on the determination of whether her medical records for Sarge complied with Rule 573.52.

**2. Whether the Records for Sarge Comply with Rule 573.52**

Rule 573.52 sets forth the Board's standards for what must be included in a veterinarian's patient records. In this case, Staff specifically contends that Respondent's medical records for Sarge failed to comply with those sections that require patient records to contain
· "Names, dosages, concentration, and routes of administration of each drug prescribed, administered and/or dispensed," and

· "Other details necessary to substantiate the examination, diagnosis, and treatment provided, and/or surgical procedure performed." [61]

During the Board's investigation, Respondent produced a medical record for Sarge comprising (1) an invoice, (2) procedure form; (3) sterilization authorization and release form; (4) post-operative instruction form; and (5) a cage card. [62] Of these documents, only the invoiceThe contains any indication of what medications were administered or dispensed to Sarge. [63] invoice contains the following line items for medications:

| Date | Product/Service | Quantity | Tax | Amount | Vet |
| --- | --- | --- | --- | --- | --- |
| 11/14/2006 | 1015 - PAIN SHOT (DOG) - KETOFEN cc SQ | 0.70 | 0.00 | 0.00 | 007 |

| 11/14/2006 | A502 - DIAZEPAM INIECTABLE CC | 3.50 | 0.00 | 0.00 | 007 |
| 11/15/2005 | A503 - KETAMINE INIECTABLE cc | 3.00 | 0.00 | 0.00 | 007 |

**\*12** The form also contains a notation that "[y]our pet was given a non-steroidal anti-inflammatory today" and that for dogs, that drug was "Ketoprofen SQ." [64]

The invoice does expressly name three drugs that were given to Sarge and the quantities dispensed. However, the invoice does not state the concentration of those medications, nor the routes of administration, as required by Rule 573.52(a)(10). Respondent contends that ketofen, diazepam, and ketamine are drugs that only come in one standard concentration, and so there was no need to denote that concentration specifically in the records. [65] Dr. Lewis and Dr. Stickney, however, explained that veterinarians sometimes use compounding pharmacies, or even mix their own drug cocktails, and that compounded or mixed drugs could be made in any concentration. [66] According to Dr. Stickney, the number of ccs administered to an animal is "really a meaningless value" without a corresponding notation of the drug concentration in the medical record. [67] The invoice also fails to clearly state the "routes of administration" for the three medications Sarge was given. The "pain shot" of ketofen was apparently given subcutaneously (or "SQ"), but beyond stating that the diazepam and ketamine were injected (as opposed, presumably, to being administered orally or topically) there is no statement of the location of the injection. Because Respondent's medical record does not contain sufficient notation of the concentration or route of administration for the medications Sarge was given, Staff has met its burden of proving that Sarge's medical records fell short of the requirements of Rule 573.52(a)(10).

Staff also complains that Respondent's medical records violate Rule 573.52(a)(ll) because they lack any detail regarding her examination and treatment of Sarge beyond the bare fact that she performed a neuter surgery. Dr. Stickney testified that a complete medical record should have included notes of Sarge's medical history, Respondent's physical examination of Sarge, an operative report of what happened during Sarge's surgery, anesthetic records indicating how long his procedure lasted, and the results of any monitoring. [68] No such details are found in her medical records. The only evidence that there was any consideration given to Sarge's pre-surgical condition is found in the authorization and release form signed by Sarge's owner certifying, among other things, that "[t]o my knowledge, this animal is in good health." [69] However, this form was filled out by Sarge's owner, and there was no testimony that it was ever reviewed or considered by Respondent or any clinic employee involved in Sarge's care. The ALJ does not believe the authorization and release form constitutes any kind of record substantiating Respondent's examination or treatment of Sarge. As for detail on the surgery, the invoice and procedure forms include no information about Sarge's neuter surgery other than the dog's weight and the price charged for the procedure. At the hearing, Respondent testified to how and when she would generally employ "open" versus "closed" techniques for performing neuter surgeries, but her medical records are silent on which technique was used on Sarge, and contain no other detail about what transpired during his surgery or how he responded to it.

**\*13** Respondent asserts that no details describing Sarge's examination and surgery were necessary because his neuter surgery is "a routine standard procedure and notations are made about things that are not standard and not routine." [70] The ALJ finds this argument unpersuasive. Rule 573.52 plainly requires that veterinarian records must be "complete, contemporaneous and legible" and must include specified details regarding the animal's treatment. A record cannot be "complete" if the required detail is merely implicit. Staff has met its burden of establishing that Respondent failed to maintain a medical record for Sarge that complied with Rule 573.52(a)(l 1).

### C. Respondent's Honesty, Integrity and Fair Dealing

Staff contends that Respondent violated Board Rule 573.26, and failed to act with "honesty, integrity, and fair dealing" as required by that rule, by (a) charging for a complete neuter surgery when only an incomplete neuter surgery was performed, and (b) charging Sarge's owner the surgical rate for a dog that weighed over 70.5 pounds when Sarge weighed less than 70.5 pounds, resulting in an overcharge of $8.00. [71]

### 1. Respondent is Responsible for Her Clinic's Billing Practices

Respondent argues that she is not accountable for any billing errors relating to Sarge's surgery because she had no involvement with or responsibility for billing matters at the Kaufman County Animal Awareness Project. She testified that she was a contract employee there, not an owner, and she did not set the clinic's fees, prepare invoices, or collect fees from clients. Respondent testified that all billing was handled by other clinic staff. [72] This was corroborated by Sarge's owner, who testified that she never spoke with Dr. Mercer the day of the neuter surgery, and when she paid for the procedure, she paid "the person at the front desk at the clinic." [73]

The Board rules in effect in 2006 provided that:

Licensees employed by, or contracted to, nonprofit or municipal corporations shall be liable for any violations of the Act or rules occurring as a result of the practice of veterinary medicine or any veterinary services provided by the nonprofit or municipal corporation, including those occurring due to the acts or omissions of non-licensed employees of, or volunteers for, the nonprofit or municipal corporation. [74]

Moreover, the Veterinary Licensing Act defines the "practice of veterinary medicine" as:

(A) the diagnosis, treatment, correction, change, manipulation, relief, or prevention of animal disease, deformity, defect, injury, or other physical condition, including the prescription or administration of a drug, biologic, anesthetic, apparatus, or other therapeutic or diagnostic substance or technique;

...

[or]

 **\*14** (D) the receipt of compensation for performing an act listed in Paragraph (A). [75]

Pursuant to the above-quoted statute and rule, as a veterinarian working under contract for the nonprofit Kaufmann County Animal Awareness Project, Respondent was responsible for any violations committed by other employees or volunteers of the clinic. Therefore, even though Respondent had no personal involvement with how or what the clinic's staff charged clients, she would nonetheless be liable for violating the Board's rules if other clinic staff acted without honesty, integrity and fair dealing in performing the clinic's billing functions.

### 2. Respondent Did Not Lack Honesty, Integrity, or Good Faith In Charging For Sarge's Neuter Surgery

Rule 573.26 obliges veterinarians to "conduct their practice with honesty, integrity, and fair dealing to clients in time and services rendered, and in the amount charged for services ...," [76] Staff asserts that Respondent fell short of this standard because her clinic charged Sarge's owner for a neuter surgery when, in fact, she failed to neuter the dog.

There is no contention that Respondent deliberately left one testicle behind when she neutered Sarge or that anyone at the Kaufmann County Animal Awareness Project was aware of Respondent's mistake when Sarge's owner, Ms. Odle, was charged for the procedure. At the time Sarge's owner was charged, everyone involved believed that Respondent had successfully performed a standard neuter surgery, and Ms. Odle was billed accordingly. It was only when Dr. Porterpan called Respondent nearly two weeks later that Respondent learned she had not, in fact, completely sterilized Sarge.

Staff seeks to sanction Respondent for what was clearly an unknowing, unintentional error, contending that "this is a strict-liability claim" and Respondent's (or clinic staffs) intent is therefore immaterial. The ALJ does not agree. A "strict liability" rule would authorize the Board to impose discipline for any billing errors, no matter what the cause. That is not what Rule 573.26 does. Instead, the rule encompasses only those instances where a veterinarian acts without "honesty, integrity, and fair dealing" in charging a client for services. Yet there is no evidence that Respondent was in any way dishonest, lacked integrity, or dealt with Sarge's owner unfairly. Instead, the evidence shows that Respondent charged Ms. Odle for services she believed, at the time, had actually been rendered. Staff has not established this violation of Rule 573.26.

### 3. The Preponderance of the Evidence Does Not Establish That Respondent Overcharged Based on Sarge's Weight

Staff next contends that Respondent violated Rule 573.26 by charging Ms. Odle the fee for a neuter procedure for a dog weighing over 70.5 pounds when she should have been charged for a lower-weight dog. Again, even if there was an error in the amount Ms. Odle was billed, Staff has adduced no evidence that this was anything other than an inadvertent mistake by the staff responsible for charging for Respondent's services. To establish a violation of Rule 573.26, it is Staffs burden to show that a clinic employee acted dishonestly, unfairly, and without integrity, all of which require some contemporaneous awareness of the mistake that is being made. There is simply no evidence that Respondent or anyone else knew or should have known that Sarge's actual weight warranted a lower charge to Ms. Odle, and Rule 573.26 cannot reasonably be construed to apply to honest mistakes.

 **\*15**  Further, even if inadvertent mistake could constitute a violation of Board Rule 573.26, the preponderance of the evidence does not establish what Sarge weighed at the time of his neuter surgery, and so it does not establish that Sarge's owner was charged the wrong price for the procedure. The record contains sharply conflicting evidence regarding Sarge's weight. In her June 2009 complaint to the Board, Ms. Odle estimated that Sarge weighed sixty to seventy pounds on the day of his 2006 neuter surgery. [77] The Kaufman County Animal Awareness Project procedure form lists Sarge's weight at 50 pounds; Respondent testified this form would have been filled in by a clinic employee using information provided by Ms. Odle when the procedure was initially scheduled, but before he was seen by clinic staff. [78] If either of the figures provided by Ms. Odle was correct, then she should have been charged a $47 fee for neutering a dog weighing 46-70 pounds, instead of the $55 fee for dogs weighing "over 70.5 lbs." However, the weight that was hand-written on Sarge's cage card says he weighed 70.5 pounds; Respondent said this would have been filled out when Sarge was actually weighed at the clinic. [79] The typewritten November 14, 2006 invoice for Sarge's neuter surgery also listed his weight as 70.5 pounds, and his owner was charged the $55.00 fee for a "DOG NEUTER - OVER 70.5 LB." [80]

Records from the other clinics Sarge visited are likewise conflicting. The Lake Ray Hubbard Emergency Clinic's records listed Sarge's weight as 55.20 pounds on November 25, 2006, eleven days after the neuter surgery. [81] Dr. Porterpan saw Sarge two days later, and her records listed his weight at 65 pounds. [82] She testified that she does not recall weighing Sarge and that 65-pound figure was probably provided on the transfer orders from the Lake Ray Hubbard Emergency Clinic. [83] To explain how the Lake Ray Hubbard records could record such different weights for Sarge, Dr. Porterpan theorized that Sarge might have gained ten pounds though fluid therapy administered to combat his severe dehydration. [84] However, she also said that, because Sarge had been so ill, he had probably lost significant weight in the thirteen days since his neuter surgery, and it was plausible that Sarge had weighed "over 70 pounds" on the date of that surgery. [85] Taken together, the records from the three veterinary clinics Sarge visited in the last thirteen days of his life include weight estimates that differ by more than twenty pounds, and conflicting explanations were offered to explain those differences. The evidence relating to Sarge's weight is simply too inconsistent and speculative to establish, by a preponderance of the evidence, what he actually weighed on the date of his neuter surgery.

 **\*16**  Staff also contends that, at best, Respondent can show that Sarge weighed <u>exactly</u> 70.5 pounds, but there is no evidence that Sarge weighed <u>over</u> 70.5 pounds when Respondent saw him; therefore, Staff claims, Sarge's owner was clearly overcharged when she paid the rate for neutering a dog "Over 70.5 lbs." The Kaufmann County Animal Awareness Project's procedure form lists prices for three different weight groups: "0-45 lbs" ($42); "Over 46-70 lbs" ($47); and "Over 70.5 lbs" ($55). [86]

While the form is not a model of clarity, the ALJ finds Staffs construction of these weight groups to be unreasonable. If Staff is correct and the form is to be taken strictly literally (meaning the highest rate can be charged only for dogs weighing 70.6 pounds and higher), then it would also be inappropriate for the clinic to charge any fee at all for a neuter surgery for a dog weighing between 45.1 and 45.9 pounds, or between 70.1 and 70.4 pounds, because those weights are not included in any of the groups listed in the clinic's rate schedule. That is clearly not what the clinic intended. Instead, the ALJ believes the form can be reasonably read to set forth a $42 fee for dogs weighing below 46 pounds, a $55 fee for dogs weighing 70.5 pounds and above, and a $47 fee for the dogs in between those two groups. Based on this construction, a $55 fee would be appropriate for a dog weighing exactly 70.5 pounds, and there is some evidence that indicates Sarge had reached this weight. Because the evidence is too conflicting to establish by a preponderance what, exactly, Sarge weighed when Respondent saw him on November 14, 2006, and therefore what, exactly, was the correct charge for his neuter surgery, Staff has not met its burden to show that Ms. Odle was overcharged for Sarge's surgery.

## D. Recommended Sanction

When determining the appropriate sanction, SOAH is required to "use the schedule of sanctions adopted by board rule."[87] The Board has adopted a Recommended Schedule of Sanctions that classifies violations as Class A, B, or C depending upon the type of violation, the extent to which a violation posed a peril to the public, and any prior disciplinary history.[88] As set forth above, Staff has established that Respondent violated Board Rule 573.22 (the standard of care claim) and Board Rule 573.52 (medical records claim) in connection with her treatment of Sarge. These violations do not rise to the level of Class A violations, which category applies only to licensees "considered as presenting imminent peril to the public."[89] They also do not qualify as Class C violations, because Respondent has been subject to a prior disciplinary order, and the Class C category applies only to licensees who "do not have a history of previous violations."[90]

**\*17** Instead, Respondent's violations of the Board's rules fall squarely into Class B.[91] In assessing Category B sanctions or penalties, the ALJ and the Board must give consideration to:

> the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited acts; the hazard or potential hazard created to the health, safety, or economic welfare of the public; the economic harm to property or the environment caused by the violation; the history of previous violations;
>
> what is necessary to deter future violations; and any other matters that justice may require.[92]

The Board's rule authorizes penalties for Class B violations of up to a 10-year license suspension, a penalty of up to $5,000 per day for each violation, and required continuing education classes.[93] Staffs Amended Formal Complaint requests penalties well within these limits, seeking a recommendation for a $1,500 administrative penalty and a requirement that Respondent "complete 3 additional hours of continuing education in small animal surgery and 3 additional hours of continuing education in record keeping." Taking into account the required factors, the ALJ believes that Staffs proposed penalty and education requirements are reasonable. While it was a serious lapse for Respondent to forget to remove one of Sarge's testicles, and while her records for Sarge were incomplete in some respects, there was no evidence of any hazard to the "health, safety, or economic welfare of the public" as a result of these violations. Nor was there evidence that any economic or environmental harm resulted from these violations.[94] Respondent's only prior violation of a Board rule was unrelated to the violations that have been found in this case, and so does not indicate a continuing course of conduct that warrants more serious penalties. The two continuing-education classes that Staff would require Respondent to take are directly related to the violations that have been found in this case, and are reasonably calculated to deter future violations. Balancing these facts, the ALJ agrees with Staff that imposing a $1,500 penalty and requiring Respondent to take two three-hour classes is a reasonable sanction for the violations that she committed.

Staff also asks for a formal reprimand of Respondent. The Board's rules authorize the Board to reprimand a veterinarian who is subject to disciplinary action, and reprimands may be formal or informal.[95] Both formal and informal reprimands are contained

in written Board orders and are publicly available upon request, but formal reprimands are additionally published in the Board's newsletter and reported to the American Association of Veterinary State Boards for inclusion in a national reporting database of veterinarians. Here, the ALJ concludes that an informal reprimand would sufficiently address Respondent's violations. This is true for the same reasons that the ALJ agrees with Staffs recommendation for imposition of a monetary penalty on the low end of the allowable range: because Respondent's error in forgetting to remove one of Sarge's testicles appears to have been a one-time mistake that is not indicative of broader problems in her veterinary practices, and because, while Sarge was not successfully neutered, he was also not harmed, nor was the public or environment harmed as a result of Respondent's mistake. Therefore, the ALJ recommends an informal reprimand be lodged against Respondent instead of the formal reprimand requested by Staff.

## V. FINDINGS OF FACT

 **\*18**  1. The Texas Board of Veterinary Medical Examiners (Board) regulates licensure for veterinarians.

2. Melanie Mercer, D.V.M. (Respondent) is a licensed veterinarian in the State of Texas holding license number 9738 issued by the Board.

3. On September 17, 2012, Board Staff issued a Notice of Hearing and Formal Complaint.

4. On October 17, 2012, Board Staff issued an Amended Notice of Hearing and Amended Formal Complaint.

5. The Amended Notice of Hearing contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short plain statement of the matters asserted.

6. The hearing on the merits was held January 16-17, 2013, before Administrative Law Judge (ALJ) Sarah Starnes at the hearing facilities of the State Office of Administrative Hearings (SOAH), 300 West 15th Street, Fourth Floor, Austin, Texas. The Board was represented by Staff Attorney Jonathan Crabtree. Respondent was represented by attorney Donald A. Ferrill. The record closed on February 27, 2013.

7. In November 2006, Respondent was a contract employee of the low-cost, spay-and- neuter clinic operated by the Kaufman County Animal Awareness Project.

8. On November 14, 2006, Respondent performed a neuter surgery on "Sarge," a thirteen- month-old German Shepherd.

9. The standard of care requires a veterinarian performing a canine neuter surgery to remove two testicles from the scrotum and, if two testicles cannot be found in the scrotum, to look for the missing testicle(s) in the dog's abdomen.

10. During Sarge's neuter surgery, Respondent accidentally forgot to remove one of Sarge's testicles from his scrotum.

11. Respondent failed to meet the standard of care by failing to remove one of Sarge's testicles.

12. Sarge began to suffer from kidney failure after his neuter surgery.

13. Sarge's kidney failure was not caused by Respondent.

14. Eleven days after Sarge's neuter surgery, Sarge was hospitalized at the Lake Ray Hubbard Emergency Clinic.

15. Thirteen days after Sarge's neuter surgery, Sarge was transferred from the Lake Ray Hubbard Emergency Clinic to the Animal Diagnostic Clinic in Mesquite, Texas.

16. At the Animal Diagnostic Clinic, Dr. Brandy Porterpan examined Sarge and discovered that Sarge had a testicle in his scrotum. The testicle was still attached to the spermatic cord, and was approximately four-to-five centimeters in diameter, or approximately the size of a small tomato.

17. On November 27, 2006, Dr. Porterpan contacted Respondent to inform her about the testicle she had discovered and to inquire about Sarge's neuter surgery.

18. Until Dr. Porterpan called her, Respondent was unaware that she had left one of Sarge's testicles intact during the neuter surgery.

19. Until Dr. Porterpan called Respondent, clinic staff at the Kaufman County Animal Awareness Project was also unaware that Respondent had left one of Sarge's testicles intact during the neuter surgery.

 **\*19** 20. In their phone conversation, Respondent admitted her mistake to Dr. Porterpan and told Dr. Porterpan that she believed she must have become distracted during Sarge's surgery and forgotten to remove one of his testicles.

21. After being informed that Sarge would probably not recover from his kidney failure, Sarge's owner elected to euthanize Sarge on November 27, 2006.

22. In June 2009, Sarge's owner filed a complaint with the Board reporting that Respondent had performed an incomplete neuter procedure on Sarge.

23. In response to the complaint, Respondent wrote a letter to the Board admitting that she had forgotten to remove one of Sarge's testicles.

24. For most male dogs, during the first six months of life, two testicles gradually move from the dog's abdomen, through the inguinal canal, and into the scrotum.

25. After six months of age, testicles will no longer descend into the scrotum of an anatomically normal dog.

26. Cryptorchidism is a condition that occurs when one or more testicles fails to descend into the scrotum. A cryptorchid testicle is a testicle that has remained in the abdomen or inguinal canal.

27. Cryptorchidism is an abnormal condition in dogs.

28. Polyorchidism is the condition of having more than two testicles.

29. Polyorchidism cases have been reported in dogs, horses, and other species, but the condition is extremely rare.

30. It is theoretically possible that Sarge was a polyorchid dog, and that his polyorchid testicle was cryptorchid.

31. There is no direct evidence in the record to suggest that Sarge had a polyorchid, cryptorchid testicle.

32. If Sarge did have a polyorchid, cryptorchid testicle, it would have been virtually impossible for that testicle to move from Sarge's abdomen or inguinal canal into his scrotum in the thirteen days between Respondent's neuter surgery and when Dr. Porterpan found a testicle in Sarge's scrotum, unless Sarge had an exceptionally large inguinal hernia.

33. There is no evidence that Sarge had an exceptionally large inguinal hernia.

34. Even if Sarge did have an inguinal hernia, a testicle would not have passed into his scrotum absent a significant amount of increased, intra-abdominal pressure.

35. Palpation by a veterinarian, vomiting, and straining to defecate can all cause some increase in intra-abdominal pressure. However, it is very unlikely that any of these could have created enough pressure to move a tomato-sized, four-to-five centimeter testicle from Sarge's abdomen or inguinal canal into his scrotum.

36. While it is theoretically possible for a polyorchid, cryptorchid testicle to move into the scrotum of a sexually mature, thirteen-month-old dog, it is virtually impossible that this occurred with Sarge.

37. Respondent acknowledged that it is more likely that she forgot to remove one of Sarge's testicles than it is that a polyorchid, cryptorchid testicle moved into Sarge's scrotum in the thirteen days following her neuter procedure.

 **\*20** 38. It is unreasonable to believe that a previously-undiagnosed, polyorchid, cryptorchid testicle moved into Sarge's scrotum, at an age when it would be extraordinarily rare for a testicle to descend at all, through an inguinal hernia that went undetected by each of the veterinarians at three different clinics who examined Sarge in the last thirteen days of his life.

39. It is more probable than not that Respondent forgot to remove one of Sarge's testicles during his neuter surgery.

40. In June 2008, two licensed-veterinarian Board members recommended that the Board not take action on a complaint filed against Respondent regarding a dog named "Harley Girl," and did not report that "Insufficient Patient Records" were kept for Harley Girl.

41. The determination that the Harley Girl complaint did not warrant further disciplinary proceedings bears no indicia of a Board policy regarding the sufficiency of Respondent's medical record forms.

42. When Respondent prepared Sarge's medical records in November 2006, she could not have been relying upon the Board's June 2008 determination not to pursue disciplinary charges regarding her Harley Girl medical records.

43. Respondent's medical records failed to include the concentration and routes of administration of each drug prescribed, administered, and/or dispensed to Sarge.

44. Respondent's medical records failed to substantiate her examination, diagnosis, and treatment of Sarge and the neuter surgery she performed on him.

45. Respondent was not personally involved in billing matters at the Kaufmann County Animal Awareness Project, and did not set the clinic's fees, prepare invoices, or collect fees from clients.

46. The Kaufmann County Animal Awareness Project charged Sarge's owner $55 for his neuter surgery, the clinic's rate for neutering a dog weighing 70.5 pounds or above.

47. When Sarge's owner was charged for his neuter surgery, neither Respondent nor her clinic's Staff was aware that Respondent had forgotten to remove one of the dog's testicles.

48. The Kaufmann County Animal Awareness Project charged Sarge's owner the correct fee for the services Respondent and clinic believed at the time had actually been rendered.

49. Sarge weighed somewhere between 50 and 70.5 pounds on the date of his neuter surgery.

50. The preponderance of the evidence does not establish precisely what Sarge weighed on the date of his neuter surgery, and so does not establish what was the correct fee for his neuter surgery.

51. The Kaufmann County Animal Awareness Project's procedure form can be reasonably read to set forth a $55 fee for a dog weighing exactly 70.5 pounds, and there is some evidence that this is what Sarge weighed.

52. On October 18, 2011, the Board approved an Agreed Order with Respondent finding that she had "administered, dispensed, and prescribed controlled substances" during a one- year period during which her controlled substance registration with the Texas Department of Public Safety had expired and not been renewed. This was a violation of the Board's Rules of Professional Conduct, and the Agreed Order required Respondent to pay a $500 penalty for the violation.

 **\*21** 53. The violation addressed in the October 18, 2011 Agreed Order is unrelated to Respondent's violations of the standard-of-care and record-keeping rules found in this case.

54. Respondent's error in forgetting to remove one of Sarge's testicles appears to have been a one-time mistake that is not indicative of broader problems in her veterinary practices.

55. While Sarge was not completely neutered, he was also not harmed by Respondent's mistake in failing to remove one of his testicles.

56. There was no evidence of any hazard to the health, safety, or economic welfare of the public, nor was there evidence that any economic or environmental harm resulted from Respondent's violations of the standard-of-care and record-keeping rules in this case.

## VI. CONCLUSIONS OF LAW

1. The Board has jurisdiction and authority to take disciplinary action against Respondent. Tex. Occ. Code §§ 801.401, 801.402.

2. The State Office of Administrative Hearings has jurisdiction over all matters relating to the conduct of a hearing in this matter, including the preparation of a proposal for decision with findings of fact and conclusions of law. Tex. Gov't Code Ch. 2003; Tex. Occ. Code § 801.407.

3. Proper and timely notice of the hearing was provided. Tex. Gov't Code § § 2001.051, 2001.052; 22 Tex. Admin. Code § 575.30(g)(l).

4. The Board had the burden of proving the case by a preponderance of the evidence. 1 Tex. Admin. Code § 155.427.

5. The Board is authorized to take disciplinary action against a veterinarian who engages in practices or conduct that violates the Board's rules of professional conduct. Tex. Occ. Code § 801.402(6).

6. It is a violation of the Board's rules of professional conduct to fail to meet the standard of care, which the Board defines as failing to "exercise the same degree of humane care, skill, and diligence in treating patients as are ordinarily used in the same or similar circumstances by average members of the veterinary medical profession." 22 Tex. Admin. Code § 573.22 (2006 ver.).

7. SOAH ALJs do not have authority to rule on the constitutionality of the Board's rules and regulations. *City of Dallas v. Stewart*, 361 S.W.3d 562, 568 (Tex. 2012); *Texas State Bd. of Pharmacy v. Walgreen Texas Co.*, 520 S.W.2d 845, 848 (Tex. Civ. App-Austin 1975, writ refdn.r.e.).

8. Respondent failed to meet the standard of care in her treatment of Sarge, in violation of the Board's rules of professional conduct. 22 Tex. Admin. Code § 573.22 (2006 ver.).

9. It is a violation of the Board's rules of professional conduct to maintain patient records that do not contain "names, dosages, concentration, and routes of administration of each drug prescribed, administered, and/or dispensed." 22 Tex. Admin. Code § 573.52(a)(10) (2006 ver.).

10. It is a violation of the Board's rules of professional conduct to maintain patient records that do not contain "other details necessary to substantiate the examination, diagnosis, and treatment provided, and/or surgical procedure performed." 22 Tex. Admin. Code § 573.52(a)(ll) (2006 ver.).

 **\*22**  11. Declining to enforce a rule in one case will not operate to estop the Board from enforcing the same rule in another case. *City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 774 (Tex. 2006).

12. Respondent failed to maintain complete medical records for Sarge, in violation of the Board's rules of professional conduct. 22 Tex. Admin. Code § 573.52(a)(10), (11) (2006 ver.).

13. It is a violation of the Board's rules of professional conduct for a veterinarian to fail to "conduct their practice with honesty, integrity, and fair dealing to clients in time and services rendered, and in the amount charged for services, facilities, appliances and drugs." 22 Tex. Admin. Code § 573.26 (2006 ver.).

14. Respondent would be responsible for any violations of the Board's rules committed by other employees or volunteers of the Kaufmann County Animal Awareness Project in providing veterinary services for Sarge, including the clinic's receipt of compensation for performing those services. Tex. Occ. Code § 801.002(5); 22 Tex. Admin. Code § 573.71 (2006 ver.).

15. Rule 573.26 is not a strict-liability rule that authorizes the Board to impose discipline for any and all billing errors, no matter what their cause.

16. A person cannot lack "honesty, integrity, and fair dealing" unless she has some contemporaneous awareness of the mistake or omission that is being made.

17. Respondent did not lack honesty, integrity and fair dealing by charging Sarge's owner for a procedure that, at the time, Respondent believed had been successfully performed.

18. Staff has not met its burden to show that Respondent failed to conduct her practice with honesty, integrity, and fair dealing by charging Sarge's owner $55 for his neuter surgery.

19. Pursuant to the Board's schedule of recommended sanctions, Respondent's violations of the rules of professional conduct are properly characterized as Class B violations, for which the Board is authorized to impose up to a 10-year license suspension, an administrative penalty of up to $5,000.00 per violation per day, continuing education requirements relevant to violations, and/or quarterly reporting requirements. 22 Tex. Admin. Code § 575.25(b).

20. The Board's rules authorize the Board to reprimand a veterinarian who is subject to disciplinary action, and reprimands may be formal or informal. 22 Tex. Admin. Code § 575.24 (2006 ver.).

## VII. RECOMMENDATION

The ALJ recommends that the Board informally reprimand Respondent, impose a $1,500 administrative penalty, and require Respondent to complete a three-hour continuing education class in small-animal surgery and a three-hour continuing education class in record keeping.

Sarah Starnes

Administrative Law Judge

Footnotes

1    Due to an unexpected office closure, Staff was unable to file its Reply to Respondent's Closing Statement by the February 26, 2013 deadline set forth in Order No. 3, so the record was held open for one additional day.

2    Tex. Occ. Code § 801.402(6).

3    *Id*. §§ 801.401, 801.451.

4    22 Tex. Admin. Code § 573.22 (2006 ver.)

5    *Id*. § 573.52(a)(10), (11) (2006 ver).

6    *Id*. § 573.26 (2006 ver.).

7    The evidence recited in this section primarily pertains to the standard-of-care claim. Additional facts pertaining to Staff's other claims are set forth in the sections that specifically analyze those claims.

8    Tr. at 76.

9    Tr. at 273-74. Staff's expert, Dr. Kirk Lewis, also testified that veterinarians may employ open or closed techniques in canine neuter surgeries, "depending] on the individual surgeon's preference." Tr. at 126-27.

10    Tr. at 274.

11    Tr. at 276, 279; Staff Ex. 2, Resp. Ex. 8.

12    Among the four veterinarians who testified at the hearing, there was no dispute that, if two testicles are present in a dog's scrotum at the time of a neuter procedure, the standard of care requires removal of both testicles. Tr. at 84- 85, 169, 260, 274.

13    Resp. Ex. 6 at MERCER 109. The Lake Ray Hubbard veterinarians who treated Sarge did not testify at the hearing, and there is no notation in clinic's records to establish the scope of that veterinarian's examination of Sarge or the attention paid to the dog's scrotum during his physical exam.

14    Staff Ex. 4.

15    Resp. Ex. 6 at MERCER 109-10.

16    Tr. at 68-70.

17    Tr. at 74, 87-88.

18    Tr. at 71-72. In addition to her testimony at the hearing, Dr. Porterpan's discharge letter summarizing her care of Sarge states that Respondent had "explained that she must have been distracted while during the procedure leaving one testicle and not completing the surgery." Staff Ex. 4.

19    Tr. at 278.

20    Resp. Ex. 2. In her complaint, Ms. Odle also alleged that Respondent's "botched surgery" caused Sarge's death. Staff, however, has not alleged that Respondent is responsible for Sarge's fatal illness.

21    Staff Ex. 1.

22    Tr. at 310 (emphasis added).

23    Tr. at 312.

24    In her testimony, Respondent said she did not "necessarily" agree that testicles cannot descend into the scrotum after six months, but she agreed "that it is not common." Tr. at 279.

25    Tr. at 310.

26    Tr. at 225.

27    Tr. at 164-65.

28    Tr. at 311; Staff Ex. 2; Resp. Ex. 8.

29    Tr. at 104.

30    Staff Exs. 2, 4; Resp. Exs. 5, 6, 8.

31    Tr. at 197.

32 Tr. at 288.

33 Tr. at 318.

34 Resp. Ex. 6.

35 Tr. 177-78.

36 Tr. at 286.

37 Dr. Stickney criticized the reliability of the horse report, noting that it was "more of an anecdotal report." Tr. at 247. Dr. Lewis likewise noted that the horse report was not a peer-reviewed article, and that the horse involved may not have been sexually mature, unlike Sarge. Tr. at 155. As for the cases of polyorchidism in dogs, Drs. Lewis and Stickney distinguished them by noting that the polyorchid testicles in those dogs were irregular or "retained," and that those cases did not necessarily suggest that the polyorchid testicle could behave like a "normal" testicle or descend into the scrotum of an adult dog. Tr. at 162, 246.

38 Tr. at 251-52.

39 Tr. at 160-64.

40 *Compare* 22 Tex. Admin. Code § 573.22 *with* Tex. Occ. Code 801.402(16).

41 *See City of Dallas v. Stewart*, 361 S.W.3d 562, 568 (Tex. 2012) (agencies "lack the ultimate power of constitutional construction"); *Texas State Bd. of Pharmacy v. Walgreen Texas Co.*, 520 S.W.2d 845, 848 (Tex. Civ. App.-Austin 1975, writ ref d n.r.e.) ("Administrative agencies have no power to determine the constitutionality of statutes.").

42 Tr. at 84-85 (Dr. Porterpan), 169 (Dr. Lewis), 260 (Dr. Stickney), 274 (Dr. Mercer).

43 Tr. at 169 (Dr. Lewis), 260 (Dr. Stickney), 274 (Dr. Mercer). Dr. Porterpan declined to opine on whether the standard of care required a search for additional testicles after two were removed. Tr. at 84.

44 1 Tex. Admin. Code § 155.427; *Scally v. Tex. State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 437 n.15 (Tex. App.-Austin 2011, pet. denied); 22 Tex. Admin. Code § 573.22 (2006 ver).

45 *Murffv. Pass*, 249 S.W.3d 407, 409 n.l (Tex. 2008); Tex. R. Civ. P. 226a.

46 Tr. at 310, 312.

47 Staff Ex. 1.

48 612 S.W.2d 199 (Tex. 1980).

49 455 S.W.2d703 (Tex. 1970).

50 612S.W.2dat204.

51 455 S.W.2d 706-07.

52 *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001). The supreme court referred to the jury as fact-finder in *Lozano*, but in administrative cases like this one, it is the ALJ who acts as fact finder. *See* Tex. Gov't Code § 2001.062(c).

53 Tr. at 203-04.

54 Staff Ex. 3a;Resp. Ex. 1.

55 Staff Ex. 3a at p. 4.

56 Staff Ex. 5.

57 1 Tex. Admin. Code § 155.419(b)(2).

58 *Id*. § 155.419(b)(3).

59 *Id*. § 155.419(b)(4).

60 *City of White Settlementv. Super Wash, Inc.*, 198 S.W.3d 770, 774 (Tex. 2006).

61 22 Tex. Admin. Code § 573.52(a)(10), (11) (2006 ver). This rule was amended effective June 14, 2012, though the substantive provisions at issue in this case are also found, with minor revisions, in the current rule.

62 Staff Ex. 2. At the hearing, Respondent also submitted a copy of Sarge's records that included a Rabies Vaccination Certificate. Resp. Ex. 8.

63 The cage card seems to be a form with spaces for writing in notes reflecting the administration of certain drugs, but the copies of the card introduced in evidence are almost completely illegible. Staff Ex. 2 at p. R00010; Resp. Ex. 8 at p. 3.

64 Dr. Lewis testified that ketoprofen and ketofen are the same drug. Tr. at 211.

65 Drs. Lewis and Stickney agreed that ketamine generally comes in a standard 100-milligrams/mil concentration. Tr. at 191, 239-40. However, there was no evidence beyond Respondent's bare assertion that ketoprofen and diazepam are sold in just one standard concentration.

66 Tr. at 190, 240.

67 Tr. at 240.

68 Tr. at 235-36.

69      Staff Ex. 2atR0008.

70      Tr. at 306.

71      The Kaufmann County Animal Awareness Project charged $55 to neuter a dog "Over 70.5 lbs" and $47 for a dog "Over 46-70 lbs." Staff Ex. 2 at R0007.

72      Tr. at 291.

73      Tr. at 54.

74      22 Tex. Admin. Code § 573.71 (2006 ver). The same provision is also found in the Board's current rules. 22 Tex. Admin. Code § 573.72.

75      Tex. Occ. Code § 801.002(5).

76      22 Tex. Admin. Code § 573.26 (2006 ver). This same rule is currently found in 22 Tex. Admin. Code § 573.27.

77      Resp. Ex. 2 at p. 2.

78      Staff Ex. 2 at R0007; Resp. Ex. 8 at 1; Tr. at 293-94.

79      Staff Ex. 2 at R00010; Resp. Ex. 8 at 3; Tr. at 294.

80      Staff Ex. 2atR0006.

81      Resp. Ex. 6 at MERCER 107.

82      Resp. Ex. 5 at TBVME 116.

83      Tr. at 99, 101.

84      Tr. at 102-03.

85      Tr. at 97-98.

86      Staff Ex. 2atR0007.

87      Tex. Occ. Code § 801.407(c).

88      22 Tex. Admin. Code § 575.25 (2006 ver). Though this rule has since been amended, the provisions applicable to this case are unchanged as they apply to Respondent.

89      *Id*. § 575.25(a) (2006 ver).

90      *Id*. § 575.25(c) (2006 ver.). On October 18, 2011, the Board approved an Agreed Order with Respondent finding that she had "administered, dispensed, and prescribed controlled substances" during a one-year period during which her controlled substance registration with the Texas Department of Public Safety had expired and not been renewed. This was a violation of the Board's Rules of Professional Conduct, and the Agreed Order required Respondent to pay a $500.00 penalty for the violation. Staff Ex. 3. Michael Miller, the Board's chief investigator, acknowledged that the violation addressed in the Agreed Order was "towards the lower end of the violations" the Board addresses. Tr. at 26.

91      22 Tex. Admin. Code § 575.25(b)(l)(B).

92      *Id*. § 575.25(b)(2).

93      *Id*. § 575.25(b)(3).

94      In fact, there was some evidence that Ms. Odle was refunded the cost of Sarge's neuter surgery, ameliorating any economic harm to Ms. Odle. Tr. at 59-60.

95      22 Tex. Admin. Code § 575.24 (2006 ver). Though this rule has since been amended, the current rule is substantively identical insofar as it applies to Respondent.

<div align="center">

**2013 WL 1785492 (TX.St.Off.Admin.Hgs.)**

</div>

---

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 6

2013 WL 1785492 (TX.St.Off.Admin.Hgs.)

State of Texas

Office of Administrative Hearings
Texas Commission on Environmental Quality

Texas Board of Veterinary Medical Examiners, Petitioner

v.

Melanie Mercer, D.V.M., Respondent

SOAH Docket No. XXX-XX-XXXX
April 15, 2013

**PROPOSAL FOR DECISION**

**\*1**  The Staff of the Texas Board of Veterinary Medical Examiners (Board) seeks to impose disciplinary sanctions against Melanie Mercer (Respondent), a veterinarian licensed by the Board. Staff alleges that Respondent violated the standard of care when she failed to completely sterilize a dog during a neuter surgery. Staff also alleges that Respondent failed to keep proper patient records relating to that surgery, and failed to act with "honesty, integrity, and fair dealing" in how her clinic charged the client. The Administrative Law Judge (ALJ) concludes that Staff has established Respondent's violation of the standard of care and record-keeping requirements. The ALJ recommends that an informal reprimand and a $1,500 administrative penalty be imposed against Respondent, and that Respondent be required to complete two three-hour continuing education classes addressing the subjects of her violations.

## I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

There are no contested issues of notice or jurisdiction in this proceeding. Therefore, those matters are addressed in the findings of fact and conclusions of law without further discussion here.

The hearing on the merits was held January 16-17, 2013, before ALJ Sarah Starnes at the hearing facilities of the State Office of Administrative Hearings (SOAH), 300 West 15th Street, Fourth Floor, Austin, Texas. Staff was represented by Jonathan Crabtree, Staff Attorney. Respondent was represented by attorney Donald A. Ferrill. After post-hearing closing statements were filed by the parties, the record closed on February 27, 2013. [1]

## II. APPLICABLE STATUTES AND RULES

The Board is authorized to take disciplinary action against a Texas veterinarian who has engaged in conduct that violates the Board's rules of professional conduct. [2]  Among the Board's disciplinary powers is the power to revoke or suspend a license, reprimand a license holder, impose administrative penalties, and require license holders to participate in continuing education programs. [3]

In this case, Staff alleges that Respondent violated three Board rules that were in effect in 2006, when the conduct at issue took place. First, Staff alleges that Respondent violated Rule 573.22, which provides:

> Veterinarians shall exercise the same degree of humane care, skill, and diligence in treating patients as are ordinarily used in the same or similar circumstances by average members of the veterinary medical profession in good standing in the locality or community in which they practice, or in similar communities. [4]

**\*2** Second, Staff alleges that Respondent violated Rule 573.52, which sets the required standards for patient record keeping. Specifically, Staff alleges that, for a neuter surgery she performed on a dog, Respondent's medical records failed to adequately reflect the "names, dosages, concentration, and routes of administration of each drug prescribed, administered and/or dispensed," and failed to record "other details necessary to substantiate the examination, diagnosis, and treatment provided, and/or surgical procedure performed" as required by that rule. [5]

Finally, Staff alleges that Respondent violated Rule 573.26, which requires veterinarians to "conduct their practice with honesty, integrity, and fair dealing to clients in time and services rendered, and in the amount charged for services, facilities, appliances and drugs." [6]

### III. EVIDENCE [7]

**A. Respondent's Veterinary Practice**

Respondent is a licensed veterinarian with license number 9738 issued by the Board. Respondent graduated from veterinary school in 1989, and is currently licensed as a veterinarian in Missouri and Texas. Respondent has been practicing in Texas for nearly ten years, and currently has a small-animal veterinary practice. She testified that she is certified in canine rehabilitation therapy and has a special interest in theriogenology, or animal reproduction. She also testified to having extensive experience with spaying and neutering small animals, both from her general pet practice and from time spent working for animal shelters and low-cost clinics. She estimated that she has performed thousands of canine neuter surgeries.

**B. Sarge's Neuter Surgery**

For approximately a year and a half, Respondent worked for the Kaufman County Animal Awareness Project, a low-cost, spay-and-neuter clinic. On November 14, 2006, while working at the clinic, Respondent performed a neuter surgery on "Sarge," a thirteen-month-old German Shepherd.

Respondent testified that, because so much time has lapsed, she has no specific memory of Sarge's neuter surgery. [8] However, she testified to her general practice in performing canine neuter procedures. She said that she will generally perform a "closed" procedure on smaller dogs (where the tunic is left on the testicle and one ligation is used to sever the cremaster muscle, blood vessels, and spermatic cord) and an "open" procedure on larger dogs (where the tunic is opened and the muscle, vessels, and cord are each separately ligated). [9] Respondent testified that, when she removes the testicles, her habit is to place them on the table next to the dog. When the surgery is over, she checks to make sure there are two testicles on the table, then throws them in the trash. [10] Respondent testified that she recalls nothing unusual about Sarge's surgery, nor do her medical records reflect anything out of the ordinary. [11] Because of this, she believes that she removed two testicles from Sarge's scrotum during his neuter surgery, as required to satisfy the standard of care. [12]

**C. Sarge's Illness and Unexpected Testicle**

**\*3** Sarge's owner, Kathleen Odle, testified that Sarge did not seem to recover from his neuter surgery. She took him to Lake Ray Hubbard Emergency Clinic on November 25th (over the Thanksgiving holiday), eleven days after his neuter surgery. He was hospitalized there over the weekend. That clinic's medical record states that Sarge had been vomiting and had not been eating for several days. The medical record also noted that, when he was examined on November 25th, Sarge's abdomen and urogenital system appeared "normal" to the veterinarian, and that abdominal palpation was painful for Sarge. [13] Blood tests performed at the clinic suggested that Sarge was experiencing "severe acute renal failure." [14] The veterinarian noted that he "relayed [a] guarded prognosis" to Sarge's owner, "due to severity of renal failure and dehydration." [15]

The following Monday, November 27, 2006, Sarge was transferred from the emergency clinic to the Animal Diagnostic Clinic in Mesquite, Texas. There, he was seen by Dr. Brandy Porterpan, a veterinarian Board-certified in small-animal internal medicine. Dr. Porterpan testified that, in examining Sarge, she palpated his scrotum and discovered that he still had a testicle that appeared to be attached to a spermatic cord. This surprised her because she was aware that Sarge had been neutered approximately two weeks earlier. She asked a colleague, a Board-certified surgeon, to examine the scrotum, and he agreed that Sarge still had a testicle. An ultrasound also confirmed there was testicular tissue in Sarge's scrotum, and that the spermatic cord was attached to the testicle. [16] Dr. Porterpan estimated that the testicle was between four and five centimeters in diameter, or approximately the size of a small tomato. [17]

Dr. Porterpan called Respondent to report the situation and inquire about Sarge's neuter surgery. According to Dr. Porterpan, Respondent stated that there had been no complications during the surgery thirteen days earlier, and explained that she must have been distracted during the surgery and forgotten to remove the remaining testicle. [18] Respondent had a similar recollection of this conversation. She testified that, when Dr. Porterpan called, her first response was "oh, my God, I must have left one." [19]

Dr. Porterpan said that, after she discussed Sarge's condition with his owner and relayed Sarge's "guarded" prognosis, the owner elected to euthanize the dog. Dr. Porterpan testified that Sarge probably had chronic kidney disease (pyelonephritis), and that Respondent could not have detected this because her low-cost clinic did not do the types of pre-surgery bloodwork that would have revealed Sarge's elevated renal values. Dr. Porterpan suspects that the anesthesia he was given during the neuter surgery pushed Sarge into acute renal failure, from which he could not recover.

**D. The Disciplinary Complaint and Respondent's Hypothesis**

 **\*4** In June 2009, Ms. Odle filed a complaint with the Board, reporting that Respondent had performed an incomplete neuter procedure on Sarge. [20] When asked to respond, Respondent wrote a letter to the Board, dated July 16, 2009, and acknowledged her mistake, writing:

First, let me say how embarrassed I was at learning of my mistake in only removing one of Sarge's testicles. ...

I can assure the Board that at no time during the surgery did I ever leave Sarge unattended on the operating room table. Due to the passage of time, I do not recall the exact nature of any "distraction" during Sarge's surgery but I strongly suspect that I was distracted by questions from staff members. In any event, the surgery, though not complete, was otherwise performed according to the standard of care ....

....

While I sincerely regret leaving a testicle in Sarge, it could not be the cause of his pyelonephritis, kidney failure and subsequent euthanasia. [21]

As the complaint made its way through the disciplinary process, however, Respondent developed another theory for why a testicle was found in Sarge nearly two weeks after she performed a neuter surgery: he might have had a polyorchid, cryptorchid testicle-in layman's terms, a third, undescended testicle-that descended into his scrotum sometime after Respondent performed the neuter surgery, but before Dr. Porterpan treated Sarge. If true, that would explain how Respondent could have removed two testicles from Sarge's scrotum on November 14th, yet there could still be an intact testicle in Sarge's scrotum when Dr. Porterpan examined him thirteen days later.

In her testimony at the hearing, Respondent admitted that this is unlikely. On cross-examination from Staff, she was asked, "Would you say it's more likely that you left [a testicle] in there or that the dog was polyorchid?" Respondent answered, "It's

<u>more likely that I left one in there</u>, but I cannot prove either - either occurrence at this point." [22] She also acknowledged that "statistically" it is more likely that she simply forgot to remove one of Sarge's testicles. [23] Nonetheless, she insisted that it is theoretically, physiologically possible that Sarge had a third, undescended testicle that made its way into his scrotum after she performed the neuter surgery.

## E. The Experts' Views

In addition to the testimony of Respondent and Dr. Porterpan, two other veterinarians testified at the hearing. Staff offered expert testimony from Dr. Kirk Lewis and Dr. Mark Stickney, both of whom have extensive experience in performing canine neuter procedures. Dr. Lewis is a small-animal practitioner with approximately twenty years' experience performing small-animal surgeries, and an estimated sixteen years' experience performing low-cost spay and neuter surgeries. He testified that he performs canine neuter procedures daily and has performed in excess of 70,000 spay and neuter procedures during his career. He has worked for Animal Trustees of Austin for over a decade and said he may perform more than twenty procedures a day when he is working in their spay/neuter clinic. Dr. Stickney has been a licensed veterinarian since 1997, and has practiced principally small-animal surgery, including spaying and neutering, since 2002. Dr. Stickney is currently the director of general surgery at the Texas A&M University College of Veterinary Medicine and teaches surgical techniques to veterinary students there. He said he performs canine neuter surgeries "daily," and estimates that he has performed over 8,000 such procedures in his career.

## 1. An Anatomically Normal Dog

 **\*5**  According to Dr. Lewis and Dr. Stickney, during the first six months of an anatomically normal dog's life, two testicles gradually move from the dog's abdomen, through the inguinal rings and inguinal canal (a narrow opening between the dog's abdomen and scrotum), and into the scrotum. Dr. Stickney explained that the testicle is pulled through the inguinal rings by the gubernaculum, a rubber-band-like structure that attaches on one end to the external inguinal ring, and to the testicle on the other end. During the first twelve weeks or so of the dog's life, the gubernaculum gradually contracts and gets shorter, pulling the testicles to the scrotum. After twelve weeks of age, the gubernaculum stops contracting and ultimately dissolves and will no longer pull a testicle toward the scrotum. There may still be some gradual movement of the testicles until the dog is four to six months of age, but after six months of age, Dr. Stickney testified, testicles will no longer descend. [24]

Dr. Porterpan explained that, before six months of age, the dog's testicles are relatively small and can pass easily through the inguinal canal. But according to Drs. Lewis, Stickney, and Porterpan, the inguinal canal gets smaller as the dog grows larger, and by the time a dog is thirteen months old (as Sarge was in November 2006), the inguinal canal would have closed to the point where a testicle could no longer pass through. Dr. Lewis estimated that, after six months, the inguinal canal opening in most dogs would be only about half a centimeter wide, just large enough to hold the vessels that provide a blood supply to the testicles.

## 2. A Polyorchid, Cryptorchid Dog

Respondent, Dr. Porterpan, Dr. Lewis, and Dr. Stickney testified at length to the confluence of abnormal conditions that would have to occur for a testicle to be present in Sarge's scrotum some two weeks after Respondent believes she removed two testicles during his neuter surgery.

Sometimes, a testicle does not descend into the scrotum, resulting in a cryptorchid testicle, which is a testicle that is stuck in the dog's abdomen or inguinal area. Respondent testified that, though abnormal, cryptorchidism is "moderately common," meaning that an "average veterinarian" might see cryptorchidism once a month or so. [25] Dr. Lewis explained that in "abdominal cryptorchids," the testicle never traveled out of the abdomen into the inguinal canal, while in "inguinal cryptorchids" a testicle made it out of the abdominal cavity, but remained in the inguinal canal. Dr. Porterpan explained that cryptorchidism can occur, for example, when the testicle has grown too large to pass through the narrowing inguinal canal. Dr. Stickney testified that cryptorchidism occurs when the gubemaculum has failed to respond normally, and has failed to pull the testicle into the scrotum.

Because Respondent believes she removed two testicles when she neutered Sarge, she contends that Sarge must have had a third, cryptorchid testicle in his abdomen or inguinal canal that descended into his scrotum only after his neuter surgery on November 14th, but before Dr. Porterpan examined him on November 27th. In her testimony, Respondent acknowledged that the condition of having more than two testicles-polyorchidism-is extremely rare. Respondent said she has never seen a polyorchid dog in her twenty-four years of practice, with the possible exception of Sarge. Drs. Porterpan, Lewis, and Stickney also testified that, in all of their years as practicing veterinarians, none had ever diagnosed polyorchidism. Only Dr. Stickney had even heard of the condition before this case, and he testified that "there are about 18 dogs in the entire world that have been reported" as cases of polyorchidism in decades of published veterinary medicine journals. [26]

 **\*6**  Even if, as Respondent suggests, Sarge was a polyorchid and his third testicle was cryptorchid, Staffs witnesses all agreed that it would be virtually impossible for such a testicle to descend into the scrotum of a thirteen-month-old dog.

Dr. Porterpan testified that a testicle in a thirteen-month-old German Shepherd would ordinarily be too large to pass through the inguinal canal, both because the canal has mostly closed by that age, and because the testicle would have grown larger than it was before six months of age, when it would ordinarily have descended before the inguinal canal closed. Dr. Stickney agreed that the testicle of a thirteen-month-old dog could not move into the scrotum because, by that age, the inguinal rings around the inguinal canal have closed, making it impossible for the testicle to pass through into the scrotum. Moreover, according to Dr. Stickney, the gubernaculum would have ceased contracting by age thirteen months, and could not create the pull or pressure required to draw the testicle down into the scrotum.

According to Dr. Lewis, the only way a polyorchid, cryptorchid testicle could have moved into Sarge's scrotum when he was thirteen months old would be if Sarge had a "very large" inguinal hernia, or an exceptionally large opening in his inguinal canal. Dr. Lewis testified that such a large inguinal hernia would have been unusual, and would have been obvious to any veterinarian examining Sarge. [27]  In her testimony, Respondent acknowledged that "[a]ny inguinal hernia is abnormal," and her medical records make no note of finding an inguinal hernia when she saw Sarge on November 14, 2006. [28]  There was no testimony from any veterinarian at the Lake Ray Hubbard clinic, but Dr. Porterpan testified that based on her review of that clinic's records, there is no indication that either of the two veterinarians who examined Sarge there diagnosed an inguinal hernia, either. [29]  Dr. Porterpan testified that she has experience examining and diagnosing dogs with inguinal hernias, and that she specifically palpated to look for an inguinal hernia on her initial physical examination of Sarge, and she did not detect an obvious inguinal hernia. In addition to performing that physical examination, she testified, she also performed an abdominal ultrasound and, after Sarge was euthanized, an autopsy; at no point in those procedures did she diagnose an inguinal hernia.

Assuming Sarge did have an inguinal hernia, some amount of increased intra-abdominal pressure would have been required to move a cryptorchid testicle through the hernia and into the scrotum. Dr. Lewis testified that the amount of pressure required would depend on the size of the hernia. If there was a large hernia-that is, a hernia close to the size of an adult German Shepherd's testicle-then very little pressure would have been required to move the testicle into the scrotum. But, as described above, such a large hernia would have been obvious, and none of the four veterinarians who examined Sarge between November 14 and November 27, 2006, at the Kaufman County Animal Awareness Project, Lake Ray Hubbard Emergency Clinic, or the Animal Diagnostic Clinic found such a large hernia or noted one in their medical records. [30]  Absent such a notably large hernia, Dr. Lewis testified that significant intra-abdominal pressure would have been required to move a cryptorchid testicle to the scrotum, an amount of pressure that he would associate only with a "significant trauma," comparable to being hit by a car. [31]

 **\*7**  Respondent suggested several things that could have created pressure in Sarge's abdomen sufficient to move a cryptorchid testicle into his scrotum: vomiting, straining to defecate or urinate, or vigorous, rough palpation of his abdomen. [32]  Dr. Porterpan acknowledged that her abdominal palpation of Sarge would have caused some increase the intra-abdominal pressure, and also that increased intra-abdominal pressure could potentially result in a hernia. However, Respondent testified that pushing something (like a testicle) through the inguinal canal would require more vigorous palpation than she would expect a veterinarian

to do to a sick dog; she admitted she does not necessarily believe rough palpation caused Sarge's testicle to move through his inguinal canal and into his scrotum. [33] Dr. Porterpan and Dr. Lewis both agreed that vomiting and straining to defecate can potentially increase intra-abdominal pressure to some degree, and Lake Ray Hubbard's medical records indicate that Sarge was constipated and had been vomiting. [34] However, Dr. Lewis testified that he believes it is highly unlikely-perhaps a one percent chance-that vomiting, constipation, or palpation by Lake Ray Hubbard veterinarians could have created sufficiently strong intra-abdominal pressure to move a testicle from Sarge's abdomen into his scrotum. [35]

Respondent also testified that, although she has never seen a polyorchid, cryptorchid dog with a testicle that descended after the dog was over a year old, she has read literature documenting, at least anecdotally, similar conditions in dogs and other species, including humans, horses, cats, and "at least one goat." [36] Dr. Lewis said that, in researching to prepare for his testimony in this case, he had found just two case studies involving polyorchidism in dogs. Dr. Lewis and Dr. Stickney also said they had read a case in which a testicle had been found in a horse's scrotum after castration where two testicles had been removed. [37] While acknowledging the theoretical possibility that a normal testicle could appear in the scrotum after removal of two testicles during neutering, Dr. Lewis and Dr. Stickney nonetheless maintained that it was virtually impossible that this could have happened to Sarge, both because a dog's testicles will not descend after six months of age [38] and because there was no indication that Sarge had the kind of "very large" inguinal hernia that would have to have been present for a four-to-five centimeter testicle to pass through the inguinal canal of a sexually mature, thirteen-month-old dog. [39]

## IV. ANALYSIS

### A. Standard of Care Allegation

Staff has alleged that Respondent left one testicle in Sarge's scrotum when performing his neuter surgery, and thereby failed to meet the standard of care for a neuter procedure in violation of Board Rule 573.22.

### 1. Constitutional Validity of Rule 573.22

**\*8** According to Respondent, Rule 573.22 imposes a professional standard of care that is equivalent to a simple-negligence standard, while the enabling statute authorizes Board discipline only if a veterinarian has committed "gross negligence" or "a pattern of acts that indicate consistent malpractice, negligence, or incompetence in the practice of veterinary medicine." [40] Therefore, Respondent contends, the Board exceeded its constitutional rulemaking authority when it enacted Rule 573.22, and Staff should not be able to rely on this rule as a basis for disciplining Respondent for one isolated act of alleged simple negligence.

SOAH ALJs do not have authority to rule on the constitutionality of the Board's rules and regulations; instead, such challenges must be raised in the judicial branch. [41] Accordingly, the ALJ will not address Respondent's challenge to the constitutionality of Rule 573.22.

### 2. Was the Standard of Care Met?

The four veterinarians who testified at the hearing all agreed that the standard of care requires a veterinarian performing a canine neuter surgery to remove two testicles from the scrotum and, if two testicles cannot be found in the scrotum, to look for the missing testicle(s) in the dog's abdomen. [42] Three of those veterinarians also agreed that, if two testicles are found and removed from the scrotum, the standard of care does not require a veterinarian to search in the dog's abdomen for a possible third testicle. [43]

To establish that Respondent violated Rule 573.22, it was Staffs burden to show, by a preponderance of the evidence, that Respondent failed to meet this standard of care or, as the rule phrases it, failed to "exercise the same degree of humane care, skill, and diligence in treating patients as are ordinarily used in the same or similar circumstances by average members of the veterinary medical profession." [44] The preponderance of the evidence standard is satisfied when a fact is established by "the greater weight of the credible evidence," or when the evidence establishes that a fact is "more likely true than not true." [45]

Staff contends that the evidence establishes that it is "more likely true than not true" that Respondent simply forgot to remove one of Sarge's testicles when she performed his neuter surgery, which is clearly a violation of the standard of care. In her testimony, Respondent candidly admitted that this is most likely what happened. [46] She also, at least initially, admitted making this mistake when she wrote to the Board expressing her embarrassment "at learning of my mistake in only removing one of Sarge's testicles." [47]

Despite these admissions, however, Respondent asserts that Staff cannot meet its burden of proof because Staff cannot *disprove* her alternate theory that Sarge had an undiagnosed polyorchid, cryptorchid testicle that descended into his scrotum after his neuter surgery and shortly before Dr. Porterpan examined him. While conceding it is possible that she forgot to remove one of Sarge's testicles, Respondent contends that her alternative theory is also possible and, because there is no direct evidence establishing which actually transpired, Staff cannot meet its burden of proof to show she violated the standard of care. In support of this argument, Respondent relies on two Texas Supreme Court cases, *Schaefer v. Texas Employers' Insurance Association,* [48] and *Lenger v. Physician's General Hospital, Inc.* [49] In those cases, the court held that personal-injury claims should not have been submitted to the jury because the plaintiffs, who bore the burden of proof, had no proof beyond their experts' conjecture that the defendants' negligence had proximately caused the plaintiffs' injuries. In both cases, the fact finders were presented with more than one reasonable explanation for what caused the plaintiffs' injuries, and no evidence establishing which possibility was more or less probable. In *Schaefer*, the court concluded that the plaintiff had no evidence of causation because his expert did "no more than suggest a possibility" as to how the plaintiff had contracted his disease, and so the expert's opinion "is not based upon reasonable medical probability but relies on mere possibility, speculation, and surmise." [50] Similarly, in *Lenger*, the court looked for a "reasonable probability" that the plaintiffs medical complications had been caused by the defendants' negligence and, because his expert had testified to three equally reasonable explanations for plaintiffs injuries, the court concluded that there was no evidence from which a jury could determine that one causation explanation was more likely than not. [51]

**\*9** The ALJ does not consider these cases controlling here because, unlike the evidence in *Lenger* and *Schaefer*, the evidence in this case clearly points to only one reasonable explanation for why a testicle was found in Sarge's scrotum two weeks after Respondent purportedly neutered him: Respondent forgot to remove one of his testicles during her neuter surgery. Respondent herself acknowledged that this is the most probable explanation, and the other expert witnesses all agreed. The only other explanation offered-that Sarge had an undiagnosed third, cryptorchid testicle that descended through a remarkably large and previously undetected inguinal hernia when Sarge was at an age when it would be extraordinarily rare for a testicle to descend at all-is too unlikely to be regarded as a reasonable and equally probable explanation.

Alternatively, even if the polyorchid, cryptorchid theory could be deemed a reasonable one, the circumstantial evidence nonetheless leads the ALJ to conclude that it is more reasonable to infer that Respondent simply forgot to remove one of Sarge's two testicles. As a majority of the Texas Supreme Court has held, "[i]f circumstantial evidence will support more than one reasonable inference, it is for the [fact-finder] to decide which is more reasonable...," [52] Here, while Respondent can point to circumstantial evidence that leaves room to infer that Sarge might have had a late-descending third testicle, the same evidence leaves equal room to support contradictory inferences.

For example, Respondent testified that it is her ordinary practice to remove two testicles during her neuter surgeries, and she recalls nothing out of the ordinary about Sarge's surgery, nor do her medical records indicate that anything unusual transpired. Respondent argues that this evidence supports an inference that there must have been only two testicles in the dog's scrotum,

she removed them both, and the third testicle Dr. Porterpan discovered thirteen days later was a polyorchid, cryptorchid testicle that had not yet descended when Respondent neutered Sarge. However, these same facts are also consistent with the theory that Respondent somehow became distracted during Sarge's surgery and forgot to remove one of his testicles. Because Respondent was unaware of her mistake until Dr. Porterpan alerted her to it thirteen days after the surgery, there would be no reason for Respondent to recall making the mistake during Sarge's surgery, nor would she have noted it on his medical records.

Respondent also suggested that the medical records from Lake Ray Hubbard Emergency Clinic-which contain no notation that Sarge had a testicle in his scrotum when he was examined there on November 25, 2005-support her theory that Sarge had a cryptorchid testicle that descended sometime after he was examined that afternoon, but before Dr. Porterpan examined him in the morning of November 27, 2006. According to Respondent, when presented with a sick dog who had recently had surgery, a competent veterinarian would examine the area associated with the surgery to determine if the dog was experiencing complications from the surgery; therefore, she believes the Lake Ray Hubbard veterinarian must have examined Sarge's scrotum since he had recently been neutered. Because the veterinarian's notes at the emergency clinic described Sarge as urogenitally "normal," and because it would be decidedly abnormal to find a testicle after a neuter surgery, Respondent concludes that Sarge must not have had a testicle present when he was examined at the emergency clinic. However, there is no evidence to suggest one way or the other whether the Lake Ray Hubbard veterinarians actually examined Sarge's scrotum. Dr. Lewis testified that the emergency clinic veterinarians would "not necessarily" have examined Sarge's scrotum because a testicle would be unrelated to the symptoms of kidney failure that brought Sarge into their clinic. [53] Thus, while Respondent would infer from the records that Sarge's scrotum was examined and no testicle was present, the same records support the equal and opposite inference that a testicle was present but the Lake Ray Hubbard veterinarians overlooked it because they never examined Sarge's scrotum.

**\*10** Here, because Respondent can point to some circumstantial evidence to support her alternative theory, and because the expert veterinarians acknowledged at least the hypothetical possibility (albeit a remote one) that it could have occurred, the ALJ cannot say that there is no evidence to support the notion that a third testicle might have descended into Sarge's scrotum shortly before Dr. Porterpan examined him. However, this possibility is so remote and so unlikely that the ALJ concludes that the preponderance of the evidence establishes what all four veterinarian witnesses agreed most likely occurred: Respondent forgot to remove one of Sarge's testicles, and breached the standard of care by making that error.

### B. Medical Records Claim

Staff has also alleged that Respondent violated Board Rule 573.52 by (a) failing to include in her medical records the concentration and route of administration of each drug that was given to Sarge, and (b) failing to substantiate her examination and treatment of Sarge and the surgical procedure she performed in sufficient detail in her medical records.

### 1. The Board's Prior Investigation is Not Relevant to this Case

Respondent argues that Board should be essentially estopped from challenging the sufficiency of Sarge's medical records because the Board declined to move forward with disciplinary charges against her in a separate Board investigation involving substantially similar records. In December 2007, the owner of a dog named "Harley Girl" filed a complaint asserting that Respondent had over-sedated her dog during a spay surgery. In response to that complaint, two licensed-veterinarian Board members reviewed Respondent's medical records for Harley Girl and recommended that no disciplinary charges should be pursued, and that the case should be closed "with the notation of 'no violation.'" [54] The investigator's report for that case noted that Harley Girl's "patient records appear to meet the Board's requirements." [55] In the form he submitted to the Board noting his recommendation regarding Harley Girl's care, the Board's Director of Enforcement checked a box indicating his belief that there was "[c]lose to no violation"; he did not check a box that would have reported "Insufficient Patient Records." [56] Respondent contends that she used the same medical record forms for Sarge that were used for Harley Girl's surgery, and because the Board did not challenge the sufficiency of the medical records in that investigation, the same forms cannot be found deficient in this proceeding.

The ALJ rejects this argument for three reasons. First, the determination that the Harley Girl complaint did not warrant further disciplinary proceedings bears no indicia of an agency-wide policy that might be relied upon in subsequent proceedings. For example, the notation that there was "close to no violation" contains no specific statement of Board policy regarding what kinds of records do or do not comply with Rule 573.52. [57] Even if the Harley Girl case did somehow indirectly indicate approval of Respondent's medical forms, there is no evidence that such approval constitutes a Board policy that has been applied in any other cases. [58] Nor is there any evidence that such a policy has been adopted or ratified by anyone other than the two Board members who conducted the initial review of the Harley Girl complaint. [59] The ALJ concludes that the decision not to initiate disciplinary proceedings against Respondent regarding her records for Harley Girl cannot be regarded as an expression of policy by the Board or its executive director regarding the sufficiency of Respondent's medical-record forms with respect to any other patients.

 **\*11**  Second, the Board cannot be estopped from enforcing a rule in this case simply because it declined to enforce the same rule in another case. "Legislative prerogative would be undermined if a government agent could-through mistake, neglect, or an intentional act-effectively repeal a law by ignoring, misrepresenting, or misinterpreting a duly enacted statute or regulation." [60] Thus, even if Harley Girl's medical records were deficient and could have prompted disciplinary action, the Board's failure to take such action in that case does not estop the Board from subsequently enforcing the rules that require Respondent to maintain adequate records for her other patients.

Finally, while the estoppel argument fails as a matter of law because it cannot be invoked against a government entity, the argument also fails as a matter of fact. The party asserting estoppel must show that she has detrimentally relied upon some false representation by the other party. *Trudy's Tex. Star, Inc. v. City of Austin*, 307 S.W.3d 894, 906 (Tex. App.-Austin 2010, pet. denied). The Board's investigation relating to Harley Girl was closed in June 2008, more than a year and a half after Respondent performed Sarge's neuter surgery and prepared the medical records at issue here. Resp. Ex. 1, Staff Ex. 2. Thus, Respondent could not have been relying upon the Board's determination regarding Harley Girl's medical records when Sarge's medical records were made. Therefore, the ALJ concludes that evidence relating to Respondent's medical records for Harley Girl, and the outcome of the Board's review of that complaint, have no relevance to or collateral estoppel effect on the determination of whether her medical records for Sarge complied with Rule 573.52.

**2. Whether the Records for Sarge Comply with Rule 573.52**

Rule 573.52 sets forth the Board's standards for what must be included in a veterinarian's patient records. In this case, Staff specifically contends that Respondent's medical records for Sarge failed to comply with those sections that require patient records to contain

· "Names, dosages, concentration, and routes of administration of each drug prescribed, administered and/or dispensed," and

· "Other details necessary to substantiate the examination, diagnosis, and treatment provided, and/or surgical procedure performed." [61]

During the Board's investigation, Respondent produced a medical record for Sarge comprising (1) an invoice, (2) procedure form; (3) sterilization authorization and release form; (4) post-operative instruction form; and (5) a cage card. [62] Of these documents, only the invoiceThe contains any indication of what medications were administered or dispensed to Sarge. [63] invoice contains the following line items for medications:

| Date | Product/Service | Quantity | Tax | Amount | Vet |
|------|-----------------|----------|-----|--------|-----|
| 11/14/2006 | 1015 - PAIN SHOT (DOG) - KETOFEN cc SQ | 0.70 | 0.00 | 0.00 | 007 |

| 11/14/2006 | A502 - DIAZEPAM INIECTABLE CC | 3.50 | 0.00 | 0.00 | 007 |
| 11/15/2005 | A503 - KETAMINE INIECTABLE cc | 3.00 | 0.00 | 0.00 | 007 |

**\*12** The form also contains a notation that "[y]our pet was given a non-steroidal anti-inflammatory today" and that for dogs, that drug was "Ketoprofen SQ." [64]

The invoice does expressly name three drugs that were given to Sarge and the quantities dispensed. However, the invoice does not state the concentration of those medications, nor the routes of administration, as required by Rule 573.52(a)(10). Respondent contends that ketofen, diazepam, and ketamine are drugs that only come in one standard concentration, and so there was no need to denote that concentration specifically in the records. [65] Dr. Lewis and Dr. Stickney, however, explained that veterinarians sometimes use compounding pharmacies, or even mix their own drug cocktails, and that compounded or mixed drugs could be made in any concentration. [66] According to Dr. Stickney, the number of ccs administered to an animal is "really a meaningless value" without a corresponding notation of the drug concentration in the medical record. [67] The invoice also fails to clearly state the "routes of administration" for the three medications Sarge was given. The "pain shot" of ketofen was apparently given subcutaneously (or "SQ"), but beyond stating that the diazepam and ketamine were injected (as opposed, presumably, to being administered orally or topically) there is no statement of the location of the injection. Because Respondent's medical record does not contain sufficient notation of the concentration or route of administration for the medications Sarge was given, Staff has met its burden of proving that Sarge's medical records fell short of the requirements of Rule 573.52(a)(10).

Staff also complains that Respondent's medical records violate Rule 573.52(a)(ll) because they lack any detail regarding her examination and treatment of Sarge beyond the bare fact that she performed a neuter surgery. Dr. Stickney testified that a complete medical record should have included notes of Sarge's medical history, Respondent's physical examination of Sarge, an operative report of what happened during Sarge's surgery, anesthetic records indicating how long his procedure lasted, and the results of any monitoring. [68] No such details are found in her medical records. The only evidence that there was any consideration given to Sarge's pre-surgical condition is found in the authorization and release form signed by Sarge's owner certifying, among other things, that "[t]o my knowledge, this animal is in good health." [69] However, this form was filled out by Sarge's owner, and there was no testimony that it was ever reviewed or considered by Respondent or any clinic employee involved in Sarge's care. The ALJ does not believe the authorization and release form constitutes any kind of record substantiating Respondent's examination or treatment of Sarge. As for detail on the surgery, the invoice and procedure forms include no information about Sarge's neuter surgery other than the dog's weight and the price charged for the procedure. At the hearing, Respondent testified to how and when she would generally employ "open" versus "closed" techniques for performing neuter surgeries, but her medical records are silent on which technique was used on Sarge, and contain no other detail about what transpired during his surgery or how he responded to it.

**\*13** Respondent asserts that no details describing Sarge's examination and surgery were necessary because his neuter surgery is "a routine standard procedure and notations are made about things that are not standard and not routine." [70] The ALJ finds this argument unpersuasive. Rule 573.52 plainly requires that veterinarian records must be "complete, contemporaneous and legible" and must include specified details regarding the animal's treatment. A record cannot be "complete" if the required detail is merely implicit. Staff has met its burden of establishing that Respondent failed to maintain a medical record for Sarge that complied with Rule 573.52(a)(l 1).

## C. Respondent's Honesty, Integrity and Fair Dealing

Staff contends that Respondent violated Board Rule 573.26, and failed to act with "honesty, integrity, and fair dealing" as required by that rule, by (a) charging for a complete neuter surgery when only an incomplete neuter surgery was performed, and (b) charging Sarge's owner the surgical rate for a dog that weighed over 70.5 pounds when Sarge weighed less than 70.5 pounds, resulting in an overcharge of $8.00. [71]

### 1. Respondent is Responsible for Her Clinic's Billing Practices

Respondent argues that she is not accountable for any billing errors relating to Sarge's surgery because she had no involvement with or responsibility for billing matters at the Kaufman County Animal Awareness Project. She testified that she was a contract employee there, not an owner, and she did not set the clinic's fees, prepare invoices, or collect fees from clients. Respondent testified that all billing was handled by other clinic staff.[72] This was corroborated by Sarge's owner, who testified that she never spoke with Dr. Mercer the day of the neuter surgery, and when she paid for the procedure, she paid "the person at the front desk at the clinic."[73]

The Board rules in effect in 2006 provided that:

Licensees employed by, or contracted to, nonprofit or municipal corporations shall be liable for any violations of the Act or rules occurring as a result of the practice of veterinary medicine or any veterinary services provided by the nonprofit or municipal corporation, including those occurring due to the acts or omissions of non-licensed employees of, or volunteers for, the nonprofit or municipal corporation.[74]

Moreover, the Veterinary Licensing Act defines the "practice of veterinary medicine" as:

(A) the diagnosis, treatment, correction, change, manipulation, relief, or prevention of animal disease, deformity, defect, injury, or other physical condition, including the prescription or administration of a drug, biologic, anesthetic, apparatus, or other therapeutic or diagnostic substance or technique;

...

[or]

**\*14** (D) the receipt of compensation for performing an act listed in Paragraph (A).[75]

Pursuant to the above-quoted statute and rule, as a veterinarian working under contract for the nonprofit Kaufmann County Animal Awareness Project, Respondent was responsible for any violations committed by other employees or volunteers of the clinic. Therefore, even though Respondent had no personal involvement with how or what the clinic's staff charged clients, she would nonetheless be liable for violating the Board's rules if other clinic staff acted without honesty, integrity and fair dealing in performing the clinic's billing functions.

### 2. Respondent Did Not Lack Honesty, Integrity, or Good Faith In Charging For Sarge's Neuter Surgery

Rule 573.26 obliges veterinarians to "conduct their practice with honesty, integrity, and fair dealing to clients in time and services rendered, and in the amount charged for services ...,"[76] Staff asserts that Respondent fell short of this standard because her clinic charged Sarge's owner for a neuter surgery when, in fact, she failed to neuter the dog.

There is no contention that Respondent deliberately left one testicle behind when she neutered Sarge or that anyone at the Kaufmann County Animal Awareness Project was aware of Respondent's mistake when Sarge's owner, Ms. Odle, was charged for the procedure. At the time Sarge's owner was charged, everyone involved believed that Respondent had successfully performed a standard neuter surgery, and Ms. Odle was billed accordingly. It was only when Dr. Porterpan called Respondent nearly two weeks later that Respondent learned she had not, in fact, completely sterilized Sarge.

Staff seeks to sanction Respondent for what was clearly an unknowing, unintentional error, contending that "this is a strict-liability claim" and Respondent's (or clinic staffs) intent is therefore immaterial. The ALJ does not agree. A "strict liability" rule would authorize the Board to impose discipline for any billing errors, no matter what the cause. That is not what Rule 573.26 does. Instead, the rule encompasses only those instances where a veterinarian acts without "honesty, integrity, and fair dealing" in charging a client for services. Yet there is no evidence that Respondent was in any way dishonest, lacked integrity, or dealt with Sarge's owner unfairly. Instead, the evidence shows that Respondent charged Ms. Odle for services she believed, at the time, had actually been rendered. Staff has not established this violation of Rule 573.26.

### 3. The Preponderance of the Evidence Does Not Establish That Respondent Overcharged Based on Sarge's Weight

Staff next contends that Respondent violated Rule 573.26 by charging Ms. Odle the fee for a neuter procedure for a dog weighing over 70.5 pounds when she should have been charged for a lower-weight dog. Again, even if there was an error in the amount Ms. Odle was billed, Staff has adduced no evidence that this was anything other than an inadvertent mistake by the staff responsible for charging for Respondent's services. To establish a violation of Rule 573.26, it is Staffs burden to show that a clinic employee acted dishonestly, unfairly, and without integrity, all of which require some contemporaneous awareness of the mistake that is being made. There is simply no evidence that Respondent or anyone else knew or should have known that Sarge's actual weight warranted a lower charge to Ms. Odle, and Rule 573.26 cannot reasonably be construed to apply to honest mistakes.

 **\*15**  Further, even if inadvertent mistake could constitute a violation of Board Rule 573.26, the preponderance of the evidence does not establish what Sarge weighed at the time of his neuter surgery, and so it does not establish that Sarge's owner was charged the wrong price for the procedure. The record contains sharply conflicting evidence regarding Sarge's weight. In her June 2009 complaint to the Board, Ms. Odle estimated that Sarge weighed sixty to seventy pounds on the day of his 2006 neuter surgery.[77] The Kaufman County Animal Awareness Project procedure form lists Sarge's weight at 50 pounds; Respondent testified this form would have been filled in by a clinic employee using information provided by Ms. Odle when the procedure was initially scheduled, but before he was seen by clinic staff.[78] If either of the figures provided by Ms. Odle was correct, then she should have been charged a $47 fee for neutering a dog weighing 46-70 pounds, instead of the $55 fee for dogs weighing "over 70.5 lbs." However, the weight that was hand-written on Sarge's cage card says he weighed 70.5 pounds; Respondent said this would have been filled out when Sarge was actually weighed at the clinic.[79] The typewritten November 14, 2006 invoice for Sarge's neuter surgery also listed his weight as 70.5 pounds, and his owner was charged the $55.00 fee for a "DOG NEUTER - OVER 70.5 LB."[80]

Records from the other clinics Sarge visited are likewise conflicting. The Lake Ray Hubbard Emergency Clinic's records listed Sarge's weight as 55.20 pounds on November 25, 2006, eleven days after the neuter surgery.[81] Dr. Porterpan saw Sarge two days later, and her records listed his weight at 65 pounds.[82] She testified that she does not recall weighing Sarge and that 65-pound figure was probably provided on the transfer orders from the Lake Ray Hubbard Emergency Clinic.[83] To explain how the Lake Ray Hubbard records could record such different weights for Sarge, Dr. Porterpan theorized that Sarge might have gained ten pounds though fluid therapy administered to combat his severe dehydration.[84] However, she also said that, because Sarge had been so ill, he had probably lost significant weight in the thirteen days since his neuter surgery, and it was plausible that Sarge had weighed "over 70 pounds" on the date of that surgery.[85] Taken together, the records from the three veterinary clinics Sarge visited in the last thirteen days of his life include weight estimates that differ by more than twenty pounds, and conflicting explanations were offered to explain those differences. The evidence relating to Sarge's weight is simply too inconsistent and speculative to establish, by a preponderance of the evidence, what he actually weighed on the date of his neuter surgery.

 **\*16**  Staff also contends that, at best, Respondent can show that Sarge weighed exactly 70.5 pounds, but there is no evidence that Sarge weighed over 70.5 pounds when Respondent saw him; therefore, Staff claims, Sarge's owner was clearly overcharged when she paid the rate for neutering a dog "Over 70.5 lbs." The Kaufmann County Animal Awareness Project's procedure form lists prices for three different weight groups: "0-45 lbs" ($42); "Over 46-70 lbs" ($47); and "Over 70.5 lbs" ($55).[86]

While the form is not a model of clarity, the ALJ finds Staffs construction of these weight groups to be unreasonable. If Staff is correct and the form is to be taken strictly literally (meaning the highest rate can be charged only for dogs weighing 70.6 pounds and higher), then it would also be inappropriate for the clinic to charge any fee at all for a neuter surgery for a dog weighing between 45.1 and 45.9 pounds, or between 70.1 and 70.4 pounds, because those weights are not included in any of the groups listed in the clinic's rate schedule. That is clearly not what the clinic intended. Instead, the ALJ believes the form can be reasonably read to set forth a $42 fee for dogs weighing below 46 pounds, a $55 fee for dogs weighing 70.5 pounds and above, and a $47 fee for the dogs in between those two groups. Based on this construction, a $55 fee would be appropriate for a dog weighing exactly 70.5 pounds, and there is some evidence that indicates Sarge had reached this weight. Because the evidence is too conflicting to establish by a preponderance what, exactly, Sarge weighed when Respondent saw him on November 14, 2006, and therefore what, exactly, was the correct charge for his neuter surgery, Staff has not met its burden to show that Ms. Odle was overcharged for Sarge's surgery.

### D. Recommended Sanction

When determining the appropriate sanction, SOAH is required to "use the schedule of sanctions adopted by board rule."[87] The Board has adopted a Recommended Schedule of Sanctions that classifies violations as Class A, B, or C depending upon the type of violation, the extent to which a violation posed a peril to the public, and any prior disciplinary history.[88] As set forth above, Staff has established that Respondent violated Board Rule 573.22 (the standard of care claim) and Board Rule 573.52 (medical records claim) in connection with her treatment of Sarge. These violations do not rise to the level of Class A violations, which category applies only to licensees "considered as presenting imminent peril to the public."[89] They also do not qualify as Class C violations, because Respondent has been subject to a prior disciplinary order, and the Class C category applies only to licensees who "do not have a history of previous violations."[90]

**\*17** Instead, Respondent's violations of the Board's rules fall squarely into Class B.[91] In assessing Category B sanctions or penalties, the ALJ and the Board must give consideration to:

> the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited acts; the hazard or potential hazard created to the health, safety, or economic welfare of the public; the economic harm to property or the environment caused by the violation; the history of previous violations;
>
> what is necessary to deter future violations; and any other matters that justice may require.[92]

The Board's rule authorizes penalties for Class B violations of up to a 10-year license suspension, a penalty of up to $5,000 per day for each violation, and required continuing education classes.[93] Staffs Amended Formal Complaint requests penalties well within these limits, seeking a recommendation for a $1,500 administrative penalty and a requirement that Respondent "complete 3 additional hours of continuing education in small animal surgery and 3 additional hours of continuing education in record keeping." Taking into account the required factors, the ALJ believes that Staffs proposed penalty and education requirements are reasonable. While it was a serious lapse for Respondent to forget to remove one of Sarge's testicles, and while her records for Sarge were incomplete in some respects, there was no evidence of any hazard to the "health, safety, or economic welfare of the public" as a result of these violations. Nor was there evidence that any economic or environmental harm resulted from these violations.[94] Respondent's only prior violation of a Board rule was unrelated to the violations that have been found in this case, and so does not indicate a continuing course of conduct that warrants more serious penalties. The two continuing-education classes that Staff would require Respondent to take are directly related to the violations that have been found in this case, and are reasonably calculated to deter future violations. Balancing these facts, the ALJ agrees with Staff that imposing a $1,500 penalty and requiring Respondent to take two three-hour classes is a reasonable sanction for the violations that she committed.

Staff also asks for a formal reprimand of Respondent. The Board's rules authorize the Board to reprimand a veterinarian who is subject to disciplinary action, and reprimands may be formal or informal.[95] Both formal and informal reprimands are contained

in written Board orders and are publicly available upon request, but formal reprimands are additionally published in the Board's newsletter and reported to the American Association of Veterinary State Boards for inclusion in a national reporting database of veterinarians. Here, the ALJ concludes that an informal reprimand would sufficiently address Respondent's violations. This is true for the same reasons that the ALJ agrees with Staffs recommendation for imposition of a monetary penalty on the low end of the allowable range: because Respondent's error in forgetting to remove one of Sarge's testicles appears to have been a one-time mistake that is not indicative of broader problems in her veterinary practices, and because, while Sarge was not successfully neutered, he was also not harmed, nor was the public or environment harmed as a result of Respondent's mistake. Therefore, the ALJ recommends an informal reprimand be lodged against Respondent instead of the formal reprimand requested by Staff.

## V. FINDINGS OF FACT

 **\*18**  1. The Texas Board of Veterinary Medical Examiners (Board) regulates licensure for veterinarians.

2. Melanie Mercer, D.V.M. (Respondent) is a licensed veterinarian in the State of Texas holding license number 9738 issued by the Board.

3. On September 17, 2012, Board Staff issued a Notice of Hearing and Formal Complaint.

4. On October 17, 2012, Board Staff issued an Amended Notice of Hearing and Amended Formal Complaint.

5. The Amended Notice of Hearing contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short plain statement of the matters asserted.

6. The hearing on the merits was held January 16-17, 2013, before Administrative Law Judge (ALJ) Sarah Starnes at the hearing facilities of the State Office of Administrative Hearings (SOAH), 300 West 15th Street, Fourth Floor, Austin, Texas. The Board was represented by Staff Attorney Jonathan Crabtree. Respondent was represented by attorney Donald A. Ferrill. The record closed on February 27, 2013.

7. In November 2006, Respondent was a contract employee of the low-cost, spay-and- neuter clinic operated by the Kaufman County Animal Awareness Project.

8. On November 14, 2006, Respondent performed a neuter surgery on "Sarge," a thirteen- month-old German Shepherd.

9. The standard of care requires a veterinarian performing a canine neuter surgery to remove two testicles from the scrotum and, if two testicles cannot be found in the scrotum, to look for the missing testicle(s) in the dog's abdomen.

10. During Sarge's neuter surgery, Respondent accidentally forgot to remove one of Sarge's testicles from his scrotum.

11. Respondent failed to meet the standard of care by failing to remove one of Sarge's testicles.

12. Sarge began to suffer from kidney failure after his neuter surgery.

13. Sarge's kidney failure was not caused by Respondent.

14. Eleven days after Sarge's neuter surgery, Sarge was hospitalized at the Lake Ray Hubbard Emergency Clinic.

15. Thirteen days after Sarge's neuter surgery, Sarge was transferred from the Lake Ray Hubbard Emergency Clinic to the Animal Diagnostic Clinic in Mesquite, Texas.

16. At the Animal Diagnostic Clinic, Dr. Brandy Porterpan examined Sarge and discovered that Sarge had a testicle in his scrotum. The testicle was still attached to the spermatic cord, and was approximately four-to-five centimeters in diameter, or approximately the size of a small tomato.

17. On November 27, 2006, Dr. Porterpan contacted Respondent to inform her about the testicle she had discovered and to inquire about Sarge's neuter surgery.

18. Until Dr. Porterpan called her, Respondent was unaware that she had left one of Sarge's testicles intact during the neuter surgery.

19. Until Dr. Porterpan called Respondent, clinic staff at the Kaufman County Animal Awareness Project was also unaware that Respondent had left one of Sarge's testicles intact during the neuter surgery.

 **\*19** 20. In their phone conversation, Respondent admitted her mistake to Dr. Porterpan and told Dr. Porterpan that she believed she must have become distracted during Sarge's surgery and forgotten to remove one of his testicles.

21. After being informed that Sarge would probably not recover from his kidney failure, Sarge's owner elected to euthanize Sarge on November 27, 2006.

22. In June 2009, Sarge's owner filed a complaint with the Board reporting that Respondent had performed an incomplete neuter procedure on Sarge.

23. In response to the complaint, Respondent wrote a letter to the Board admitting that she had forgotten to remove one of Sarge's testicles.

24. For most male dogs, during the first six months of life, two testicles gradually move from the dog's abdomen, through the inguinal canal, and into the scrotum.

25. After six months of age, testicles will no longer descend into the scrotum of an anatomically normal dog.

26. Cryptorchidism is a condition that occurs when one or more testicles fails to descend into the scrotum. A cryptorchid testicle is a testicle that has remained in the abdomen or inguinal canal.

27. Cryptorchidism is an abnormal condition in dogs.

28. Polyorchidism is the condition of having more than two testicles.

29. Polyorchidism cases have been reported in dogs, horses, and other species, but the condition is extremely rare.

30. It is theoretically possible that Sarge was a polyorchid dog, and that his polyorchid testicle was cryptorchid.

31. There is no direct evidence in the record to suggest that Sarge had a polyorchid, cryptorchid testicle.

32. If Sarge did have a polyorchid, cryptorchid testicle, it would have been virtually impossible for that testicle to move from Sarge's abdomen or inguinal canal into his scrotum in the thirteen days between Respondent's neuter surgery and when Dr. Porterpan found a testicle in Sarge's scrotum, unless Sarge had an exceptionally large inguinal hernia.

33. There is no evidence that Sarge had an exceptionally large inguinal hernia.

34. Even if Sarge did have an inguinal hernia, a testicle would not have passed into his scrotum absent a significant amount of increased, intra-abdominal pressure.

35. Palpation by a veterinarian, vomiting, and straining to defecate can all cause some increase in intra-abdominal pressure. However, it is very unlikely that any of these could have created enough pressure to move a tomato-sized, four-to-five centimeter testicle from Sarge's abdomen or inguinal canal into his scrotum.

36. While it is theoretically possible for a polyorchid, cryptorchid testicle to move into the scrotum of a sexually mature, thirteen-month-old dog, it is virtually impossible that this occurred with Sarge.

37. Respondent acknowledged that it is more likely that she forgot to remove one of Sarge's testicles than it is that a polyorchid, cryptorchid testicle moved into Sarge's scrotum in the thirteen days following her neuter procedure.

 **\*20**  38. It is unreasonable to believe that a previously-undiagnosed, polyorchid, cryptorchid testicle moved into Sarge's scrotum, at an age when it would be extraordinarily rare for a testicle to descend at all, through an inguinal hernia that went undetected by each of the veterinarians at three different clinics who examined Sarge in the last thirteen days of his life.

39. It is more probable than not that Respondent forgot to remove one of Sarge's testicles during his neuter surgery.

40. In June 2008, two licensed-veterinarian Board members recommended that the Board not take action on a complaint filed against Respondent regarding a dog named "Harley Girl," and did not report that "Insufficient Patient Records" were kept for Harley Girl.

41. The determination that the Harley Girl complaint did not warrant further disciplinary proceedings bears no indicia of a Board policy regarding the sufficiency of Respondent's medical record forms.

42. When Respondent prepared Sarge's medical records in November 2006, she could not have been relying upon the Board's June 2008 determination not to pursue disciplinary charges regarding her Harley Girl medical records.

43. Respondent's medical records failed to include the concentration and routes of administration of each drug prescribed, administered, and/or dispensed to Sarge.

44. Respondent's medical records failed to substantiate her examination, diagnosis, and treatment of Sarge and the neuter surgery she performed on him.

45. Respondent was not personally involved in billing matters at the Kaufmann County Animal Awareness Project, and did not set the clinic's fees, prepare invoices, or collect fees from clients.

46. The Kaufmann County Animal Awareness Project charged Sarge's owner $55 for his neuter surgery, the clinic's rate for neutering a dog weighing 70.5 pounds or above.

47. When Sarge's owner was charged for his neuter surgery, neither Respondent nor her clinic's Staff was aware that Respondent had forgotten to remove one of the dog's testicles.

48. The Kaufmann County Animal Awareness Project charged Sarge's owner the correct fee for the services Respondent and clinic believed at the time had actually been rendered.

49. Sarge weighed somewhere between 50 and 70.5 pounds on the date of his neuter surgery.

50. The preponderance of the evidence does not establish precisely what Sarge weighed on the date of his neuter surgery, and so does not establish what was the correct fee for his neuter surgery.

51. The Kaufmann County Animal Awareness Project's procedure form can be reasonably read to set forth a $55 fee for a dog weighing exactly 70.5 pounds, and there is some evidence that this is what Sarge weighed.

52. On October 18, 2011, the Board approved an Agreed Order with Respondent finding that she had "administered, dispensed, and prescribed controlled substances" during a one- year period during which her controlled substance registration with the Texas Department of Public Safety had expired and not been renewed. This was a violation of the Board's Rules of Professional Conduct, and the Agreed Order required Respondent to pay a $500 penalty for the violation.

 **\*21** 53. The violation addressed in the October 18, 2011 Agreed Order is unrelated to Respondent's violations of the standard-of-care and record-keeping rules found in this case.

54. Respondent's error in forgetting to remove one of Sarge's testicles appears to have been a one-time mistake that is not indicative of broader problems in her veterinary practices.

55. While Sarge was not completely neutered, he was also not harmed by Respondent's mistake in failing to remove one of his testicles.

56. There was no evidence of any hazard to the health, safety, or economic welfare of the public, nor was there evidence that any economic or environmental harm resulted from Respondent's violations of the standard-of-care and record-keeping rules in this case.

## VI. CONCLUSIONS OF LAW

1. The Board has jurisdiction and authority to take disciplinary action against Respondent. Tex. Occ. Code §§ 801.401, 801.402.

2. The State Office of Administrative Hearings has jurisdiction over all matters relating to the conduct of a hearing in this matter, including the preparation of a proposal for decision with findings of fact and conclusions of law. Tex. Gov't Code Ch. 2003; Tex. Occ. Code § 801.407.

3. Proper and timely notice of the hearing was provided. Tex. Gov't Code § § 2001.051, 2001.052; 22 Tex. Admin. Code § 575.30(g)(l).

4. The Board had the burden of proving the case by a preponderance of the evidence. 1 Tex. Admin. Code § 155.427.

5. The Board is authorized to take disciplinary action against a veterinarian who engages in practices or conduct that violates the Board's rules of professional conduct. Tex. Occ. Code § 801.402(6).

6. It is a violation of the Board's rules of professional conduct to fail to meet the standard of care, which the Board defines as failing to "exercise the same degree of humane care, skill, and diligence in treating patients as are ordinarily used in the same or similar circumstances by average members of the veterinary medical profession." 22 Tex. Admin. Code § 573.22 (2006 ver.).

7. SOAH ALJs do not have authority to rule on the constitutionality of the Board's rules and regulations. *City of Dallas v. Stewart*, 361 S.W.3d 562, 568 (Tex. 2012); *Texas State Bd. of Pharmacy v. Walgreen Texas Co.*, 520 S.W.2d 845, 848 (Tex. Civ. App-Austin 1975, writ refdn.r.e.).

8. Respondent failed to meet the standard of care in her treatment of Sarge, in violation of the Board's rules of professional conduct. 22 Tex. Admin. Code § 573.22 (2006 ver.).

9. It is a violation of the Board's rules of professional conduct to maintain patient records that do not contain "names, dosages, concentration, and routes of administration of each drug prescribed, administered, and/or dispensed." 22 Tex. Admin. Code § 573.52(a)(10) (2006 ver.).

10. It is a violation of the Board's rules of professional conduct to maintain patient records that do not contain "other details necessary to substantiate the examination, diagnosis, and treatment provided, and/or surgical procedure performed." 22 Tex. Admin. Code § 573.52(a)(ll) (2006 ver.).

 **\*22**  11. Declining to enforce a rule in one case will not operate to estop the Board from enforcing the same rule in another case. *City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 774 (Tex. 2006).

12. Respondent failed to maintain complete medical records for Sarge, in violation of the Board's rules of professional conduct. 22 Tex. Admin. Code § 573.52(a)(10), (11) (2006 ver.).

13. It is a violation of the Board's rules of professional conduct for a veterinarian to fail to "conduct their practice with honesty, integrity, and fair dealing to clients in time and services rendered, and in the amount charged for services, facilities, appliances and drugs." 22 Tex. Admin. Code § 573.26 (2006 ver.).

14. Respondent would be responsible for any violations of the Board's rules committed by other employees or volunteers of the Kaufmann County Animal Awareness Project in providing veterinary services for Sarge, including the clinic's receipt of compensation for performing those services. Tex. Occ. Code § 801.002(5); 22 Tex. Admin. Code § 573.71 (2006 ver.).

15. Rule 573.26 is not a strict-liability rule that authorizes the Board to impose discipline for any and all billing errors, no matter what their cause.

16. A person cannot lack "honesty, integrity, and fair dealing" unless she has some contemporaneous awareness of the mistake or omission that is being made.

17. Respondent did not lack honesty, integrity and fair dealing by charging Sarge's owner for a procedure that, at the time, Respondent believed had been successfully performed.

18. Staff has not met its burden to show that Respondent failed to conduct her practice with honesty, integrity, and fair dealing by charging Sarge's owner $55 for his neuter surgery.

19. Pursuant to the Board's schedule of recommended sanctions, Respondent's violations of the rules of professional conduct are properly characterized as Class B violations, for which the Board is authorized to impose up to a 10-year license suspension, an administrative penalty of up to $5,000.00 per violation per day, continuing education requirements relevant to violations, and/or quarterly reporting requirements. 22 Tex. Admin. Code § 575.25(b).

20. The Board's rules authorize the Board to reprimand a veterinarian who is subject to disciplinary action, and reprimands may be formal or informal. 22 Tex. Admin. Code § 575.24 (2006 ver.).

### VII. RECOMMENDATION

The ALJ recommends that the Board informally reprimand Respondent, impose a $1,500 administrative penalty, and require Respondent to complete a three-hour continuing education class in small-animal surgery and a three-hour continuing education class in record keeping.

Sarah Starnes

Administrative Law Judge

Footnotes

1     Due to an unexpected office closure, Staff was unable to file its Reply to Respondent's Closing Statement by the February 26, 2013 deadline set forth in Order No. 3, so the record was held open for one additional day.

2     Tex. Occ. Code § 801.402(6).

3     *Id*. §§ 801.401, 801.451.

4     22 Tex. Admin. Code § 573.22 (2006 ver.)

5     *Id*. § 573.52(a)(10), (11) (2006 ver).

6     *Id*. § 573.26 (2006 ver.).

7     The evidence recited in this section primarily pertains to the standard-of-care claim. Additional facts pertaining to Staff's other claims are set forth in the sections that specifically analyze those claims.

8     Tr. at 76.

9     Tr. at 273-74. Staff's expert, Dr. Kirk Lewis, also testified that veterinarians may employ open or closed techniques in canine neuter surgeries, "depending] on the individual surgeon's preference." Tr. at 126-27.

10    Tr. at 274.

11    Tr. at 276, 279; Staff Ex. 2, Resp. Ex. 8.

12    Among the four veterinarians who testified at the hearing, there was no dispute that, if two testicles are present in a dog's scrotum at the time of a neuter procedure, the standard of care requires removal of both testicles. Tr. at 84- 85, 169, 260, 274.

13    Resp. Ex. 6 at MERCER 109. The Lake Ray Hubbard veterinarians who treated Sarge did not testify at the hearing, and there is no notation in clinic's records to establish the scope of that veterinarian's examination of Sarge or the attention paid to the dog's scrotum during his physical exam.

14    Staff Ex. 4.

15    Resp. Ex. 6 at MERCER 109-10.

16    Tr. at 68-70.

17    Tr. at 74, 87-88.

18    Tr. at 71-72. In addition to her testimony at the hearing, Dr. Porterpan's discharge letter summarizing her care of Sarge states that Respondent had "explained that she must have been distracted while during the procedure leaving one testicle and not completing the surgery." Staff Ex. 4.

19    Tr. at 278.

20    Resp. Ex. 2. In her complaint, Ms. Odle also alleged that Respondent's "botched surgery" caused Sarge's death. Staff, however, has not alleged that Respondent is responsible for Sarge's fatal illness.

21    Staff Ex. 1.

22    Tr. at 310 (emphasis added).

23    Tr. at 312.

24    In her testimony, Respondent said she did not "necessarily" agree that testicles cannot descend into the scrotum after six months, but she agreed "that it is not common." Tr. at 279.

25    Tr. at 310.

26    Tr. at 225.

27    Tr. at 164-65.

28    Tr. at 311; Staff Ex. 2; Resp. Ex. 8.

29    Tr. at 104.

30    Staff Exs. 2, 4; Resp. Exs. 5, 6, 8.

31    Tr. at 197.

32      Tr. at 288.

33      Tr. at 318.

34      Resp. Ex. 6.

35      Tr. 177-78.

36      Tr. at 286.

37      Dr. Stickney criticized the reliability of the horse report, noting that it was "more of an anecdotal report." Tr. at 247. Dr. Lewis likewise noted that the horse report was not a peer-reviewed article, and that the horse involved may not have been sexually mature, unlike Sarge. Tr. at 155. As for the cases of polyorchidism in dogs, Drs. Lewis and Stickney distinguished them by noting that the polyorchid testicles in those dogs were irregular or "retained," and that those cases did not necessarily suggest that the polyorchid testicle could behave like a "normal" testicle or descend into the scrotum of an adult dog. Tr. at 162, 246.

38      Tr. at 251-52.

39      Tr. at 160-64.

40      *Compare* 22 Tex. Admin. Code § 573.22 *with* Tex. Occ. Code 801.402(16).

41      *See City of Dallas v. Stewart*, 361 S.W.3d 562, 568 (Tex. 2012) (agencies "lack the ultimate power of constitutional construction"); *Texas State Bd. of Pharmacy v. Walgreen Texas Co.*, 520 S.W.2d 845, 848 (Tex. Civ. App.-Austin 1975, writ ref d n.r.e.) ("Administrative agencies have no power to determine the constitutionality of statutes.").

42      Tr. at 84-85 (Dr. Porterpan), 169 (Dr. Lewis), 260 (Dr. Stickney), 274 (Dr. Mercer).

43      Tr. at 169 (Dr. Lewis), 260 (Dr. Stickney), 274 (Dr. Mercer). Dr. Porterpan declined to opine on whether the standard of care required a search for additional testicles after two were removed. Tr. at 84.

44      1 Tex. Admin. Code § 155.427; *Scally v. Tex. State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 437 n.15 (Tex. App.-Austin 2011, pet. denied); 22 Tex. Admin. Code § 573.22 (2006 ver).

45      *Murff v. Pass*, 249 S.W.3d 407, 409 n.l (Tex. 2008); Tex. R. Civ. P. 226a.

46      Tr. at 310, 312.

47      Staff Ex. 1.

48      612 S.W.2d 199 (Tex. 1980).

49      455 S.W.2d703 (Tex. 1970).

50      612S.W.2dat204.

51      455 S.W.2d 706-07.

52      *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001). The supreme court referred to the jury as fact-finder in *Lozano*, but in administrative cases like this one, it is the ALJ who acts as fact finder. *See* Tex. Gov't Code § 2001.062(c).

53      Tr. at 203-04.

54      Staff Ex. 3a;Resp. Ex. 1.

55      Staff Ex. 3a at p. 4.

56      Staff Ex. 5.

57      1 Tex. Admin. Code § 155.419(b)(2).

58      *Id*. § 155.419(b)(3).

59      *Id*. § 155.419(b)(4).

60      *City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 774 (Tex. 2006).

61      22 Tex. Admin. Code § 573.52(a)(10), (11) (2006 ver). This rule was amended effective June 14, 2012, though the substantive provisions at issue in this case are also found, with minor revisions, in the current rule.

62      Staff Ex. 2. At the hearing, Respondent also submitted a copy of Sarge's records that included a Rabies Vaccination Certificate. Resp. Ex. 8.

63      The cage card seems to be a form with spaces for writing in notes reflecting the administration of certain drugs, but the copies of the card introduced in evidence are almost completely illegible. Staff Ex. 2 at p. R00010; Resp. Ex. 8 at p. 3.

64      Dr. Lewis testified that ketoprofen and ketofen are the same drug. Tr. at 211.

65      Drs. Lewis and Stickney agreed that ketamine generally comes in a standard 100-milligrams/mil concentration. Tr. at 191, 239-40. However, there was no evidence beyond Respondent's bare assertion that ketoprofen and diazepam are sold in just one standard concentration.

66      Tr. at 190, 240.

67      Tr. at 240.

68      Tr. at 235-36.

69     Staff Ex. 2atR0008.

70     Tr. at 306.

71     The Kaufmann County Animal Awareness Project charged $55 to neuter a dog "Over 70.5 lbs" and $47 for a dog "Over 46-70 lbs." Staff Ex. 2 at R0007.

72     Tr. at 291.

73     Tr. at 54.

74     22 Tex. Admin. Code § 573.71 (2006 ver). The same provision is also found in the Board's current rules. 22 Tex. Admin. Code § 573.72.

75     Tex. Occ. Code § 801.002(5).

76     22 Tex. Admin. Code § 573.26 (2006 ver). This same rule is currently found in 22 Tex. Admin. Code § 573.27.

77     Resp. Ex. 2 at p. 2.

78     Staff Ex. 2 at R0007; Resp. Ex. 8 at 1; Tr. at 293-94.

79     Staff Ex. 2 at R00010; Resp. Ex. 8 at 3; Tr. at 294.

80     Staff Ex. 2atR0006.

81     Resp. Ex. 6 at MERCER 107.

82     Resp. Ex. 5 at TBVME 116.

83     Tr. at 99, 101.

84     Tr. at 102-03.

85     Tr. at 97-98.

86     Staff Ex. 2atR0007.

87     Tex. Occ. Code § 801.407(c).

88     22 Tex. Admin. Code § 575.25 (2006 ver). Though this rule has since been amended, the provisions applicable to this case are unchanged as they apply to Respondent.

89     *Id*. § 575.25(a) (2006 ver).

90     *Id*. § 575.25(c) (2006 ver.). On October 18, 2011, the Board approved an Agreed Order with Respondent finding that she had "administered, dispensed, and prescribed controlled substances" during a one-year period during which her controlled substance registration with the Texas Department of Public Safety had expired and not been renewed. This was a violation of the Board's Rules of Professional Conduct, and the Agreed Order required Respondent to pay a $500.00 penalty for the violation. Staff Ex. 3. Michael Miller, the Board's chief investigator, acknowledged that the violation addressed in the Agreed Order was "towards the lower end of the violations" the Board addresses. Tr. at 26.

91     22 Tex. Admin. Code § 575.25(b)(l)(B).

92     *Id*. § 575.25(b)(2).

93     *Id*. § 575.25(b)(3).

94     In fact, there was some evidence that Ms. Odle was refunded the cost of Sarge's neuter surgery, ameliorating any economic harm to Ms. Odle. Tr. at 59-60.

95     22 Tex. Admin. Code § 575.24 (2006 ver). Though this rule has since been amended, the current rule is substantively identical insofar as it applies to Respondent.

**2013 WL 1785492 (TX.St.Off.Admin.Hgs.)**

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 7

Texas Administrative Code
  Title 22. Examining Boards
    Part 24. Texas Board of Veterinary Medical Examiners
      Chapter 571. Licensing
        Subchapter D. License Renewals

22 TAC § 571.61

Tex. Admin. Code tit. 22, § 571.61

§ 571.61. Inactive License Status

Currentness

(a) Application. A licensee may request his/her license be placed on inactive status, whether or not he/she is practicing within the State of Texas, provided:

(1) his or her current license is active and is in good standing;

(2) a request in writing, on the form prescribed by the Board, is made for his or her license to be placed on official inactive status; and

(3) the original request is made during the annual license renewal period between January 1 and February 28; provided however, that subsequent requests for continued inactive status may be accepted by the Board at any time during the renewal year if accompanied by the appropriate delinquent penalty.

(b) Restrictions. The following restrictions shall apply to veterinary licensees whose licenses are on inactive status:

(1) Except as provided in § 801.004, Texas Occupations Code, the licensee may not engage in the practice of veterinary medicine or otherwise provide treatment to any animal in the State of Texas.

(2) If the licensee possesses or obtains a federal Drug Enforcement Administration (DEA) and/or a Department of Public Safety (DPS) controlled substances registration for a Texas location, the licensee must comply with § 573.43 and § 573.50 of this title (relating to Misuse of DEA Narcotics Registration and Controlled Substances Records Keeping for Drugs on Hand, respectively).

(c) Return to Active Status. A licensee on inactive status wishing to practice within the State of Texas must receive written approval from the Board prior to returning to active status. In addition to other information which may be requested or required by the Board, the following conditions apply to licensees applying to return to active status.

(1) A licensee who is licensed and practicing in another state or jurisdiction must prove he or she is in good standing in that state or jurisdiction.

(2) A licensee on inactive status must pay the total annual renewal fee, less the amount of the inactive annual renewal fee, plus a $25 administrative processing fee to obtain a regular license. The regular annual renewal fee shall not be prorated for applications to return to active status made after the annual renewal period.

(d) Continuing Education Requirements.

(1) If a licensee on inactive status requesting a return to regular license status has maintained an annual average equal to the number of continuing education hours required annually for renewal of the license, not including any portion of the reactivation year, the licensee will be placed on regular license status without any additional requirements. If the average annual continuing education is less than the number of hours required annually for renewal of the license, the licensee will be placed on regular license status but must complete twice as many continuing education hours as is required to renew the license in the twelve months immediately following the licensee's attaining of regular license status.

(2) For the year of reactivation, proof of continuing education shall not be required for an active license renewal in the year following reactivation.

(3) For purposes of this subsection, the terms "year" and "annual" mean the calendar year.

(e) Cancellation of Inactive License. A license maintained on inactive status will be automatically cancelled at the end of nine consecutive years. A new license will be issued only upon completion of all requirements for licensure. During the ninth consecutive year of inactive status, the Board will notify the inactive licensee that during the following year, his or her license must be on regular status or the license will be cancelled.

(f) Annual Renewal Fees. The annual fee for a license on inactive status shall be as set by the Board in § 577.15 of this title (relating to Fee Schedule).

**Credits**
**Source:** The provisions of this §571.61 adopted to be effective May 29, 2011, 36 TexReg 3187; amended to be effective June 19, 2012, 37 TexReg 4424; amended to be effective May 4, 2014, 39 TexReg 3423.

Current through 40 Tex.Reg. No. 5104, dated August 7, 2015, as effective on or before August 7, 2015

22 TAC § 571.61, 22 TX ADC § 571.61

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 8

Texas Administrative Code
   Title 22. Examining Boards
      Part 24. Texas Board of Veterinary Medical Examiners
        Chapter 573. Rules of Professional Conduct
          Subchapter A. General Professional Ethics

22 TAC § 573.6

Tex. Admin. Code tit. 22, § 573.6

§ 573.6. Restriction of Partnerships to Members of Veterinary Profession

Currentness

In the formation of partnerships for the practice of veterinary medicine, no person shall be admitted as a partner who is not a member of the veterinary profession, duly authorized to practice, and amenable to professional discipline. No person shall be held out as a practitioner of veterinary medicine or a member of the firm who is not so admitted. In the selection and use of a firm name, no false or misleading name shall be used. Partnerships between veterinarians and members of other professions or nonprofessional persons shall not be formed or permitted if a part of the partnership employment consists of the practice of veterinary medicine.

**Credits**

**Source:** The provisions of this §573.6 adopted to be effective June 14, 2012, 37 TexReg 4229.

Current through 40 Tex.Reg. No. 5104, dated August 7, 2015, as effective on or before August 7, 2015

22 TAC § 573.6, 22 TX ADC § 573.6

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 9

Texas Administrative Code
  Title 22. Examining Boards
    Part 24. Texas Board of Veterinary Medical Examiners
      Chapter 573. Rules of Professional Conduct
        Subchapter A. General Professional Ethics

22 TAC § 573.7
Tex. Admin. Code tit. 22, §573.7

§ 573.7. No Abuse of Position or Trust

[Currentness](#)

Any licensee who uses present or past position, or office of trust, deliberately to create an individual professional advantage, or to coerce, or to deceive the public shall be in violation of the rules of professional conduct. A licensee may not influence, or attempt to influence, the statement, response, or opinion of any person, licensed or unlicensed, to the Board if the Board has requested the statement or opinion.

**Credits**
**Source:** The provisions of this §573.7 adopted to be effective June 14, 2012, 37 TexReg 4229.

Current through 40 Tex.Reg. No. 5104, dated August 7, 2015, as effective on or before August 7, 2015

22 TAC § 573.7, 22 TX ADC § 573.7

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 10

Vernon's Texas Statutes and Codes Annotated
  Health and Safety Code (Refs & Annos)
    Title 10. Health and Safety of Animals
      Chapter 826. Rabies
        Subchapter B. General Powers and Duties of Executive Commissioner, Department, and Local Governments

V.T.C.A., Health & Safety Code § 826.016

§ 826.016. Contracts

[Currentness](#)

The governing body of a municipality and the commissioners court of a county may enter into contracts or agreements with public or private entities to carry out the activities required or authorized under this chapter.

**Credits**

Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989.

**Editors' Notes**

**REVISOR'S NOTE**

**2010 Main Volume**

The revised law omits the source law reference to "incorporated" for the reason stated in Revisor's Note (1) under Section 826.011.

Notes of Decisions (1)

V. T. C. A., Health & Safety Code § 826.016, TX HEALTH & S § 826.016
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 11

Vernon's Texas Statutes and Codes Annotated
  Occupations Code (Refs & Annos)
    Title 4. Professions Related to Animals (Refs & Annos)
      Chapter 801. Veterinarians (Refs & Annos)
        Subchapter A. General Provisions

V.T.C.A., Occupations Code § 801.001

§ 801.001. Short Title

[Currentness]

This chapter may be cited as the Veterinary Licensing Act.

**Credits**

Acts 1999, 76th Leg., ch. 388, § 1, eff. Sept. 1, 1999.

Notes of Decisions (1)

V. T. C. A., Occupations Code § 801.001, TX OCC § 801.001
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 12

---

> Vernon's Texas Rules Annotated
>   Texas Rules of Appellate Procedure
>     Section One. General Provisions

TX Rules App.Proc., Rule 11

Rule 11. Amicus Curiae Briefs

Currentness

An appellate clerk may receive, but not file, an amicus curiae brief. But the court for good cause may refuse to consider the brief and order that it be returned. An amicus curiae brief must:

(a) comply with the briefing rules for parties;

(b) identify the person or entity on whose behalf the brief is tendered;

(c) disclose the source of any fee paid or to be paid for preparing the brief; and

(d) certify that copies have been served on all parties.

**Credits**
Eff. Sept. 1, 1997. Amended by Supreme Court Dec. 23, 2002, eff. Jan. 1, 2003.

**Editors' Notes**

**NOTES AND COMMENTS**
   Comment to 1997 change: This is former Rule 20. The rule is rewritten and now requires disclosure of the identity of the person or entity on whose behalf the brief is filed, and the source of any fee paid.

   Comment to 2002 change: The change expressly recognizes that a court may refuse to consider an amicus curiae brief for good cause.

Notes of Decisions (1)

Rules App. Proc., Rule 11, TX R APP Rule 11
Current with amendments received through 6/1/2015

---

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

# APPENDIX 13

Texas Administrative Code
　Title 22. Examining Boards
　　Part 24. Texas Board of Veterinary Medical Examiners
　　　Chapter 571. Licensing
　　　　Subchapter D. License Renewals

22 TAC § 571.61

Tex. Admin. Code tit. 22, § 571.61

§ 571.61. Inactive License Status

Currentness

(a) Application. A licensee may request his/her license be placed on inactive status, whether or not he/she is practicing within the State of Texas, provided:

(1) his or her current license is active and is in good standing;

(2) a request in writing, on the form prescribed by the Board, is made for his or her license to be placed on official inactive status; and

(3) the original request is made during the annual license renewal period between January 1 and February 28; provided however, that subsequent requests for continued inactive status may be accepted by the Board at any time during the renewal year if accompanied by the appropriate delinquent penalty.

(b) Restrictions. The following restrictions shall apply to veterinary licensees whose licenses are on inactive status:

(1) Except as provided in § 801.004, Texas Occupations Code, the licensee may not engage in the practice of veterinary medicine or otherwise provide treatment to any animal in the State of Texas.

(2) If the licensee possesses or obtains a federal Drug Enforcement Administration (DEA) and/or a Department of Public Safety (DPS) controlled substances registration for a Texas location, the licensee must comply with § 573.43 and § 573.50 of this title (relating to Misuse of DEA Narcotics Registration and Controlled Substances Records Keeping for Drugs on Hand, respectively).

(c) Return to Active Status. A licensee on inactive status wishing to practice within the State of Texas must receive written approval from the Board prior to returning to active status. In addition to other information which may be requested or required by the Board, the following conditions apply to licensees applying to return to active status.

(1) A licensee who is licensed and practicing in another state or jurisdiction must prove he or she is in good standing in that state or jurisdiction.

(2) A licensee on inactive status must pay the total annual renewal fee, less the amount of the inactive annual renewal fee, plus a $25 administrative processing fee to obtain a regular license. The regular annual renewal fee shall not be prorated for applications to return to active status made after the annual renewal period.

(d) Continuing Education Requirements.

(1) If a licensee on inactive status requesting a return to regular license status has maintained an annual average equal to the number of continuing education hours required annually for renewal of the license, not including any portion of the reactivation year, the licensee will be placed on regular license status without any additional requirements. If the average annual continuing education is less than the number of hours required annually for renewal of the license, the licensee will be placed on regular license status but must complete twice as many continuing education hours as is required to renew the license in the twelve months immediately following the licensee's attaining of regular license status.

(2) For the year of reactivation, proof of continuing education shall not be required for an active license renewal in the year following reactivation.

(3) For purposes of this subsection, the terms "year" and "annual" mean the calendar year.

(e) Cancellation of Inactive License. A license maintained on inactive status will be automatically cancelled at the end of nine consecutive years. A new license will be issued only upon completion of all requirements for licensure. During the ninth consecutive year of inactive status, the Board will notify the inactive licensee that during the following year, his or her license must be on regular status or the license will be cancelled.

(f) Annual Renewal Fees. The annual fee for a license on inactive status shall be as set by the Board in § 577.15 of this title (relating to Fee Schedule).

**Credits**
**Source:** The provisions of this §571.61 adopted to be effective May 29, 2011, 36 TexReg 3187; amended to be effective June 19, 2012, 37 TexReg 4424; amended to be effective May 4, 2014, 39 TexReg 3423.

Current through 40 Tex.Reg. No. 5104, dated August 7, 2015, as effective on or before August 7, 2015

22 TAC § 571.61, 22 TX ADC § 571.61

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 14

Texas Administrative Code
  Title 22. Examining Boards
    Part 24. Texas Board of Veterinary Medical Examiners
      Chapter 573. Rules of Professional Conduct
        Subchapter G. Other Provisions

22 TAC § 573.72
Tex. Admin. Code tit. 22, § 573.72

§ 573.72. Employment by Nonprofit or Municipal Corporations

Currentness

(a) A nonprofit or municipal corporation may employ or contract with a veterinarian to provide veterinary services in connection with sheltering, sterilization, vaccination, or other medical care and treatment of animals.

(b) Employment by or contractual service to a nonprofit or municipal corporation does not exempt the veterinarian from any of the provisions of the Veterinary Licensing Act or the Board's rules.

(c) Veterinarians employed by, or contracted to, nonprofit or municipal corporations shall be liable for any violations of the Act or rules occurring as a result of the practice of veterinary medicine or any veterinary services provided by the nonprofit or municipal corporation, including those occurring due to the acts or omissions of non-licensed employees of, or volunteers for, the nonprofit or municipal corporation.

**Credits**
**Source:** The provisions of this §573.72 adopted to be effective June 14, 2012, 37 TexReg 4229.

Current through 40 Tex.Reg. No. 5104, dated August 7, 2015, as effective on or before August 7, 2015

22 TAC § 573.72, 22 TX ADC § 573.72

**End of Document**                                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.